IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MERLE L. ROYCE,  )
  )
        Plaintiff,  )
  )
v.  )   Case No. 15 C 259
  )
MICHAEL R. NEEDLE, P.C., et al.,  )
  )
        Defendants.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Merle Royce ("Royce") brought this interpleader action to determine the proper allocation of settlement funds received upon the resolution of Amari Co. v. Burgess, Case No. 07 C 1425 (the "Amari litigation"), a nearly seven-year-old civil RICO lawsuit that spawned over 1200 docket entries. Royce and defendant Michael Needle ("Needle") were co-counsel to all 16 of the plaintiffs in that case at the time it settled. And because the fees and expenses to be paid to Royce and Needle out of the settlement proceeds are the linchpin to a determination of the amounts recoverable by the various plaintiffs, this Court has directed the litigants to address that subject first.

Royce and 15 of the 16 Amari litigation plaintiffs (the "Amari Group Parties") contend that the lawyers are entitled to one-third of the settlement proceeds. Needle, in his Amended Counterclaim Count IV asserted against Royce and in his Amended Counterclaim Count III

asserted against the Amari Group Parties,[1] urges that the lawyers are entitled to much more.[2] Royce and the Amari Group Parties have filed Fed. R. Civ. P. ("Rule") 12(b)(6) motions to dismiss those two Counterclaims with prejudice.[3] For the reasons set out in this opinion, both motions are granted.

## Standard of Review

Under Rule 12(b)(6) a party may move for dismissal for the "failure to state a claim upon which relief can be granted." Familiar Rule 12(b)(6) principles require the district court to accept as true all of Needle's well-pleaded factual allegations and view them in the light most favorable to him as the non-moving party (Lavalais v. Vill. of Melrose Park, 734 F.3d 629, 632 (7th Cir. 2013)). But "legal conclusions or conclusory allegations that merely recite a claim's elements" are not entitled to any presumption of truth (Munson v. Gaetz, 673 F.3d 630, 632 (7th Cir. 2012)).

In recent years the Supreme Court has made an important change in the evaluation of Rule 12(b)(6) motions via what this Court regularly refers to as "the Twombly-Iqbal canon" (a

---

[1] This opinion cites to the Counterclaim in Needle's filing labeled "Amended Answer and Affirmative Defenses to the Amended Complaint and Counterclaims Against Royce" as "N. Cc. against Royce ¶ --." It similarly cites to the Counterclaim in "Needle's Amended Answer and Affirmative Defenses to the Amari Group Parties' Cross Claims and Counterclaims Against the Amari Group Parties" as "N. Cc. against AGP ¶ --." Additionally, Royce's Amended Complaint for Interpleader is cited as "Am. Compl. ¶ --," and the Amari Group's response to that pleading is cited as "AGP Ans. ¶ --."

[2] John Cardullo & Sons, the sixteenth plaintiff who was a party to the settlement, agrees with Needle that the lawyers are entitled to collect more than one-third, but that plaintiff is not involved in the instant motions.

[3] This opinion cites to the Amari Group Parties' moving memorandum as "AGP Mem.," to Needle's consolidated response to both motions as "N. Resp.," to his declaration in support of that response as "N. Decl." and to the Amari Group Parties' reply brief as "AGP Reply."

usage drawn from (1) Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), as more finely tuned in Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam), and (2) Ashcroft v. Iqbal, 556 U.S. 662 (2009)). That canon has introduced the concept of "plausibility" into the analysis, and in that respect our Court of Appeals has "interpreted Twombly and Iqbal to require the plaintiff [or counterclaimant] to provid[e] some specific facts to support the legal claims asserted" (McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011) (internal quotation marks omitted but brackets in original)). As McCauley, id. went on to reconfirm, claimants must set out "enough details about the subject-matter of the case to present a story that holds together."

Because their focus is on the pleadings, Rule 12(b)(6) motions "can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice" (Geinosky v. City of Chicago, 675 F.3d 743, 745 n.1 (7th Cir 2012)).[4] But a nonmovant has more flexibility, for he "may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings" (see id.).

Upon dismissal, courts should usually give a claimant at least one opportunity to amend (Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago, 786 F.3d 510, 519 (7th Cir. 2015). And consistent with the principles of Rule 15(a)(2), courts generally grant leave to amend freely. But where "it is certain . . . that any amendment would be futile or otherwise unwarranted," the court can deny leave to amend (id. at 520).

---

[4] In the context of this opinion, "counterclaim" should be substituted for "complaint" in that quotation from Geinosky.

## Facts for Rule 12(b)(6) Purposes

All parties agree that the terms of the original fee agreement drafted by Needle and the two lawyers then associated with him (before Royce came into the picture) (the "Fee Agreement," attached as Ex. 1 to the Am. Compl.[5]) govern this dispute, and specifically, its Section IV.1. Needle has disclaimed any contention that the parties modified that contract post-execution (N. Cc. against Royce ¶ 322; N. Ans. to AGP ¶ 318).

Section IV.1 provides that the lawyers shall be collectively entitled to collect a contingency fee:

> equal to the greater of: (A) any fee paid to us pursuant to a judgment and award of fees under the RICO or other fee shifting statute or pursuant to any settlement agreement, or (B) one-third of any recovery actually received, with the recovery to be computed as any and all damages, treble damages, punitive damages, costs, expenses, attorney's fees or other compensation actually paid, whether pursuant to settlement agreement or judgment, less any retainer paid pursuant to Section V below.

Here the Amari litigation culminated in a written settlement agreement, but that agreement is totally silent on the subject of attorneys' fees.[6]

Royce and the Amari Group Parties assert that because no fee is specified (or even referred to) in the settlement agreement, Section IV.1(B) controls and the lawyers may collect only one-third of the ▓▓▓▓▓▓ in aggregate settlement proceeds (Am. Compl. ¶ 33; AGP Ans. ¶ 33). For his part, Needle contends that Section IV.1(A) controls, for he asserts that the parties separately agreed to pay the lawyers approximately $▓▓▓▓▓▓ in their discussions leading up

---

[5] Further references to the Fee Agreement simply take the form "Section --."

[6] That settlement agreement, which is reproduced as AGP Mem. Ex. B, can properly be considered here, for it is critical to, and is referred to in, the Needle Counterclaims.

to the settlement,[7] and that the plaintiffs understood that they would recoup only enough to be made whole (N. Cc. against Royce ¶¶ 6-7, 15, 323; N. Cc. against AGP ¶¶ 6-7, 15, 319). Although not written into the settlement document itself, Needle asserts that the purported agreement (one as to which, as n.6 reflects, he himself expressed conflicting versions) was still "pursuant to" the written settlement agreement (N. Cc. against Royce ¶¶ 322-28; N. Cc. against AGP ¶¶ 318-24). Before this opinion delves into the law on those competing positions, it is important to provide context on the Fee Agreement, the litigation and the settlement.

**Fee Agreement**

As stated earlier, Needle and his then co-counsel drafted the Fee Agreement back in 2008, before Royce joined the litigation team (N. Cc. against Royce ¶¶ 72-81). Needle himself prepared and circulated three drafts, with input from his then co-counsel, and the plaintiffs signed off on it (id. ¶¶ 72-81). Around that time Needle informed the plaintiffs that the best that they could expect to recover was 100% of their damages and expenses plus legal fees (id. ¶ 76). Two of the plaintiffs, Shelly Amari ("Amari") and Lee Gilbert ("Gilbert"), commented that "100 cents on the dollar" would be a "great victory" (id. ¶ 78). That said, however, the Fee Agreement did not at all limit plaintiffs to such a recovery: Instead it specified that after payment of legal fees and other expenses, any recovery would be distributed "pro rata" in proportion to each client's damages -- but that by no means capped their recoveries

---

[7] Among other problems with Needle's position, a subject dealt with in depth later, he has shifted ground at different times in attempting to quantify the purported agreement as to fees (his memorandum in opposition to the motions states that the fee was between ▓▓▓ and ▓▓▓ (N. Resp. 1)) -- an approach that, because he cannot and does not say that a mutual agreement was reached on the most critical term (the <u>amount</u> of the claimed fee), does serious violence to the fundamental principles of the law of contracts learned as far back as Contracts 101.

(Section VI.3). That of course made perfect sense -- after all, the underlying lawsuit was brought under civil RICO, which can result in plaintiffs' collection of as much as treble damages (see 18 U.S.C. § 1964(c)).

Before the story moves forward, it is also important to note one other crucial provision in the Fee Agreement. Section VI.2 outlines the process for approval of a settlement and requires that any decision to accept a settlement offer must:

> be made by all active clients after notice of the same, which shall include a copy of the actual settlement proposal or proposed settlement agreement, counsel's recommendation regarding the settlement, and a deadline by which to indicate acceptance or rejection. No settlement will be accepted save upon approval by fax, email or mail of at least 2/3's of the active and existing clients at the time notice . . . is given.

For reasons that will become clear, Section VI.2 is also crucial for determining how much money the lawyers may receive.

**Litigation, Mediation and Settlement**

Over the next several years, Needle "devoted his solo practice almost entirely to the RICO Case" (N. Cc. against Royce ¶ 10). Though other lawyers, including Royce, committed to serving as lead counsel, Needle repeatedly found himself picking up for their slack (see, e.g., id. ¶¶ 97-98, 139).

Finally in 2013, the civil RICO litigants began to consider settlement seriously (id. ¶ 171). Former Magistrate Judge Morton Denlow held two mediation sessions in September of that year (id. ¶¶ 199, 202-08). Although neither of those culminated in settlement -- this Court's colleague Judge Jay Tharp brokered that in November, after the mediation had twice failed (id. ¶¶ 228-29) -- Needle seeks to rely extensively on mediation communications to support his claim that the parties reached a separate understanding on fees in the course of settlement negotiations.

But as this opinion later details, the Illinois Mediation Act (the "Mediation Act," 710 ILCS 35/1 et seq.) forbids consideration of those communications. Hence the analysis that follows next will treat with the issues without such consideration, after which this opinion will go on to show that even if that statutorily-barred forbidden fruit <u>were</u> to be tasted the legal result would be the same: the dismissal of Counts III and IV.

To return to the appropriately-considered Rule 12(b)(6) facts, it has already been noted that on November 14, 2013 Judge Tharp brokered an oral compromise and declared the case settled for ███████, ordering that the parties memorialize the agreement in writing by November 22 (id. ¶ 228-29). On November 16 Needle and Royce prepared a preliminary notice of settlement, which Needle e-mailed to the plaintiffs (id. ¶ 230). That e-mail set out the aggregate amount of the settlement (███████) and explained that it (id.):

> should be enough to (1) refund all moneys paid [by] each of you to IPA, ITA, AA, ITA-IS (Amari litigation defendants); (2) cover incidental and consequential damages due to IPA's "racketeering" which any of you have established; (3) cover expenses, including (a) contributions made to the Litigation Fund, (b) fees due Merle and I for our work and (c) other responsibilities some of you may have under the terms of the fee agreement.

Concisely stated, the notice explained that the ███████ settlement would be enough to make each of the plaintiffs whole and cover litigation expenses, including legal fees. But absent from that notice is any specification of the amount of those legal fees (N. Decl. Ex. 9).[8] Three plaintiffs purportedly responded to the notice in frustration that they would recover only single damages (N. Cc. against Royce ¶ 228) (again remember that civil RICO carries with it the

---

[8] This opinion may consider the preliminary notice of settlement because it is quoted in Needle's Counterclaims and, pursuant to <u>Geinosky</u>, Needle has the right to elaborate upon his Counterclaims.

prospect of recovering treble damages) -- but nothing in the notice indicated to all plaintiffs that their recovery was so limited.

After negotiating back and forth the parties arrived at a written settlement agreement on November 22, and that document was sent to all plaintiffs (id. ¶¶ 229-30). Shortly thereafter (on November 25) Needle circulated a final notice of settlement to explain the "core terms of the settlement," recommend that the plaintiffs accept it and outline the process for approval pursuant to the Fee Agreement (id. ¶228). By December 5, 2013 all parties had executed the Settlement Agreement and on December 10, the parties entered a Stipulated Order of Dismissal (id. ¶¶ 233-34).

Without any attempt to explain why -- if, that is, Needle were right about an agreement having been reached on the amount of fees -- it is clear that he did not take the normal (and really essential) step of embodying that in the settlement document sent to the plaintiffs for their required 2/3 approval, Needle seeks to point to other matters to support his theory that the lawyers were entitled to approximately (!) ▓▓▓▓ and that the clients were limited to recouping damages and expenses in an amount somewhere between ▓▓ and ▓▓▓▓ (for a grand total of about ▓▓▓▓) (N. Decl. ¶¶ 5, 9-10, 13, 15, 19-20). More specifically, Needle points to public court filings and other post-settlement plans to divide the proceeds. For instance, the plaintiffs' Rule 26.1 statements, their interrogatories and the final pretrial order (N. Cc. against Royce ¶¶ 101-02, 107, 174) enumerated their damages. But Needle does not allege that any of those filings limited their <u>recovery</u> to those enumerated damages.[9]

---

[9] This paragraph and the one that follows are elaborated on in the section of this opinion that sets out the legal analysis of the issues.

Needle also raises a number of other post-settlement individual proposals as to division of the proceeds. For instance, one plaintiff specifically stated that he "simply" wanted to be compensated for his damages (id. ¶ 270). Members of the Management Committee also proffered a proposal under which ▓▓▓▓▓ would go to the lawyers (id. ¶¶ 250, 256). But when Needle countered that the lawyers were entitled to collect ▓▓▓▓▓, Amari retracted the offer and adopted the "1/3 theory" (id. ¶ 266).[10] That April Amari called Needle and told him that if the one-third provision did govern so that the lawyers received ▓▓▓▓▓, it would free up ▓▓▓▓▓ in funds previously earmarked for legal fees -- an implicit admission, in Needle's mind, that the lawyers would otherwise have been entitled to collect approximately ▓▓▓▓▓ (the sum of ▓▓▓▓▓ and ▓▓▓▓▓) (id. ¶ 293). But once more that mindset cannot alter what this opinion will show to be the normal reading of the Fee Agreement as well as the consequence of (1) the continued failure of the lawyers and clients to reach an express agreement on fees and (2) the omission of any reference to fees in the settlement agreement sent to and approved by the clients.

**Dismissal of Counterclaim Counts III and IV**

Contract interpretation is a matter of law (Gallagher v. Lenart, 226 Ill. 2d 208, 219, 874 N.E.2d 43, 50 (2007)), and here Section IX.9 specifies that Illinois law governs. In interpreting a contract a court's primary objective is to give effect to the intent of the parties at the time the contract was drafted (Gallagher, id. at 232, 874 N.E.2d at 58), so long as it does not conflict with

---

[10] Once again the law of contracts has a good deal to say about the effect (really the lack of effect) of unaccepted offers -- of negotiations that fail to reach accord as to the amount at issue.

law or public policy (Intersport, Inc. v. Nat'l Collegiate Athletic Ass'n, 381 Ill. App. 3d 312, 319, 885 N.E.2d 532, 538 (1st Dist. 2008)).

To ascertain the parties' intent, courts look first to the language of the contract (id.). But because courts cannot discern intent from any one provision in isolation, they view each provision in light of the others, and construe the contract as a whole (id.). For that purpose a term is ambiguous only if the language is "reasonably susceptible to more than one meaning" (Thompson v. Gordon, 241 Ill. 2d 428, 443, 948 N.E.2d 39, 48 (2011)). In that case courts can consider extrinsic evidence to ascertain intent (id. at 441, 948 N.E.2d at 47). But a contract is not ambiguous simply because the parties disagree about its meaning (id. at 443, 948 N.E.2d at 48).

In this case it is clear from the language of the Fee Agreement (both Section IV.1 and later provisions of the contract) that Section IV.1(B) governs this dispute, not Section IV.1(A). Experience teaches that documents memorializing the settlement of lawsuits -- "settlement agreements" -- almost universally embody the understanding of how much out of the proceeds of settlement go to the lawyers handling the case. There may perhaps be an occasional rare bird in which that is not so, though no such occasion comes to this Court's recollection, but in any event any such possibility simply does not suffice to render the words ambiguous. No, the plain meaning of the words in Section IV.1(A) is that the phrase "pursuant to any settlement agreement" means "as embodied in any settlement agreement." No one (save perhaps a lawyer seeking to make "the worse appear the better reason" (Diogenes, Socrates 5)) would understand that phraseology to encompass informal side agreements not specified in the written settlement document itself.

Needle cites to two dictionaries and a lot of unpersuasive case law to support his tortured textual argument that "pursuant to" does not mean "specified in."[11] It is true that when divorced from context the words "pursuant to" can carry multiple meanings, ranging from a more narrow meaning such as "according to" to a broader meaning such as "in conformity with" (Pursuant To, Merriam-Webster, http://www.merriam-webster.com/dictionary/pursuant%20to (last visited Aug. 17, 2015)). But "Illinois construes attorney contingent fee agreements strictly in favor of clients" (In re Solis, 610 F.3d 969, 972 (7th Cir. 2010)). And in this context a reasonable person, whether lawyer or client, would understand Section IV.1(A) to mean that the fee must be specified in the settlement agreement itself.

Moreover, another provision of the Fee Agreement, Section VI.2, strongly supports this conclusion. That section requires that the lawyers remit to the clients a copy of the <u>written</u> settlement agreement (or proposal) before the clients approve of it. It would be absurd to conclude that the highly material term of assertedly-agreed-upon legal fees -- especially when Needle would have it that those fees amount to nearly 60% of the proceeds -- could appropriately be omitted from the writing circulated for approval, as it was here.

Furthermore, Needle's own conduct undermines the plausibility of his asserted interpretation of Section IV.1(A). If Needle truly thought that he and Royce were entitled to collect such an astronomical sum under the "pursuant to" language of Section IV.1(A), there is no question that a practitioner with Needle's litigation experience and knowhow, well manifested

---

[11] Of the cases that Needle cites, only <u>Old Colony Trust Co. v. Comm'r of Internal Revenue</u>, 301 U.S. 379 (1937) is a federal authority that is binding on this Court. It did address the meaning of the phrase "pursuant to" -- but in a context entirely irrelevant to this case. There the issue was whether certain charitable donations made by trustees were "pursuant to" a trust deed where that trust deed expressly authorized but did not mandate such donations (id. at 383). <u>Old Colony</u> held that they were (id. at 384).

and exemplified by the carefully drafted and comprehensive Fee Agreement, would have taken pains to memorialize that claimed entitlement in a document that makes clear that the entitlement was both (1) agreed upon and (2) "pursuant to" the primary Settlement Agreement, as Section IV.1(A) requires. That Needle, as drafter or codrafter of the Fee Agreement (and therefore totally familiar with its provisions), did not so act surely suggests that he did not <u>intend</u> the forced interpretation that he now asserts.

In addition, a holding in Needle's favor would also flout Illinois Rule of Professional Conduct 1.5(c) ("Rule 1.5(c)"), which requires that lawyers set out contingency fees in writing. Underlying that rule is the concern that, absent a written agreement ex ante, attorneys could wait to reduce their fees to writing "until after the work is done" and they are "in possession of the proceeds of the litigation" (In re Spak, 188 Ill. 2d 53, 67, 719 N.E.2d 747, 754 (1999)). At that point a client "may be left with the unenviable choice of agreeing with his attorney's recollection of the fee agreement, or delaying receipt of his money pending resolution of a fee dispute" (id. at 67, 719 N.E.2d at 754-55). Here the lawyers never set out their proposed fee in a writing signed by all of the clients. To the extent that Section IV.1(A) itself might be asserted to have satisfied the writing requirement, such a distorted reading would gut the effectiveness of Rule 1.5(c). That, in conjunction with everything that has come before, puts the nail in Needle's coffin on the current motions to dismiss.

Needle clearly put a great deal of time and effort into the litigation, and the outcome here doubtless represents a significant loss in hourly-rate terms. But that is really a self-inflicted wound, for he knew what his own document (the Fee Agreement) provided and had the ability to avoid the controversy that has ensued by taking the normal step of memorializing what he now contends the fee provision to mean and then submitting it to the clients for approval (a subject

dealt with in the next section of this opinion). No matter how much Needle may wish it, he cannot now rewrite the Fee Agreement that he originally authored -- or at worst coauthored.[12] Nor will this Court accept his invitation to do so.

Although identifying still another fatal flaw in Needle's position may amount to the classic piling of Ossa on Pelion, it is worth emphasizing that the clients never gave the required approval to any specific lawyers' fee, whether one of the different versions now contended for by Needle or any other. It will be recalled that under Section VI.2, for the clients to approve the terms of any settlement they must receive a copy of the written settlement proposal/agreement and at least 2/3 of them must assent in writing. But with the legal fee never having been set out in any written notice sent to the clients by the lawyers, it was never a term to which the clients properly assented. It may well be (though there is no way for this Court to know) that Needle was concerned that if he had included his contended-for fee claim in the proposed settlement agreement and had coupled that with the full disclosure required of any lawyer dealing with a client on the subject of fees (which in this case would include apprising the clients of the Section IV.1(B) alternative), that would enhance the likelihood that Needle's proposal for fees far in excess of the Section IV.1(B) figure would not obtain the necessary 2/3 client approval -- but any such concern certainly could not justify his seeking to shift the burden of decision as to the fee award to this Court, as he has sought to do.

---

[12] Stanza 71 of the Rubaiyat of Omar Khayyam had it right:

> The Moving Finger writes; and, having writ,
> Moves on: nor all your Piety nor Wit
> Shall lure it back to cancel half a Line,
> Nor all your Tears wash out a Word of it.

Needle tries to fight his way out of that box with the argument that Royce, as local counsel, was equally responsible for drafting both the preliminary and final notices of settlement. But that contention collapses of its own weight, both because it was Needle who drafted or co-drafted the original Fee Agreement with which the notices failed to comply and because he would somehow attempt to hold Royce responsible for not advancing Section IV.1(A), even though Royce unquestionably views Section IV.1(B) as the relevant provision (if that were not the case, why was this lawsuit brought in the first place?).

To turn to another losing effort on Needle's part, he attempts to call to his aid a number of communications that occurred during or in furtherance of mediation. This section will first explain why those communications are legally barred from this proceeding, and it will then go on to show that even if that were not the case they would not change the outcome on the current motions to dismiss.

Under the Illinois Mediation Act communications that occur "during a mediation" or that are "made for purposes of considering, conducting, participating in, initiating, continuing, or reconvening a mediation or retaining a mediator" (710 ILCS 35/2(2)) are "not subject to discovery or admissible in evidence in a proceeding," subject to only limited exceptions (see 710 ILCS 35/4(a), 35/5, 35/6).[13] There is no need to enumerate each specific exception -- their plain language makes them inapplicable here.

---

[13] Neither side disputes the applicability of the Mediation Act privilege here. Because state contract law governs Needle's counterclaims, state law also governs the privilege that applies to those claims (Doe v. Archdiocese of Milwaukee, 772 F.3d 437, 440 (7th Cir. 2014)). And because the Mediation Act's privileges take effect any time the "parties use as a mediator an individual who holds himself or herself out as a mediator" (710 ILCS 35/3(a)(3)), they clearly apply to the mediation communications here.

Needle contends that the Mediation Act's confidentiality provisions apply only to proceedings that are "directly related to the mediation controversy" (quoting Sara Cook and Sheryl Healy, The Uniform Mediation Act: Illinois' Newest Privilege 92 Ill. B.J. 92, 94 (2004)) and that this proceeding is not directly related to the underlying civil action because it is concerned with construing the settlement agreement. But nothing other than that law review article's naked assertion supports the contention that the Mediation Act is so circumscribed. To the contrary, neither this Court nor such nonjudicial authors are in a position to engraft new exceptions onto the Mediation Act. Instead the judicial responsibility is "to apply the . . . statute as it is written" (Doe, 772 F.3d at 443, construing Wisconsin's similar Mediation Act).

Needle alternatively argues that Royce and the Amari Group Parties cannot use "what transpired -- or what . . . did not transpire -- at the mediation as a sword" and simultaneously prohibit Needle from responding (N. Resp. 18). It is true that an individual who "discloses or makes a representation about a mediation communication which prejudices another person in a proceeding is precluded from asserting a privilege . . . to the extent necessary for the person prejudiced to respond" (710 ILCS 35/5(b)). But Needle threw the first stones in his Counterclaims, so that Royce and the Amari Group Parties' motions simply responded to Needle's representations about the mediation -- hence it is Needle who is precluded from asserting the privilege to the extent necessary for Royce and the Amari Group Parties to respond, not the other way around.

As Illinois adopted its own version of the Uniform Mediation Act, the drafter's notes to the Uniform Mediation Act reinforce the just-stated analysis. Those notes confirm that the drafters deliberately shielded oral understandings reached in the course of mediation discussions from disclosure because such an exception to the mediation privilege "has the potential to

swallow the rule of privilege" itself (Unif. Mediation Act § 6 cmt. 2 (Nat'l Conf. of Comm'rs on Unif. State Laws 2003)).

Finally, lest it mistakenly be thought that what has just been said here is essential to the result reached in this opinion, it should be added that none of the barred mediation communications would change the outcome of the instant motions to dismiss in any event. None of them changes the facts that (1) the settlement agreement did not specify attorneys' fees or (2) that the attorneys failed to notify the plaintiffs properly of any alleged separate agreement.

What follows in this paragraph briefly summarizes the communications that Needle seeks to introduce. Basically he emphasizes that during both September mediations the opening demands included requests for ▮▮▮▮ in legal fees (N. Cc. against Royce ¶¶ 195, 204) and that by the end of the second mediation Royce had hammered out a term sheet with the other side for an aggregate settlement amount of ▮▮▮▮, out of which Royce proposed that ▮▮▮▮ go to the lawyers (id. ¶ 216). But plaintiffs' Management Committee -- the committee responsible for monitoring the litigation and communicating with counsel (see Section III.1) -- rejected that term sheet (id. ¶ 218). Royce spoke with defendants and was able to bump the proposed settlement amount up to ▮▮▮▮, with ▮▮▮▮ reserved to pay the lawyers (according to Needle's understanding), but the plaintiffs rejected that settlement proposal (id. ¶¶ 223-27) and Judge Tharp then stepped into the mix.

But all of that, whatever it may show as to unrealized hopes and expectations, bumps head on into the hard fact that Section IV.1(A) was drafted to apply only if the lawyers' entitlement to fees was embodied in a court-ordered award or a client-approved settlement agreement. Judge Tharp did not bring the first of those alternatives into play, and Needle himself might have -- but did not -- bring the second into play.

### Conclusion

For the reasons stated in this opinion, Dkt. Nos. 84 and 88 are granted and Needle's Counterclaims III and IV are dismissed -- with prejudice, because Needle cannot allege via any amendment that the attorneys' fees were in the written settlement agreement itself. Indeed, Needle's proposed <u>second</u> amended pleadings, filed with this Court while the instant motions were pending, have still refrained from making any such allegation.[14] Finally, this action has previously been set for a status hearing at 9:15 a.m. August 21 (tomorrow) -- but that may well be too soon, given the need for the litigants to absorb the impact of this ruling on the future course of proceedings in this action. If so, this Court would be perfectly amenable to all counsel's communicating that sense telephonically or via e-mail to its courtroom deputy, in which event the hearing time and date will be shifted to 8:45 a.m. August 28, 2015 to discuss the next phase of the litigation.

_____
Milton I. Shadur
Senior United States District Judge

Date: August 20, 2015

---

[14] Parenthetically, the Amari Group Parties' reply submission asks this Court to order a partial distribution to the plaintiffs (AGP Reply ¶ 15). Although this Court could well entertain issuing such an order, that matter was not briefed in the instant motions and is one which all parties must weigh in. Thus the issue is reserved for the next status hearing.