**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MERLE L. ROYCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15 C 00259 |
| | ) | |
| | ) | Judge Milton I. Shadur |
| MICHAEL R. NEEDLE, P.C., *et al.*, | ) | |
| | ) | Mag. Judge Shield M. Finnegan |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS FOR RULE 11
SANCTIONS FILED BY MERLE L. ROYCE AND THE AMARI GROUP PARTIES**

Cafferty Clobes Meriwether and Sprengel LLP ("CCMS") was hired to represent an attorney in a complicated and emotionally-charged disagreement with his co-counsel and clients over the distribution of settlement proceeds from a long-pending RICO litigation. CCMS did what lawyers do – represented the client to the best of their ability. But the long and hostile battle that resulted in the filing of the instant suit had caused irreparable damage to the relationships among the parties, and CCMS's efforts to facilitate a prompt resolution of the controversy were unsuccessful. CCMS posits that the vitriolic relationship among the parties – not any purported misconduct by CCMS – has prompted the filing of these Rule 11 motions.

CCMS, together with Anthony F. Fata (collective referred to as "CCMS"), submits this Memorandum of Law in Opposition to the motions filed by Merle L. Royce ("Royce") and the Amari Group Parties ("the Amari Group") for Rule 11 sanctions against them for filing Count IV[1]

---

[1] Count IV of the Amended Counterclaim against Royce and Count III of the Amended Counterclaim against the Amari Group are the same in all material respects, so this brief will simply refer to "Count IV." (Doc. 76 and 77).

of the Amended Counterclaim on behalf of their then-client, Michael R. Needle, P.C. ("Needle").[2]
For the reasons set forth below, CCMS respectfully requests that the motions be denied and that
costs, including attorneys' fees, be awarded to CCMS for having to defend these motions.[3]

## I. INTRODUCTION

CCMS was retained in 2014 to represent Needle in connection with a fee and client
allocation dispute among counsel and plaintiffs in a now-settled RICO action. That dispute
escalated and resulted in the filing of the lawsuit here. As part of this retention, CCMS attorneys
reviewed hundreds of documents and had many extensive conversations with Needle concerning
the complicated history of the underlying RICO litigation and the complex interactions among
Needle, Royce and the Amari Group. *See* Declaration of Anthony F. Fata ("Fata Decl.") ¶ 4,
attached as Exhibit B. A subset of the documents reviewed by CCMS attorneys is attached to the
Needle Declaration filed with his opposition to the motions to dismiss. (Doc. 105). Based on these
documents and other information provided by Needle (including under-oath factual statements
made by Mr. Needle in various declarations), as well as on CCMS's legal research, CCMS
believed, in good faith, that there was a reasonable basis to assert Count IV on Needle's behalf.

---

[2] CCMS has since been granted leave to withdraw from the representation of Needle, which arose
from a difference of opinion on how to proceed in this case. This Memorandum is submitted on
its own behalf, and not on behalf of its former client. Moreover, no aspect of this Rule 11 briefing
has been coordinated with Needle. As ordered by the Court, CCMS is filing this brief a week in
advance of the brief to be filed by Needle.

[3] *See* Fed. R. Civ. P. 11(c)(2) ("If warranted, the court may award to the prevailing party the
reasonable expenses, including attorney's fees, incurred for the motion."). In a letter dated
September 10, 2015 addressed to Royce and the Amari Group, CCMS explained why the Rule 11
Motions directed to CCMS were unwarranted and requested that those parties withdraw them.
They did not and CCMS has spent a significant amount of time attending court appearances,
keeping up to date on the numerous filings in this case, and responding to these Rule 11 motions.
A copy of this correspondence is attached hereto as Exhibit A.

Royce and the Amari Group assert that Count IV was "frivolous" and lacked an evidentiary basis because a fee could not have been paid "pursuant to any settlement agreement," unless it was explicitly set forth within the four corners of the settlement document or in a separate writing. Yet neither Royce nor the Amari Group pointed to any case compelling this conclusion or foreclosing the construction of the phrase "pursuant to" urged by CCMS on Needle's behalf. Nor did Royce or the Amari Group refute any of the facts alleged in Count IV or make a showing that Count IV lacked an evidentiary basis. While this Court ultimately dismissed Count IV, that does not establish that CCMS had no reasonable basis to assert the claim on behalf of their client. "The certification is that there is (or likely will be) evidentiary support for the allegation, not that the party will prevail with respect to its contention." Fed. R. Civ. P. 11 Advisory Committee notes on 1987 amendments.[4] "Filing an original Complaint in reliance on a client's seemingly plausible representations is nothing more than what lawyers reasonably do every day." *Philos Technologies Inc. v. Philos & D. Inc*., 943 F. Supp. 2d 880, 890 (N.D. Ill. 2013) (Shadur, J.), *vacated in part on other grounds,* No. 12-3446, 2015 WL 5562178, at *11 (7th Cir. Sept. 22, 2015). As the Seventh Circuit observed, "[m]erely because plaintiffs' case proved to be weak, plaintiffs' counsel should not be reprimanded for trying to protect their clients' interests." *Harlyn Sales Corp. Profit Sharing Plan v. Kemper Fin. Serv., Inc.,* 9 F.3d 1263, 1270 (7th Cir.1993).

In addition, Royce's and the Amari Group's motions are procedurally infirm. During the safe harbor period provided under Rule 11, CCMS filed a motion to withdraw the pleading that is the subject of this Rule 11 challenge, and replace it with a second amended pleading. (Doc.106).

---

[4] The claims asserted in Count IV were "warranted by existing law or by a non-frivolous argument for extending . . . existing law. . . ." *see* Fed. R. Civ. P. 11(b)(2), the "factual allegations have evidentiary support, s*ee* Fed. R. Civ. P. 11(b)(3), and the record belies any assertion that CCMS asserted the claim for an improper purpose. Fed. R. Civ. P. 11(b)(1).

Royce and the Amari Group objected to CCMS's motion to withdraw that pleading and instead filed their Rule 11 motions attacking the prior pleading.

## II.     PROCEDURAL HISTORY

This case was commenced on January 12, 2015 when Royce filed an interpleader action against Needle and the Amari Group seeking, among other things, a determination of the aggregate amount of attorneys' fees owed to Needle and Royce under the Fee Agreement. (Doc. 1 at 17). Needle responded to the interpleader complaint in a timely fashion, alleging in his initial Counterclaim against Royce (and identical Cross Claim against the Amari Group) that Part IV. I.A ("Part A") of the Fee Agreement determined the fee payable to the attorneys. (Doc. 26). After a pretrial conference on April 23, 2015 at which this Court questioned the factual and legal underpinnings of Count IV, CCMS, on behalf of Needle, sought to and was granted leave to file an amended Count IV, which was supported with additional factual allegations that an attorneys' fee was separately negotiated during a mediation and follow up discussions that eventually lead to the settlement. That Amended Counterclaim was filed on May 15, 2015.

Royce and the Amari Group moved to dismiss Count IV of the Amended Counterclaim and while that motion was pending, served Rule 11 Notices demanding withdrawal of Count IV. Royce and the Amari Group argued that the pleading violated Rule 11(b)(1)-(3) because the legal claims were frivolous, the factual claims lacked evidentiary support, and the pleading was interposed for an improper purpose. *See, e.g.,* Royce Mem. (Doc. 138) at 9-12. Royce and the Amari Group also complained of so-called vitriolic and abusive rhetoric contained in the Amended Counterclaim. *Id.* at 13.

Following the receipt of the Rule 11 Notices, CCMS, on behalf of Needle, moved to withdraw the Amended Counterclaim and to replace it with a Second Amended Counterclaim.

(Doc. 106). Among other things, the proposed Second Amended Counterclaim added factual allegations to support the claim that a fee was separately negotiated, thus triggering the applicability of Part A of the Fee Agreement. The amended pleading also withdrew the purported "intemperate and vitriolic rhetoric." The Amari Group and Royce opposed the motion to withdraw and amend the Amended Counterclaim.

CCMS also filed a response to the pending motions to dismiss on behalf of Needle. (Doc. 102). That response and the supporting Needle Declaration was Needle's first opportunity to address in writing the arguments raised by the Amari Group and Royce in their motions to dismiss. CCMS's response provided cases to support Needle's interpretation of the Fee Agreement, and Mr. Needle's Declaraion added factual matter with evidentiary support for the claims asserted in Count IV.

On August 11, 2015, CCMS filed a motion to withdraw as counsel for Needle effective August 26, 2015. On August 20, 2015, the Court granted the motions to dismiss with prejudice. (Doc. 130). The Court found that "Section IV.1.A was drafted to apply only if the lawyers' entitlement to fees was embodied in a court-ordered award or a client-approved settlement agreement." *Id*. at 16.

On August 26, 2015, the requested effective date of CCMS's withdrawal, and the day before this Court granted CCMS's motion to withdraw, Royce and the Amari Group filed their Rule 11 motions directed to the Amended Counterclaim. They did so despite the fact that during the safe harbor period, CCMS, on behalf of Needle, had moved to withdraw the Amended Counterclaim and replace it with a second amended pleading.[5]

---

[5] Several weeks after CCMS's withdrawal as attorneys in this matter, Needle withdrew the motion to withdraw and amend the Amended Counterclaim, which had been filed on its behalf by CCMS.

III.     **ARGUMENT**

A.     **Legal Standard**

Pursuant to Rule 11, an attorney who submits a pleading or other paper to the Court certifies that: "(1) it is not being presented for any improper purpose, such to harass or cause unnecessary delay or needless increase in the cost of litigation; (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; [and] (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. . . ." Fed. R. Civ P. 11(b)(1)-(3). The 1993 amendments to Rule 11 prescribe specific procedural requirements for the imposition of sanctions. A party seeking sanctions under Rule 11 must serve the motion on its adversary but not file or present it to the court until at least 21 days after service. *See* Fed. R. Civ. P. 11(c)(1)(A). If the party against whom sanctions are sought corrects the alleged violation during this "safe harbor" period, there is no Rule 11 liability. *Stove Builder Int'l, Inc. v. GHP Grp., Inc.*, 280 F.R.D. 402, 403 (N.D. Ill. 2012) ("That fourth element, with its creation of a potential safe harbor, was the major change wrought by the 1993 amendments to Rule 11—before that a Rule 11 violation created a form of strict liability.")

The Court has interpreted Rule 11 to consist of "several strands. There must be reasonable inquiry into both fact and law; there must be good faith (that is, the paper must not be interposed 'to harass'); the legal theory must be objectively warranted by existing law or a good faith argument for the modification of existing law; and the lawyer must believe that the complaint is well grounded in fact." *Harriston v. Chicago Tribune Co*. 136 F.R.D. 482, 484 (N.D. Ill. 1991) (citing *Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1080 (7th Cir.1987)). "When

considering a motion for sanctions, the district court examines the underlying suit from two perspectives: 1) was the lawsuit brought in *subjective* good faith (i.e., not for the purpose of harassment); and 2) was the lawsuit *objectively* warranted by existing law (i.e., was there a reasonable inquiry into both fact and law)." *Harriston,* 136 F.R.D. at 138 (citations omitted). *See also Szabo Food Service,* 823 F.2d at 1081–1082 ("The district court in analyzing a Rule 11 sanction claim should determine if there has been a "callous disregard for governing law or the procedures of the court . . . ." ) (quoting *Allison v. Dugan*, 951 F.2d 828, 834 (7th Cir.1992)). Further, "[a]n attorney is entitled to rely on his or her client's statements as to factual claims when those statements are objectively reasonable." *Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1329 (2d Cir. 1995) (citing *Calloway v. Marvel Entertainment Group,* 854 F.2d 1452, 1470 (2d Cir.1988)); *accord Philos Technologies Inc.*, 943 F. Supp. 2d at 890.

Rule 11 is not a "fee shifting" device in the sense that the loser pays. Thus, the mere fact that a party did not succeed on its claims does not mean that Rule 11 sanctions should be imposed. "Otherwise Rule 11 sanctions would be imposed whenever a complaint was dismissed, thereby transforming it into a fee shifting statute under which the loser pays." *Harlyn Sales Corp. Profit Sharing Plan,* 9 F.3d at 1270.

Rule 11 is also not intended to "chill an attorney's enthusiasm or creativity in pursuing factual or legal theories." *Id.* (quoting Advisory Committee Notes, 1983 Amendments). As the district court observed in *Harlyn*, "[m]erely because plaintiffs' case proved to be weak, plaintiffs' counsel should not be reprimanded for trying to protect their clients' interests." 9 F.3d at 1267 (quoting district court opinion). Finally, courts have noted that serious consequences can flow from an award of sanctions against an attorney. As explained in *FDIC v. Tekfen Construction and Installation Co., Inc.,* 847 F.2d 440, 444 (7th Cir. 1988):

While the Rule 11 sanction serves an important purpose, it is a tool that must be used with utmost care and caution. Even where, as here, the monetary penalty is low, a Rule 11 violation carries intangible costs for the punished lawyer or firm. A lawyer's reputation for integrity, thoroughness and competence is his or her bread and butter. We may not impugn that reputation without carefully analyzing the legal and factual sufficiency of the arguments.

Here, there is no basis to conclude that CCMS asserted Count IV on behalf of Needle in bad faith, or for the purposes of harassment or delay. Moreover, CCMS conducted a reasonable inquiry into both fact and law. *See Harriston Co.,* 138 F.R.D. at 138.

### B.    CCMS had a Reasonable Factual and Legal Basis for the Assertion of Count IV on behalf of its Client.

Count IV of the Amended Counterclaim alleged that the attorneys' fees payable to the lawyers on account of the now-settled underlying RICO action should be determined pursuant to Section IV.I. A of the Fee Agreement ("Part A"), rather than Section IV.I.B ("Part B"). That claim was reasonably grounded in law and fact for the purposes of Rule 11, even though it ultimately did not survive challenge under Rule 12(b)(6). In asserting the claim on Needle's behalf, CCMS was entitled to rely on statements and documents provided by Needle in forming the belief that the claim was reasonably grounded. *Albrecht v. Stranczek*, 136 F.R.D. 155, 156 (N.D. Ill. 1991) (Court did not award sanctions against counsel where it found that counsel "did not act unreasonably in relying on plaintiff's representation."); *accord Philos Technologies Inc.,* 943 F. Supp. 2d at 890. Needle's statements, including statements made under penalty of perjury, the supporting documents, and the legal authorities researched by CCMS provided a reasonable basis for the assertion of the claim.

Needle supported its claim in Count IV with approximately 50 separate paragraphs of factual allegations outlining the circumstances of the negotiation of the fee, including the original demand for a specific attorneys' fee in the Mediation Statement and the subsequent discussions

(and reduction) of that demand in the second mediation session. (*See* Doc. 76, at ¶¶ 176-227). In response to Royce's and the Amari Group's motions to dismiss the Amended Counterclaim, CCMS provided case law supporting Needle's interpretation of the disputed term "pursuant to" as used in the Fee Agreement. Needle Mem. (Doc. 102) at pp 14-15. CCMS also provided even more specifics about the negotiation of the fee, and attached contemporaneous documents circulated among the parties demonstrating an awareness that a fee was negotiated at the mediation. *See* Needle Decl. (Doc. 105) at ¶¶ 12-52.

Royce and the Amari Group assert that Needle's claim is "frivolous" because in order for Part A to apply, the fee must be specified within the four corners of the agreement. Neither movant has provided any case law to support their reading of the disputed phrase "pursuant to." And while the Supreme Court case and other authorities cited by CCMS on Needle's behalf were found by the Court to be distinguishable, they provided CCMS with a good faith basis for urging Needle's interpretation of the phrase "pursuant to." In short, Needle's legal contention that a fee can be paid "pursuant to" a settlement agreement even if it is not set forth within the four corners settlement document itself is a claim that CCMS reasonably believed to be "warranted by existing law or by a non-frivolous argument for extending . . . existing law. . ." Fed. R. Civ. P. 11(b)(2). *Cf. Philos Technologies Inc.,* 943 F. Supp. 2d at 889 (Attorneys did not act vexatious when "[t]hey presented several Illinois cases that, while distinguishable, bore some similarities to this case, and a nuanced understanding of their facts is required to see why they are inapplicable.").

Royce also attacks as "preposterous" and "frivolous" the "legal conclusion" that the "lump sum [amount] set forth in the Settlement includes the amount of the separately negotiated

attorneys' fee in addition to the amounts owed to the RICO Plaintiffs." Royce Br. at 10, 12. [6] But Royce does not explain away the factual material offered to support this assertion, including the facts and evidence establishing that the Mediation Statement made a separate demand for attorneys' fees (in addition to Plaintiffs' damages); that those fees were discussed as part of negotiations during the mediation; that Plaintiff Naccarato told all of the other Plaintiffs that the attorneys fee was an amount (confidential) that was near the original demand; and that after the settlement was reached, the parties discussed allocation proposals that would have provided this amount to the attorneys. (See Doc. 105 at ¶¶ 16, 19-24, 28, 31, 35, 46-48, 56). All of these facts provided CCMS with a reasonable evidentiary basis to assert that Part A should apply, and that argument was supported by enough evidentiary material to withstand Rule 11 challenge.[7]

The Court ultimately decided that what the parties believed about the allocation of the fee was immaterial, because the fee was not specified within the settlement agreement itself or set forth in a writing approved by plaintiffs. *See* Opinion (Doc. 130) at 9 ("mindset [of the parties] cannot alter what this opinion will show to be the normal reading of the Fee Agreement"). But this

---

[6] CCMS disagrees that this is a "legal conclusion." Nevertheless, as set forth in the text, CCMS provided numerous detailed facts that support a conclusion that the lump sum set forth in the settlement agreement included negotiated fees in an amount approaching that set forth in the Mediation Statement. *See* Needle Decl. at ¶¶ 16, 19-24, 28, 31, 35, 46-48, 56. Royce also argues that counsel is responsible for the "apparent legal conclusion" that "something other than the November 25, 2014 'Notice' of Settlement could or did precipitate Part A and the apparent legal conclusion that the November 25, 2014 Notice of Settlement in fact could or did so." To the extent CCMS understand this argument, it is not one that Needle made. Needle argued only that, from the totality of the information provided to plaintiffs prior to their acceptance of the settlement, they were aware of the amount they would each receive from the settlement and the approximate amount of the fee.

[7] Royce complains that Needle's claim is based on a "trail of bread crumbs." But that "trail of bread crumbs" is comprised of evidentiary facts that support the claim that that a separate fee amount was negotiated. *See supra* n. 4. None of those evidentiary facts have been disputed by Royce.

conclusion under Rule 12(b)(6) does not establish that there was no legal or factual basis for the *assertion* of the claim for purposes of Rule 11. *See Harlyn Sales Corp. Profit Sharing Plan,* 9 F.3d at 1270. The question is not whether Needle prevailed on the motion to dismiss, but whether CCMS had a reasonable basis in law and fact to assert Count IV on Needle's behalf. The record shows that CCMS had such a basis.[8]

     *Super Pawn Jewelry and Loan LLC v. American Environmental Agency Inc.*, *LLC*, No. 11-cv-08894, 2015 WL 1777484 (N.D. Ill. Apr. 16, 2015), cited by Royce, is distinguishable. There, the court dismissed plaintiffs' claims in a 29-page opinion and order that carefully explained the deficiencies in the complaint. *Id* at *1. *After* that occurred, plaintiff hired new counsel who refiled essentially the same claims without correction. That is not what happened here. Rather, the Amended Counterclaims were filed (with the Court's permission) *before* the Court issued an opinion on, or had any briefing on, the sufficiency of Needle's claims. CCMS, as a fiduciary for its client, should not be punished for attempting to plead and support Needle's claims with the best facts possible, just because the Court expressed skepticism about those claims prior to briefing. As in *Harlyn*, "sanctions in this case may only serve to chill zealous lawyering. Merely because plaintiffs' case proved to be weak, plaintiffs' counsel should not be reprimanded for trying to protect their clients' interests." 9 F.3d at 1270. *See also Stove Builder Int'l, Inc.,* 280 F.R.D. at 404

---

[8] *See* Fed. R. Civ. P. 11(b)(3). *See also Willhelm v. Eastern Airlines, Inc.*, No. 89 C 5584, 1992 WL 159187 at *1 (N.D. Ill. June 29, 1992) (In case dealing with a novel or unique legal theory, sanctions denied because, "[a]lthough plaintiff lost on a motion to dismiss in his attempt to make new law, Rule 11 should not be used to chill [counsel's] creativity in pursuing new legal theories."); *Chaplin v. Du Pont Advance Fiber Systems,* 303 F. Supp. 2d 766 (E.D. Va. 2004) (Attorney was not subject to Rule 11 sanctions where there was no binding authority contrary to attorney's position, and attorney provided court with voluminous facts in support of claims).

("no sanctions will attach to the filing of the original Complaint, for counsel's initial reliance on an apparently plausible account by their client has met the reasonable inquiry standard.")

### C. The Pleading was not Asserted for an Improper Purpose.

Royce and the Amari Group conclude that CCMS filed Count IV for an improper purpose: to delay payments to the Amari Group and Royce in order to extort a settlement for Needle that he did not deserve. There is no support in the record for this speculation. Neither movant provides any facts or evidence to support this assertion and the record facts belie it. First, during the Summer of 2014 as well as during the Rule 16 conference, CCMS put forth extensive efforts on behalf of their former client Needle, at Needle's expense, to settle these disputes and commence interim distributions pending resolution. *See* Fata Decl. at ¶¶ 6-9, 11. Second, Needle's original counterclaim acknowledged that the Amari Group were entitled to significant and immediate distributions and requested the Court allow distributions of the undisputed amounts due plus interest. *See*, *e.g.*, Count II (Doc. 26). Additionally, CCMS made requests, during court hearings and by formal motion, for a settlement conference. These attempts at early resolution were repeatedly rebuffed by the other parties. There is simply no basis in the record to conclude that CCMS acted in bad faith to delay or harass. *See* Fata Decl. at ¶ 16. *Cf. Philos Technologies Inc.*, 943 F. Supp. 2d at 890 ("We are left then to look solely to supposition and inferences, and those alone cannot suffice to support a holding that the Attorneys acted vexatiously.").

The Rule 11 motions also fault CCMS for vitriolic and intemperate statements in the Amended Counterclaim. *See*, *e.g.*, Royce Mem. p. 13-14. These arguments are moot, as these challenged statements were removed from the proposed second amended counterclaim filed by CCMS within the safe harbor period. In short, the record shows that CCMS vigorously represented its client in good faith and its conduct was both objectively and subjectively reasonable.

**D**.    **The Rule 11 Motions are Procedurally Defective.**

The Rule 11 motions, directed at the Amended Counterclaim filed in May 2015, are procedurally defective. This pleading was the subject of a motion to withdraw and correct which was filed within the safe harbor period. Given the proposed amendment, Rule 11 clearly prohibits the filing of the motions against an old pleading. *See* Fed. R. Civ. P. 11(c)(2) ("[B]ut it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets."). The Advisory Committee Notes remove any doubt as to this prohibition.[9] Royce and the Amari Group improperly filed Rule 11 motions that addressed a pleading that CCMS sought to withdraw during the safe harbor period. *See Tri-Tech Machine Sales, Ltd. v. Artos Engineering Co.*, 928 F. Supp. 836, 840 (E.D. Wis. 1996) (motion for sanctions denied where it failed to account for the fact that target filed amended complaint indicating that it was "invoking the 'safe-harbor' provision of Rule 11(c)(1)(A), by correcting the contested allegations within the applicable time period).

## IV. CONCLUSION

CCMS vigorously and ethically represented their client, under difficult circumstances, and to the best of their ability. At no time did CCMS sign a pleading without first conducting an objectively reasonable inquiry and forming a belief that the pleading was supported by the facts and the law. Following receipt of the Rule 11 notices from Royce and the Amari Group, CCMS filed a motion to withdraw the challenged pleading and replace it with a new amended pleading.

---

[9] "[S]uch a motion may be filed *only* if the offending paper is not withdrawn or corrected within 21 days after service of the motion." Fed. R. Civ. P. 11, Advisory Committee Comments, 1993 Amendments (emphasis added).

Royce and the Amari Group objected to that withdrawal and amendment and instead filed Rule 11 motions directed to the pleading that CCMS sought to withdraw. CCMS respectfully asks this Court to deny those Rule 11 motions, and to award CCMS costs and fees as the prevailing party under Rule 11.

Respectfully Submitted,

Dated: October 29, 2015     By:     _s/ Dom J. Rizzi_
                                    Dom J. Rizzi
                                    Jennifer W. Sprengel
                                    Cafferty Clobes Meriwether & Sprengel LLP
                                    150 S. Wacker Dr., Suite 3000
                                    Chicago, Illinois 60606
                                    Telephone: (312) 782-4880
                                    Facsimile: (312) 782-4485
                                    Email: drizzi@caffertyclobes.com
                                    Email: jsprengel@caffertyclobes.com

                                    **_Attorneys for Respondents_**
                                    **_Cafferty Clobes Meriwether & Sprengel LLP_**
                                    **_and Anthony Francis Fata_**

<u>**CERTIFICATE OF SERVICE**</u>

I, Dom J. Rizzi, an attorney, hereby certify that on October 29, 2015, service of the ***Memorandum of Law in Opposition to Motions for Rule 11 Sanctions Filed by Merle L. Royce and the Amari Group Parties*** was accomplished pursuant to ECF as to Filing Users and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.


<u>*s/ Dom J. Rizzi*</u>
Dom J. Rizzi

# EXHIBIT A



Cafferty Clobes
Meriwether&Sprengel LLP

Jennifer W. Sprengel
jsprengel@caffertyclobes.com

By Electronic Mail and U.S. Mail

September 10, 2015

Richard J. Cochran                        Alan R. Borlack
Tenney & Bentley, LLC                     Bailey Borlack Nadelhoffer LLC
111 West Washington Street, Suite 1900    135 South LaSalle Street, Suite 3950
Chicago, Illinois 60602                   Chicago, Illinois 60603
dickcochran@hotmail.com                   aborlack@bbn-law.com

Re:    *Royce v. Needle P.C., et al.*, Case No. 15-C-00259

Dear Counsel:

As you know, my firm no longer represents Mr. Needle. I will be handling the pending motions which are directed toward my firm and my partner, Mr. Fata.

Mr. Royce's motion for sanctions pursuant to 28 U.S.C. § 1927 (Dkt. Nos. 143, 144, and 149) and the Amari Group's joinder (Dkt. No. 141) (collectively the "Section 1927 Papers") are baseless and should be withdrawn. Before we incur fees preparing and serving a formal Rule 11 motion, we wanted to give you an opportunity to withdraw these pleadings in their entirety. If they are not withdrawn by September 16, 2015, we will commence preparing and serving formal Rule 11 papers.

The Section 1927 Papers accuse Anthony Fata of vexatiously multiplying proceedings by "hiding" his client's attestation that "the separately negotiated fee was allegedly negotiated during mediation." *See* Royce's Memorandum in Support of Motion for § 1927 Sanctions for filing Court IV of Successive Counterclaims (Dkt. No. 144) ("Section 1927 Mem.") at 3. This accusation is so obviously false that the only logical conclusion is that it was asserted for the improper purpose of punishing Mr. Fata for having represented Michael R. Needle, P.C. ("Mr. Needle") and timed to discourage new counsel from entering an appearance on Mr. Needle's behalf.

Cafferty Clobes Meriwether&SprengelLLP

Richard J. Cochran
Alan R. Borlack
September 10, 2015
Page Two

For the following reasons the Section 1927 Papers are groundless and should be withdrawn:[1]

1.  The fact that the fee was negotiated during the mediation, which mediation was part of a larger "settlement process," is obvious from the initial pleading as well as from pre-filing communications and other documents of record. *See* Original Counterclaim (Dkt. No. 25) ¶¶65-83. In fact, in his original motion to dismiss, Mr. Royce recognized that the "term 'settlement process' . . . can easily refer to mediation." Mot. Dismiss (Doc. 49) at 13. Mr. Fata cannot be accused of hiding a fact that the parties recognized as having been alleged.

2.  The purported motivation for Mr. Fata to have "hidden" this well-known fact is nonsensical. Mr. Fata argued from the outset that the mediation privilege did not apply to the communications at issue here, because the dispute arose in a subsequent proceeding among parties *on the same side of the mediation* and concerned what they agreed *among themselves* regarding the allocation of the settlement proceeds, and further, that under no circumstances should the Court be deprived of this useful information. Mr. Fata never alleged or argued that the fee negotiation took place outside of the mediation context.

3.  It is clear that nobody was misled by the allegations in the initial counterclaims. For example, after the original counterclaim was filed, Mr. Royce filed a motion seeking to prevent Mr. Needle from making allegations or presenting facts barred by the mediation privilege in the anticipated, amended counterclaims. *See* Motion to Bar (Doc. No. 61).

4.  *After* Mr. Royce asserted the bar of the mediation privilege, Mr. Needle's Counterclaims became even more specific about the context of the fee negotiations—describing them in no less than *50 paragraphs* in the Amended Counterclaims, many of which specifically reference the mediation statement and the mediation sessions in which the fee demands were made. *See* Amended Counterclaims (Dkt. No. 76) at ¶¶ 177-227. For example, paragraph 195 explains the fee demand in the August 2013 mediation statement, and paragraphs 205-207 describe the September 17, 2013 mediation session and discussion of fees. These allegations directly contradict the assertion that Mr. Fata was attempting to hide the circumstances of the fee negotiations in order to avoid the mediation privilege.

---

[1] This letter is directed toward Mr. Royce and his counsel as well as the Amari Group Parties and their counsel, who have purported to adopt and incorporate in its entirety Mr. Royce's Section 1927 Motion. (Dkt. No. 141).

**Cafferty Clobes Meriwether&Sprengel**LLP

Richard J. Cochran
Alan R. Borlack
September 10, 2015
Page Three

5. The claim that the issue was not joined until Mr. Needle filed his opposition brief on July 17, 2015 is patently false. The issue was joined in the Motion to Bar filed in April of 2015 and was raised again in both Royce's and the Amari Group Parties' motions to dismiss the Amended Counterclaims. Indeed, Royce's motion to dismiss specifically moved to strike (on the basis of the mediation privilege) paragraphs 2, 179-219 of the Amended Counterclaims, *the very paragraphs that describe the negotiation of the fee.*

6. There is no possible basis for the claim that the motions to dismiss could have been decided any earlier than they were. They were decided shortly after Mr. Needle filed his *first* written response to the dismissal motions. Moreover, Mr. Needle's response brief (Dkt. No. 102) and Declaration contained *even more detail still* as to the circumstances of the fee negotiations. This belies the assertions that Mr. Fata was trying to hide those circumstances in an effort to avoid dismissal of Needle's counterclaims.

7. Nor is there any basis for the claim that the bar of the mediation privilege actually had an effect on the outcome or the timing of the Court's dismissal order. The Court stated:

> Finally, lest it mistakenly be thought that what has just been said here is essential to the result reached in this opinion, it should be added that *none of the barred mediation communications would change the outcome of the instant motions to dismiss in any event.* None of them changes the facts that (1) the settlement agreement did not specify attorneys' fees or (2) that the attorneys failed to notify the plaintiffs properly of any alleged separate agreement.

In short, the existence of the mediation privilege, whether it applied, and to what extent had no bearing on the Court's ultimate decision, which was based solely on the fact that the fee was not embodied within the written settlement agreement nor specified in the communications to Plaintiffs.

Finally, the other arguments in the Section 1927 Papers regarding Mr. Fata's representation of Mr. Needle in connection with the theory that Part A applies are totally lacking in merit. The papers conflate the standard under Section 1927 with the standard on a motion to dismiss. Although the Court determined that Mr. Needle's theory did not satisfy the *Twombly* plausibility standard, Mr. Fata presented specific facts (based on underlying evidence) and specific cases that support the theory. In fact, much of the evidence regarding a separately negotiated fee was authored by parties *other than* Mr. Needle, and Mr. Needle was the only party to cite cases addressing the meaning of "pursuant to."

Cafferty Clobes Meriwether&Sprengel LLP

Richard J. Cochran
Alan R. Borlack
September 10, 2015
Page Four

     In sum, the personal accusations of active, professional misconduct by Mr. Fata are so groundless and so illogical—and their timing (on the eve of Mr. Fata's withdrawal) so suspicious—that the only rational conclusion is that they were asserted for some improper purpose, such as to harass Mr. Fata for representing Mr. Needle, or to discourage new counsel from appearing on his behalf. The Section 1927 Papers and the Amari Group Parties' joinder should be withdrawn by September 16, 2015. Otherwise, we will have no choice but to proceed with the Rule 11 process.

     Please be advised that we will be separately addressing your Rule 11 motions directed at us, which are also groundless.

          Very truly yours,

          Jennifer W. Sprengel

JWS/smn

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MERLE L. ROYCE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15 C 00259 |
| | ) | |
| v. | ) | Judge Milton I. Shadur |
| | ) | |
| MICHAEL R. NEEDLE, P.C., *et al.*, | ) | Mag. Judge Sheila M. Finnegan |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ANTHONY FRANCIS FATA

1.      My name is Anthony Francis Fata. I am a partner in the law firm of Cafferty Clobes Meriwether & Sprengel LLP ("CCMS"). I have personal knowledge of the matters set forth below. I could competently testify to the matters set forth below if required to do so.

2.      In 1999, I was admitted to practice in the State of Illinois. In 2000, I was admitted to practice in the United States District Court for the Northern District of Illinois, where I am also a member of the Trial Bar. I am admitted to, or admitted pro hac vice for particular cases in, other federal appellate and district courts, such as the Seventh Circuit, Sixth Circuit and Ninth Circuit Court of Appeals, as well as the District of Colorado, the Northern District of California and the Eastern District of Michigan. In every bar or court in which I have been admitted to practice, I have been a member in good standing from the date of my admission through the present.

3.      To the best of my knowledge, I have never been the subject of any disciplinary investigation or proceeding. In addition, to the best of my knowledge, I have never been the target of a sanctions motion, filed or unfiled.

4.      In March 2014, CCMS was retained to represent Michael R. Needle, P.C. in connection with post-judgment proceedings in a RICO action styled, *Amari Co., Inc., et al. v. John*

1

*Burgess, et al.*, Case No. 07-CV-1425. In connection with the representation, I received and reviewed hundreds of pages of documents and had numerous, lengthy conversations with Mr. Needle concerning the factual and legal issues that were subsequently litigated in the present case.

5.      In April and May 2014, Mr. Needle prepared and signed two declarations which were then filed in *Amari Co., Inc., et al. v. John Burgess, et al.*, Case No. 07-CV-1425. The first was executed and filed on or about April 9, 2014. The second was executed on April 30, 2015 and filed under seal on or about May 5, 2015. (This second declaration was subsequently filed by Mr. Royce in this case as Exhibit D to his motion regarding mediation confidentiality. *See* Doc. 61). In these declarations, Mr. Needle made factual statements under penalty of perjury. I relied on these statements in representing Michael R. Needle, P.C. in this case.

6.      I made several overtures on behalf of Michael R. Needle, P.C. in an attempt to settle the dispute. Namely, on May 22, 2014, I sent a letter to Alan R. Borlack ("Mr. Borlack") and Richard Cochran ("Mr. Cochran") proposing that the parties discuss interim distributions of the Settlement fund to Plaintiffs, Mr. Royce and Michael R. Needle, P.C., and also ways of resolving the impasse over allocation.

7.      On June 3, 2014, I sent a letter to Mr. Borlack and Mr. Cochran suggesting that the parties discuss settlement and potentially meet in person.

8.      In July 2014, Mr. Cochran and I exchanged statements setting forth our clients' respective positions concerning whether Part A of the Fee Agreement applied. The position statement that I prepared is 19 pages long and attaches numerous documents on which Mr. Needle's position was based. It also includes a discussion of the case law and citation to several cases that I located concerning the phrase "pursuant to," which is used in the Fee Agreement.

9.      Shortly after exchanging position statements, I invited Mr. Cochran to meet me at my office to discuss settlement. He agreed, but we were unable to reach a settlement for our clients.

10.     On January 12, 2015, Mr. Royce filed the instant interpleader action.

11.     On February 23, 2015, I met with Mr. Cochran and Mr. Borlack (and Blake Hannafan, who was representing John Cardullo & Sons, Inc.) for a planning conference pursuant to the Court's Order. I was prepared to discuss settlement or at least a process for reaching settlement, but I was informed that such conversations would not be productive.

12.     On March 20, 2015, John Cardullo & Sons. Inc., which was represented by its own independent counsel, filed its answer to the interpleader complaint (Doc. 19). In Paragraph 33, John Cardullo & Sons, Inc. admits that it asserts that "the distribution of settlement proceeds pursuant to Section VI.1 is to be determined under Part A and not Part B." *Id.* at 16 (Answer to ¶33).

13.     On March 30, 2015, I filed Michael R. Needle P.C.'s original answers and counterclaims to the interpleader complaint and the cross-claims filed by the Amari Group. (Docs. 25 and 26). They were based on my review and analysis of hundreds of pages of documents, Mr. Needle's factual statements made under penalty of perjury in his declarations signed and filed in April and May 2014, and many extensive conversations with Mr. Needle. In addition, they were based on my legal research concerning various issues, including the meaning of the phrase "pursuant to," which was used in the Fee Agreement and which was the subject of dispute between the parties.

14.     On May 15, 2015, I filed Michael R. Needle P.C.'s amended answers and counterclaims to the interpleader complaint and the cross-claims filed by the Amari Group. (Docs. 76 and 77). They were based on the materials I had previously reviewed in connection with the

3

original answer and counterclaim. In addition, in connection with these pleadings, I reviewed additional materials provided by Mr. Needle and had several lengthy telephone conversations with him regarding the issues.

15.     On July 30, 2015, I filed Michael R. Needle P.C.'s motion for leave to file second amended pleadings, as well as the proposed second amended answers and counterclaims. The proposals were based on my review of the same materials and legal research as the original and amended answers and counterclaims. They were also based on the factual statements made under penalty of perjury and contained in Mr. Needle's declaration dated July17, 2015, which was filed with the Court in connection with motion to dismiss briefing.

16.     Before filing the original, amended and proposed second amended answers and counterclaims in this case, I reviewed hundreds of pages of documents and factual statements by Mr. Needle which were made under penalty of perjury. I also had numerous, lengthy telephone conversations with Mr. Needle. In addition, I engaged in legal research concerning the phrase "pursuant to," the division of settlement proceeds between attorneys and clients, and other pertinent legal matters. Based on these efforts, I believed that the claims asserted in Count IV of the amended counterclaim against Mr. Royce and Count III of the amended counterclaim against the Amari Group were reasonably grounded in both fact and law. I would not have filed the pleadings at issue had I concluded otherwise. At no time did I file any pleading or other paper with the Court for any improper purpose, such as to delay or harass the other parties.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: October 29, 2015 in Chicago, Illinois

Anthony Francis Fata