**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MERLE L. ROYCE**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15 C 259 |
| | ) | |
| **MICHAEL R. NEEDLE, P.C.**, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Merle L. Royce ("Royce") brought this interpleader action to determine the proper distribution of settlement funds resulting from a civil RICO suit (the "Amari litigation") in which he and Michael R. Needle ("Needle") served as plaintiffs' counsel. Aligned with Royce are 15 of the 16 prevailing plaintiffs (the "Amari Group"), four of whom also served as a "Management Committee." On the other side of the "v." sign are (1) the professional corporation of Royce's former co-counsel, Michael R. Needle, P.C. ("Needle, P.C."), joined by (2) the sixteenth plaintiff, John Cardulo & Sons, Inc. ("Cardulo & Sons").[1]

---

[1] In referring to documents submitted in this case, this opinion abbreviates "Royce" as "R.," the "Amari Group" as "A.," "Needle, P.C." as "N.," "Cardulo & Sons" as "C." and "Fata and Cafferty & Clobes" collectively as "F." Memoranda submitted on the current Fed. R. Civ. P. ("Rule") 11 motions are abbreviated "Mem.," "Resp." and "Reply" as appropriate. Needle, P.C.'s amended responsive pleadings (Dkt. Nos. 76 and 77) are referred to by paragraph or count number with the abbreviations "Am." for "Amended," "Ans." for "Answer", "AD" for "Affirmative Defense" and "Cc." for "Counterclaim," coupled with a specification of the party to whom or against which a pleading is directed, using for that purpose "R.," "A." or (where a paragraph is one of the 304 duplicates directed against both) "R. and A." (e.g., "N. Am. AD against R. II" and "N. Am. Cc. against R. and A. ¶ 21"). Needle, P.C.'s narrative has three sets of ¶¶ 228-30, which will be differentiated with superscripts (e.g., "N. Am. Cc. against R. and A. ¶ 229[a]" or "N. Am. Cc. against R. and A. ¶ 229[c]"). Needle, P.C.'s responsive memorandum to

(continued)

Initially Needle, P.C. targeted Royce and the Amari Group with nearly identical attacks that it listed as "Counterclaims." Those attacks began with identical allegations comprising 298 numbered paragraphs and occupying well over 60 pages each, then followed with brief assertions as to different theories of relief to which Needle, P.C. claimed to be entitled, with each of those theories advanced in a separate "count."[2]

In any event, this Court asked Royce and the Amari Group to move expeditiously as to certain of those so-called Counterclaims (N. Am. Cc. IV against R. and N. Am. Cc. III against A.) on the assurance that they would not thereby waive their right to challenge the amended pleadings in other respects later (see May 19, 2015 Tr. [Dkt. No. 82] at 39:18-23). When they did so this Court did not address Needle, P.C.'s other "Counterclaims" or affirmative defenses, dealing instead with the above-cited "Counterclaims" in an opinion (the "Dismissal Order," Dkt. No. 128).

Thereafter Royce and the Amari Group brought twin motions under Rule 11(c)(2) against Needle, P.C., its (now former) counsel Anthony F. Fata ("Fata") and Fata's law firm, Cafferty

---

(footnote continued)

the earlier motions to dismiss (Dkt. No. 104) is cited "N. Resp. Mot. Dismiss, --" and its declaration in that matter (Dkt. No. 105) is cited "N. Decl. Mot. Dismiss ¶ --." Citations to the Contingent Fee Agreement (Am. Compl. Ex. 1) take the form "Fee Agreement" followed by the specific section or part referred to, while the Royce Engagement Letter (Am. Compl. Ex. 2) is cited "R. Engagement Letter ¶ --" and the Settlement Agreement (Dkt. No. 39) is cited "Settlement Agreement § --."

[2] This Court has had frequent occasion to comment over the years as to the "count" designation's failure to conform to either the language or the purpose of the last sentence of Fed. R. Civ. P. ("Rule") 10(b), for that usage really stems from the state court concept of a "cause of action" rather than the federal concept of a "claim for relief" -- in that respect, see the felicitous discussions in Bartholet v. Reishauer A.G.(Zurich), 953 F.2d 1073, 1078 (7th Cir. 1992) and NAACP v. Am. Family Mut. Ins. Co., 978 F.2d 287, 291-93 (7th Cir. 1992).

Clobes Meriwether & Sprengel, LLP ("Cafferty Clobes").  This opinion now revisits the Needle,

P.C. contentions (hereafter termed the "Dismissed Counterclaims") that were dispatched in the

Dismissal Order, in order to determine whether sanctions are warranted.

## Rule 11 Sanctions Standards

As explained by <u>Brunt v. Serv. Employees Int'l Union</u>, 284 F.3d 715, 721 (7th Cir. 2002)

(internal quotation marks and citations omitted):

> Rule 11 imposes a duty on attorneys to ensure that any papers filed with the court
> are well-grounded in fact, legally tenable, and not interposed for any improper
> purpose. The rule is principally designed to prevent baseless filings. Sanctions
> will be imposed if counsel files a complaint with improper motives or without
> adequate investigation.

To be sure, not every doomed argument has violated Rule 11:  "[S]anctions do not inevitably

flow from being wrong on the law" (<u>Harlyn Sales Corp. Profit Sharing Plan v. Kemper Fin.</u>

<u>Servs., Inc.</u>, 9 F.3d 1263, 1270 (7th Cir. 1993)).  But Rule 11(b)(2) does require that all legal

contentions be "warranted by existing law or by a nonfrivolous argument for extending,

modifying, or reversing existing law or for establishing new law."

On that score <u>Fries v. Helsper</u>, 146 F.3d 452, 458 (7th Cir. 1998) (internal quotation

marks and citation omitted) has explained that "a frivolous argument or claim is one that is

baseless and made without a reasonable and competent inquiry."  Whether a contention fails to

clear that bar is determined by "an objective inquiry into whether the party or his counsel should

have known that his position is groundless" (<u>Cuna Mut. Ins. Soc. v. Office & Prof'l Employees</u>

<u>Int'l Union, Local 39</u>, 443 F.3d 556, 560 (7th Cir. 2006)).  And while litigants need not

specifically identify when they are seeking to break new legal ground (see Advisory Committee

note to the 1993 amendment to Rule 11(b)(2)) or even address unfavorable precedent so long as

some principled basis exists for distinguishing it (<u>Thompson v. Duke</u>, 940 F.2d 192, 197-98 (7th

Cir. 1991)), simply ignoring <u>controlling</u> precedent in the hope that a judge will fail to heed it "is a paradigm of frivolous litigation" (<u>Nisenbaum v. Milwaukee County</u>, 333 F.3d 804, 809 (7th Cir. 2003)). For example, an unabashed disregard of the basic and uncontested principles of contract law plainly deserves sanctions.

Where a paper presented to a federal court exhibits either frivolousness or an improper purpose, Rule 11(c)(1) provides:

> [T]he court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

In that regard, however, a monetary sanction may not be imposed on a represented party where the paper is deficient only in advancing unwarranted <u>legal</u> contentions (Rule 11(c)(5)(A)).

While a court "has wide latitude to determine what sanctions should be imposed for a Rule 11 violation" (<u>United States Bank Nat'l Ass'n, N.D. v. Sullivan-Moore</u>, 406 F.3d 465, 471 (7th Cir. 2005)), both Rule 11(c)(4) and opinions from our Court of Appeals have provided some guidance as to what sanctions are appropriate. Under that Rule this Court is instructed that sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."

Yet <u>Brandt v. Schal Assocs., Inc.</u>, 960 F.2d 640, 646 (7th Cir. 1992) serves as a reminder that "[c]ompensation and deterrence are not only not mutually exclusive, they are sometimes compatible." And so a district court may impose sanctions by ordering a rule violator to make good its opponent for the harm caused by its violation (see, among other cases, <u>Divane v. Krull Elec. Co.</u>, 319 F.3d 307, 314 (7th Cir. 2003)). In that regard <u>Wade v. Soo Line R.R.</u>, 500 F.3d 559, 564 (7th Cir. 2007) has expressed a preference for monetary sanctions, observing that "[t]he

punishment should fit the crime, so fees and fines -- which can be scaled as appropriate -- often are the best sanctions."

## Background

This interpleader action concerns the proper distribution of a settlement resulting from a civil RICO suit. In this Court's (ultimately unsuccessful) pursuit of greater brevity in this lengthy opinion, this background section will provide only a sketch of what has transpired to this point, reserving many of the details for the places where they become relevant to the analysis so as to avoid too much repetition.

### <u>Amari</u> Litigation and Associated Agreements

Both Royce and Needle, P.C. came to represent the <u>Amari</u> litigation plaintiffs after the underlying litigation had already been filed in this District Court in March 2007 by an attorney who -- having since withdrawn as counsel in July 2008 -- is not a party to this action (N. Am. Ans. to R. ¶¶ 8-9, 15-19). Needle, P.C. joined that case in October 2008 (together with two other attorneys who also subsequently withdrew and so are also not before this Court), with Royce following suit some 13 months later (<u>id.</u>). Apart from the <u>Amari</u> litigation, Royce also agreed to defend eight members of the Amari Group against actions brought by an entity controlled by the <u>Amari</u> litigation defendants (the "Lake County litigation") (Am. Compl. ¶¶ 14, 20; N. Am. Cc. against R. and A. ¶¶ 131, 136).

When Needle, P.C. began representing the <u>Amari</u> litigation plaintiffs, Needle himself took the lead in drafting a new Contingent Fee Agreement (Am. Compl. ¶ 28; A. Ans. ¶ 28; N. Am. Cc. against R. and A. ¶¶ 72-73, 81). Two provisions of that agreement bear special mention. First, its Section IV.1 described the amounts due to the lawyers:

> We will be entitled to a contingent fee equal to the greater of: (A) any fee paid to us pursuant to a judgment and award of fees under the RICO or other fee-shifting statute or pursuant to any settlement agreement, or (B) one-third of any recovery actually received, with the recovery to be computed as any and all damages, treble damages, punitive damages, costs, expenses, attorney's fees or other compensation actually paid, whether pursuant to settlement agreement or judgment, less any retainer paid pursuant to Section V below.

And second, its Section IX.12 required that all waivers or modifications of any rights be in writing signed by the disadvantaged party.

Following two unsuccessful mediation sessions in September 2013, on November 14 of that year Judge John Tharp, Jr. of this District Court brokered a global settlement in the <u>Amari</u> and Lake County litigations for $4.2 million and directed the parties to reduce its terms to writing (N. Am. Ans. to R. ¶ 4; N. Am. Cc. against R. and A. ¶¶ 2, 229[a]). Eight days later that produced the written Settlement Agreement (N. Am. Cc. against R. and A. ¶¶ 3, 229[b]), a document that made no mention of attorneys' fees, specifying only the amount to be paid to the plaintiffs and the schedule for doing so (Settlement Agreement § 2). Crucially the writing <u>did</u> contain a classic integration provision (<u>id.</u> § 18):

> <u>Entire Agreement</u>. This Agreement represents the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes all prior agreements thereto, whether written or oral.

With the Settlement Agreement having been signed by or on behalf of the parties, the <u>Amari</u> litigants stipulated to a dismissal that Judge Tharp granted (N. Am. Ans. to R. ¶ 3).

After Judge Tharp had entered orders approving the stipulated dismissal, Needle attempted to bring the issue of attorneys' fees before him (that subject had not been included in the Settlement Agreement) in the course of arguing that the Judge had jurisdiction to disqualify Royce as a co-counsel in the <u>Amari</u> litigation. But Judge Tharp rejected both those efforts,

stating as to the subject of fees (<u>Amari Co., Inc. v. Burgess</u>, No. 7-CV-1425 at 3 (N.D. Ill. May 20, 2014)):

> As further argument in favor of the exercise of supplemental jurisdiction, Needle contends, citing <u>Baer v. First Options of Chicago, Inc.</u>, 72 F.3d 1294, 1301 (7th Cir. 1995), that "the fee award derives from a federal fee shifting statute." That is clearly wrong. There is no judicial award of attorneys' fees in this case. The parties reached what is apparently a global settlement agreement inclusive of attorneys' fees; this court did not determine any "reasonable attorney's fee" to be awarded to a "prevailing party" pursuant to RICO's fee-shifting provision, 18 U.S.C. § 1964(c). To the extent the plaintiffs' attorneys fees are to be paid from the plaintiffs' total recovery under the settlement agreement, there is no statutory "fee award" in play; rather, the fees are being paid as a percentage of the amount recovered, according to the provisions of the plaintiffs' engagement contract.

After thus having prevailed in the <u>Amari</u> litigation, the parties to this interpleader action quickly fell into disagreement over how to divide the settlement. For purposes of the current motions the important dispute involves the amount due to the attorneys. Royce and the Amari Group contend that the Contingent Fee Agreement entitles Royce and Needle, P.C. to one-third of the settlement amount (some $1.4 million) under Section IV.1(B) ("Fee Agreement Part B") (Am. Compl. ¶ 32; N. Am. Ans. to A. ¶ 45), while Needle, P.C. and Cardulo & Sons insist that Section IV.1(A) ("Fee Agreement Part A") governs because there was assertedly a fee paid "pursuant to [a] settlement agreement" (C. Ans. to R. ¶ 33; N. Ans. to R. ¶ 33; N. Am. Ans. to A. ¶ 45).

**Royce's Interpleader Action and Needle, P.C.'s Initial Responsive Pleadings**

After months of sometimes acrimonious disagreement, Royce filed this interpleader action on January 12, 2015, quickly amending it to name Needle, P.C. rather than Needle personally as the appropriate defendant (Dkt. No. 4). Soon afterward the Amari Group filed an Answer (Dkt. No. 12) that aligned themselves with Royce and crossclaimed against both Needle, P.C. and Cardulo & Sons (which then aligned itself with Needle, P.C. on the subject of fees).

In its initial responsive pleadings (Dkt. Nos. 25 and 26)[3] Needle, P.C. brought identical counterclaims (precursors to the Dismissed Counterclaims) against both Royce and the Amari Group, seeking declaratory judgments that the fee due to Royce and Needle, P.C. is governed by Fee Agreement Part A (N. Cc. against R. ¶ 194; N. Cc. against A. ¶ 188). In support of that contention Needle, P.C. alleged (N. Cc. against R. ¶ 190; N. Cc. against A. ¶ 184):

> Each RICO Plaintiff was aware before executing the Settlement Agreement that the attorneys' fees were $2.5 million. This notice came from a variety of sources -- discovery responses, trial plans, settlement communications, and the settlement notices.

It further alleged (1) that no Amari litigation plaintiff thought before executing the Settlement Agreement that Fee Agreement Part B would determine the amount of the lawyers' fees and (2) that the Amari Group members themselves acknowledged that Fee Agreement Part A was operative in that respect -- until, that is, Needle, P.C. began to object to how the settlement proceeds should be distributed among the Amari litigation plaintiffs (N. Cc. against R. ¶¶ 191-93; N. Cc. against A. ¶¶ 185-87).

At an April 8, 2015 status hearing this Court explained to Fata -- at some length -- what appeared to be serious deficiencies in the legal theory underlying the precursors to the Dismissed Counterclaims (Apr. 8, 2015 Tr. [Dkt. No. 34] at 5:13-15:18, 19:21-27:4). That explanation covered several fronts, in part because it was not clear initially whether Needle, P.C. was urging that the Amari litigation plaintiffs had agreed to pay more in attorneys' fees than contemplated by

---

[3] Because Needle, P.C. withdrew those pleadings, the factual and legal contentions they contained cannot of course form the basis for sanctions under Rule 11(c). This opinion repeats those contentions solely for the pattern of behavior they evince and as probative of whether Needle, P.C. and Fata made later factual and legal contentions for an improper purpose.

the Contingent Fee Agreement or whether it was instead asserting that the <u>Amari</u> litigation <u>defendants</u> had agreed to pay a specified sum in attorneys' fees in the Settlement Agreement.

Both Royce and the Amari Group moved to dismiss those counterclaims for failure to state a claim, noting the inadequate factual and legal grounding for both (Dkt. Nos. 40, 48, 50).[4] At the April 23, 2015 presentment hearing for those motions Needle, P.C. raised the possibility of seeking leave to amend. In response to that possibility this Court admonished Fata and Needle, P.C. (Apr. 23, 2015 Tr. [Dkt. No. 65] at 7:13-20) in these terms:

> It seems to me that an amended pleading is very much called for. I for one have not had any notion of how it is that Mr. Needle can make the arguments in the good faith that is required by Rule 11(b) to somehow say that there are things that permit him, for example, to get away from the unambiguous language of the two alternatives that we have spoken about in the past in terms of the . . . total amount of fees.

This Court then requested that Needle, P.C. describe which aspects of the then-pending motions to dismiss and to strike no longer had to be addressed in light of any amended pleadings.

**Dismissed Counterclaims**

Fata submitted the Dismissed Counterclaims as part of Needle, P.C.'s amended pleadings on May 15, 2015. There Needle, P.C. clarified that it was not saying that Fee Agreement § IV.1 was ambiguous or had been later modified (N. Am. Cc. against R. ¶ 322; N. Am. Cc. against A. ¶ 318).[5] Instead the amended pleading supplemented its narrative with a new allegation (N. Am. Cc. against R. ¶ 323; N. Am. Cc. against A. ¶ 319):

---

[4] Royce and the Amari Group also sought to strike Needle, P.C.'s affirmative defenses and some of its other counterclaims as well.

[5] That clarification has not however dissuaded Needle, P.C. from denying the Amari Group's allegation that not one of its members signed a written waiver or modification of the Contingent Fee Agreement (see N. Am. Ans. to A. ¶ 59). And Needle, P.C. incessantly refers to what the <u>Amari</u> litigation plaintiffs allegedly agreed to pay or understood themselves as

(continued)

The attorneys' fee was separately negotiated during the discussions that led to the Settlement. The lump sum set forth in the Settlement includes the amount of the separately negotiated attorneys' fee in addition to the amounts owed to the RICO Plaintiffs. . . .

And it revised N. Cc. against R. ¶ 190 and N. Cc. against A. ¶ 184 to read (N. Am. Cc. against R. ¶ 324; N. Am. Cc. against A. ¶ 320):

Each RICO Plaintiff was aware and consented before executing the Settlement Agreement that the attorneys' fees to be paid from the Settlement were the attorneys' fee separately negotiated by Needle and Royce with the RICO Defendants.

But the Dismissed Counterclaims also notably dropped any specification of just what that separately negotiated fee was (although the number lingered in the general narrative -- see N. Am. Cc. against R. and A. ¶¶ 2(c), 15, 84).

Those amended pleadings were accompanied by a Statement Regarding Amended Pleadings and Status of Motion to Extend (Dkt. No. 80, "Pleadings Statement"), again filed by Fata. That Pleadings Statement at 2 sought to explain:

A separate amount for the attorneys' fee was negotiated during the settlement discussions. Id. ¶¶ 195, 204, ¶ 319. Communications in September 2013 between Royce and certain [Amari litigation plaintiffs] . . . make it clear that the attorneys' fee would be a separate amount, not 1/3 of the total recovery. Id. ¶¶ 214-15.

But reading the paragraphs cited in the Pleadings Statement reveals that its purported explanation was bogus, for those paragraphs either merely asserted that there was such a negotiated fee

_____

(footnote continued)
obligated to pay in attorneys' fees, as though there were somehow an agreement to pay something other than what Section IV.1 mandates (see N. Am. Ans. to A. ¶¶ 43; N. Am. AD against A. I; N. Am. Cc. against R. and A. ¶¶ 6-7, 230[a]-228[b], 244, 246, 250, 252, 256-57, 266-67, 277; N. Am. Cc. against R. ¶¶ 324-27; N. Am. Cc. against A. ¶¶ 320-23). But given that the Dismissed Counterclaims expressly disclaimed any modification and asked for a declaration of rights under the unmodified Contingent Fee Agreement, this opinion will not address whether any incompletely excised arguments that there was such a subsequent agreement would themselves violate Rule 11(b)(2).

- 10 -

(N. Am. Cc. against A. ¶ 319) or referred to <u>rejected</u> settlement demands (and one description of a <u>rejected</u> settlement offer) from the two unfruitful mediation sessions (N. Am. Cc. against R. and A. ¶¶ 195, 204, 215-16[6]).

Once again this Court pressed Needle, P.C. on the issue of whether the Dismissed Counterclaims could be asserted in good faith. On May 19, 2015 this Court advised Needle, P.C. that the meaning of the Settlement Agreement could not be gleaned from pre-execution conversations when it was both unambiguous and an integrated agreement (May 19, 2015 Tr. [Dkt. No. 82] at 23:21-24:20, 34:21-35:3). Indeed, this Court said that it had yet to hear a definite argument bearing on just how the Settlement Agreement purportedly dealt with an award of attorneys' fees -- what it heard instead was that Needle, P.C. desired to get to discovery to see what sort of parol evidence might be uncovered (<u>id.</u> at 26:14-23, 30:7-19, 36:6-9).

Next Royce and the Amari Group filed motions, this time attacking the Dismissed Counterclaims (Dkt. Nos. 84 and 88). In addition, each served Needle, P.C., Fata and Cafferty Clobes with Rule 11(c)(2) motions on June 26, 2015 (R. Mem. 1 n.1; A. Mem. 1).

Prompted by those Rule 11 motions, Needle, P.C. moved for an extension of the Rule 11(c)(2) safe harbor date, which this Court granted until July 30, 2015 (Dkt. No. 103). On that appointed date Fata requested and this Court granted leave to withdraw Needle, P.C.'s amended responsive pleadings in order to amend them further (Dkt. No. 106). Fata also submitted a memorandum on behalf of Needle, P.C. (Dkt. No. 104, "Dismissal Memorandum")

---

[6] This Court assumes those are the paragraphs to which Fata meant to refer in the Pleadings Statement, as N. Am. Cc. against R. and A. ¶ 214 simply accused Royce of malfeasance and N. Resp. Mot. Dismiss at 8 relied on N. Am. Cc. against R. and A. ¶ 216 to argue that point. But this Court cannot discern what relevance N. Am. Cc. against R. and A. ¶ 215 had to Needle, P.C.'s claims, for it described fees incurred in the Lake County litigation.

in response to the renewed motions to dismiss, together with a separate Declaration by Needle, P.C. (Dkt. No. 105).

Less than two weeks later (on August 11) Fata moved to withdraw as attorney for Needle, P.C. (Dkt. No. 124). Nine days later this Court granted the motions attacking the Dismissed Counterclaims (Dkt. No. 128), after which Royce and the Amari Group filed the instant Rule 11(c)(2) motions[7] on August 26 (Dkt. Nos. 136, 137), and this Court granted Fata's motion to withdraw two days later (Dkt. No. 148). Needle, P.C. then obtained new counsel, who withdrew the motion to re-amend pleadings (Dkt. No. 169) before also withdrawing as counsel (Dkt. No. 203).

### Potential Grounds for Sanctions

Royce and the Amari Group seek to have Needle, P.C., Fata and Cafferty Clobes sanctioned for bringing the Dismissed Counterclaims. They urge first that Fata advanced a legally frivolous position contrary to Rule 11(b)(2) and second that he, together with Needle, P.C., brought those counterclaims for an improper purpose and without adequate evidentiary support in violation of Rules 11(b)(1) and (3).

**Legally Frivolous Arguments**

Any assessment of Needle, P.C.'s right or lack of right to the declaratory judgment requested in the Dismissed Counterclaims called for the interpretation of two agreements. For one thing, Needle, P.C. ultimately had to establish (or at least plausibly allege) that the <u>Amari</u> litigation defendants had agreed to pay a specific amount in attorneys' fees to the <u>Amari</u> litigation plaintiffs under the Settlement Agreement. In an effort to make that contention even remotely

---

[7] They also initially filed motions for sanctions under 28 U.S.C. § 1927 but have since withdrawn them (Dkt. No. 166).

plausible, Needle, P.C. also had to have the Contingent Fee Agreement interpreted in a way that would have reshaped in a bizarre fashion what would qualify as an agreement to pay those fees.

Both of those arguments were not merely wrong but frivolous, disregarding what anyone having taken a first-year contracts class could identify as the pivotal legal issues. From the claimed admissibility of prior negotiations to what light those prior negotiations might purportedly shed on the final agreement, the legal contentions advanced to support the Dismissed Counterclaims were utterly devoid of merit.[8] They wholly disregarded such fundamentals as the offer-and-acceptance rudiments of contract law, and they did not even gesture in the direction of addressing the Settlement Agreement's integration clause.

### Contingent Fee Agreement

Fee Agreement § IX.9 specifies that it is to be construed according to Illinois law, and in Illinois "because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others" (Gallagher v. Lenart, 226 Ill. 2d 208, 233, 874 N.E.2d 43, 58 (2007)). At the same time, "[c]ontract terms should also be interpreted in accordance with the custom and usage of those particular terms in the trade or industry of the parties" (Intersport, Inc. v. Nat'l Collegiate Athletic Ass'n, 381 Ill. App. 3d 312, 319, 885 N.E.2d 532, 539 (1st Dist. 2008)). On the other hand, dictionaries may be useful for discerning the "plain and ordinary meaning" of terms where it is that meaning that controls (see Fremont Cas. Ins. Co. v. Ace-Chicago Great Dane Corp., 317 Ill. App. 3d 67, 74, 739 N.E.2d 85,

---

[8] Needle, P.C.'s contentions also ran aground on the Illinois Mediation Act and Illinois Rules of Professional Conduct 1.5(c) and 1.8(g), but because the Dismissed Counterclaims were so glaringly frivolous for the reasons discussed in the body of this opinion there is no need to pore over the Dismissal Memorandum to determine whether every jot and tittle of its argument violated Rule 11(b)(2).

91 (1st Dist. 2000)). All of those principles are an aid to the "primary objective in construing a contract," which "is to give effect to the intent of the parties" (Gallagher, 226 Ill. 2d at 232, 874 N.E.2d at 58) -- but that objective is tempered by the countervailing consideration that "Illinois construes attorney contingent agreements strictly in favor of clients" (In re Solis, 610 F.3d 969, 972 (7th Cir. 2010)).

Thus it was of no importance that Fata was able to adduce a dictionary definition indicating that "pursuant to any settlement agreement" could conceivably mean something else than "as embodied in any settlement agreement." Nor was Needle, P.C. aided by the handful of cases that Fata turned up that interpreted what "pursuant to" meant in entirely different contracts or statutes. What mattered -- and the only thing that mattered -- is what "pursuant to any settlement agreement" meant in Fee Agreement § IV.1(A). At issue was not what the words could mean in other agreements but rather what they plainly meant in this one.

This opinion need not rehearse in detail the reasons why the arguments advanced in the Dismissal Memorandum are clearly fallacious. In brief, the interpretation advanced by Fata did not make sense in light of (1) the procedures for ratifying a settlement specified in Fee Agreement § VI.2 and (2) the requirement of Illinois Rule of Professional Conduct 1.5(c) that contingent fees be stated in writing. Nor did that lamely attempted interpretation reflect the way settlement agreements are normally drafted, where the bare specification of a lump sum signifies that the amount was not divided into specifically calculated -- but for some inexplicable reason unrecited -- subtotals for compensatory damages, exemplary damages, statutory damages, costs, expenses and attorneys' fees.

What is the key for purposes of the present motions is that Fata's arguments did not even make a show of elucidating the Contingent Fee Agreement according to generally accepted

principles of contract interpretation.  In terms of his unsuccessful attempt to argue that Royce's interpretation -- which <u>proper</u> analysis revealed to be the only plausible interpretation -- was not necessarily that only plausible interpretation, the Dismissal Memorandum did not advance any coherent reading of its own.

Nor does Fata's memorandum opposing the motions for sanctions speak to the bankruptcy of his arguments in logical terms (or in legal terms, which may sometimes be thought to depart from logic[9]).  Instead Fata simply repeats that he cited case law and a dictionary to oppose Royce's interpretation of Fee Agreement § IV.1 (F. Resp. 3, 9).  But what requires -- yet has not received -- justification for purposes of the current motions is Fata's entire procedure of simplistically opening up a dictionary to find a definition that might perhaps be stretched to support his client's counterclaim and then searching out some cases that, at best, have arguably employed that same definition, regardless of whether that definition was the one intended by the parties in <u>this</u> case at the time of contracting, as revealed by industry custom and the structure of the Contingent Fee Agreement as a whole.  Fata's task was not to search the headwords of a dictionary but to interpret a contract, and because he performed only the former task -- and now defends only his competence in having performed that task -- his contract interpretation was not warranted by any defensible articulation of the law.

**<u>Settlement Agreement</u>**

Just as with the Contingent Fee Agreement, a comparison of the law applicable to the Settlement Agreement with the arguments proffered by Fata plainly shows why the latter were

---

[9]  As Oliver Wendell Holmes put it at page 1 of <u>The Common Law</u> (1881):

The life of the law has not been logic:  it has been experience.

legally frivolous. In no way could the Settlement Agreement be read to have made an award of attorneys' fees, so that in no way could the Dismissed Counterclaims have had merit.

As in the Contingent Fee Agreement, Settlement Agreement § 19 also contained a choice of law provision under which it "shall be governed by and in accordance with the law of the State of Illinois." That being so, where as here a writing represents a complete statement or total integration of the parties' agreement, the Illinois parol evidence rule "generally precludes evidence of understandings, not reflected in a writing, reached before or at the time of its execution which would vary or modify its terms" (J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc., 162 Ill. 2d 265, 268-69, 642 N.E.2d 1215, 1217 (1994)). In the presence of a total integration provision, such as exists here, that preclusion reaches additional consistent terms as well (id. at 273, 642 N.E.2d at 1219-20).

Only if the language of a contract is ambiguous on its face (that is, when looking solely to the four corners of the agreement) will an Illinois court turn to extrinsic evidence as an aid to interpretation (Air Safety, Inc. v. Teachers Realty Corp., 185 Ill. 2d 457, 462, 706 N.E.2d 882, 884 (1999)). There is an even steeper mountain for a proponent of parol evidence to climb where (as here) the writing contains an integration clause, for in that regard Air Safety, id. at 464, 706 N.E.2d at 885 further teaches:

> [W]here parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence.

In such a case "extrinsic evidence of prior negotiations" cannot be considered "to create an 'extrinsic ambiguity'" (id., with internal quotation marks in the original).

At a still more fundamental level, "an offer, an acceptance and consideration are the basic ingredients of a contract" under Illinois law (Melena v. Anheuser-Busch, Inc., 219 Ill. 2d 135,

151, 847 N.E.2d 99, 109 (2006)). As <u>Sementa v. Tylman</u>, 230 Ill. App. 3d 701, 705, 595 N.E.2d 688, 692 (2d Dist. 1992) has put it, moreover, "Responding to an offer with a counteroffer constitutes a rejection of the original offer," and "[a] rejected offer cannot be revived by a later acceptance."

Here Fata had to establish that an agreement existed between the <u>Amari</u> litigation plaintiffs and defendants under which the latter would pay a specific amount as the attorneys' fees of the former. In that respect he did not (as he could not) point to the language of the Settlement Agreement. He did not even competently argue that there was any agreement at all along those lines, whether specifically mentioned or not. For whatever form such an agreement to pay attorneys' fees might take under the Contingent Fee Agreement, by the terms of Settlement Agreement ¶ 18 there could be no such accord if it was not expressly stated in the writing: Instead there was a total integration provision! Nor do Fata and his firm even attempt to justify their ignoring that provision in response to the instant sanctions motions (see F. Resp. 9-11).

Confronted with that difficulty, Fata did not argue that the Settlement Agreement was facially ambiguous, nor did he suggest that parol evidence was admissible. Instead he jumped straight into recounting allegations concerning prior negotiations, insisting that the motions to dismiss required controverting the facts that he alleged (see, e.g., N. Resp. Mot. Dismiss 15-16). That strategy too goes undefended in response to the present motions (see F. Resp. 9-11).

What is worse, the parol evidence upon which the Dismissed Counterclaims were sought to be founded and that was proffered by Fata consisted entirely of offers that had been rejected (see Pleadings Statement 2). Thus Royce had sent a mediation demand that included attorneys' fees -- but that produced a counteroffer, not an acceptance (N. Am. Cc. against R. and AGP

¶¶ 195, 200-01).  Another demand along the same lines was issued in the second mediation --

and that too was the subject of counteroffers that were themselves rejected in turn (N. Am. Cc.

against R. and AGP ¶¶ 204-07, 218-19).  It goes without saying that those rejected offers, which

never reached the offer-and-acceptance stage essential to a mutually binding agreement, were not

somehow revived and given contractual status just because the <u>Amari</u> litigation defendants

eventually settled for an amount in the general vicinity of those demands.

And the suggestion that Royce's September 20, 2013 email to four members of the Amari

Group constituted an agreement by the <u>Amari</u> litigation defendants to pay $2.5 million to the

attorneys (see Pleadings Statement 2; N. Resp. Mot. Dismiss 8) is truly dumbfounding.  Not only

was it a description of an offer that the <u>Amari</u> litigation plaintiffs rejected (N. Am. Cc. against

R. and A. ¶¶ 218-19), but the <u>Amari</u> litigation defendants were not even privy to that

communication, and no persons of even minimal intelligence could believe that it described an

agreement by them to pay $2.5 million in attorneys' fees.  In its amended pleadings Needle, P.C.

casts Royce's description as promising "a total distribution to plaintiffs of $1.6M and a legal fee

of $2.4M" (N. Am. Cc. against R. and A. ¶ 216) -- not $2.5 million.  But Royce's email actually

proposed that he and Needle, P.C. would receive $1 million each (N. Decl. Mot. Dismiss ¶ 31).

Needle, P.C. arrived at its figure of $2.4 million only by reasoning (?) that because Royce's email

had linked the $1 million per law firm parol to an allocation of $1.6 million to the <u>Amari</u>

litigation plaintiffs, there would have been "an extra $2.4 million to distribute, <u>presumably for</u>

<u>attorney's fees</u>" (N. Decl. Mot. Dismiss ¶ 31).  Royce's statement to his clients that an offer (one

that they rejected) was large enough to set $2 million aside for the attorneys (for whom Needle,

P.C. argues that $2.4 million was actually available) cannot even arguably equate to an

agreement by the <u>Amari</u> litigation defendants to allocate $2.5 million for fees.

What is more, the various pieces of parol evidence that Fata put forward in his attempt to vary the unambiguous terms of a fully integrated contract recited different numbers rather than any definite amount of attorneys' fees that the <u>Amari</u> litigation defendants are fancifully said to have agreed to pay. One rejected mediation demand did indeed advert to a $2.5 million jackpot (N. Am. Cc. against R. and A. ¶ 204), while another demanded "approximately" that amount (N. Am. Cc. against R. and A. ¶ 195). But Fata also sought to point to a quoted figure of $2 million as "proof" of $2.4 million (N. Am. Cc. against R. and A. ¶ 216; N. Decl. Mot. Dismiss. ¶ 31) before he conceded in the Dismissal Memorandum that there might be an issue of fact over whether the (alleged) separately negotiated attorney's fee was actually just $2.2 million (N. Resp. Mot. Dismiss at 2).[10]

That indeterminacy is damning, for the Settlement Agreement was not a requirements contract or one where the price was set by reference to an specified index. Instead it was, as Needle, P.C. would have it, a contract to pay a definite sum in attorneys' fees. But simply to frame it in those totally amorphous and varying numbers is a sure sign -- an unmistakable sign -- that there was no such agreement. Even were the parol evidence not excludable, it still would not suffice to establish the existence of any <u>agreement</u> at all (as contrasted with a series of rejected offers), let alone an agreement to pay $2.5 million in particular.

---

[10] Although the Dismissal Memorandum does not identify the source of its $2.2 million figure -- a fourth candidate for a purportedly-agreed-upon amount of attorneys' fees -- it seems clear that it stems from a series of post-settlement communications where just three of the 16 <u>Amari</u> litigation plaintiffs wrote (or merely forwarded) emails to Royce, Needle and another two plaintiffs with a proposed distribution (see N. Am. Cc. against R. and A. ¶¶ 244, 250, 256).

**Factual Contentions Without Evidentiary Basis**

Royce and the 4Amari Group urge that the Dismissed Counterclaims also violated Rule 11(b)(3), which deals with the evidentiary support that factual contentions must have (see R. Mem. 7-9; R. Reply 7-10). But Echo, Inc. v. Whitson Co., 121 F.3d 1099, 1102 (7th Cir. 1997) has said that under Illinois law the bare existence of a contract is a matter of law when the basic facts are not in dispute. With no substantial discovery having taken place in this case and with the possibility that the facts alleged in the Dismissed Counterclaims might add up to a contract for payment of attorneys' fees, this Court is not in a position to find those allegations wanting as to their evidentiary basis as well. Hence the potential for the imposition of monetary sanctions against it on this additional ground[11] depends on whether the Dismissed Counterclaims were also presented for an improper purpose.

**Presented for an Improper Purpose**

Neither Fata nor Needle, P.C. has, in opposing the current motions for sanctions, presented any believable innocent explanation for the glaring deficiencies in the Dismissed Counterclaims. On the contrary, any lawyer admitted to the bar (let alone one with Needle's background -- he says he has had 35 years of experience litigating complex civil matters with multiple clients and in class actions (N. Am. Cc. against R. and A. ¶ 21)) should have realized how utterly baseless the contentions there were.

Nor did Needle, P.C. or Fata have to await opposing counsels' shots across the bow to alert either of them to the Dismissed Counterclaims' shortcomings. This Court had admonished

_____

[11] To keep the analytical eye on the ball, it should be emphasized that what has been said to this point has already established the movants' entitlement to the imposition of sanctions. What follows in the text examines whether the movants have an independent second arrow in their sanctions quiver.

them that it did not see how those arguments could be presented consistently with Rule 11, and had otherwise highlighted their failings, both before they were presented in writing (it did so by criticizing the parallel problems with the precursor contentions in Needle, P.C.'s initial pleadings) and also did so afterwards, when there was still time to withdraw them. Instead the only changes that occurred in the various iterations of the pleadings (and proposed pleadings) was to recount legally irrelevant facts in ever greater detail.

Thus this was not a case of having advanced a legally frivolous position due to insufficient or slipshod research. Instead both Needle, P.C. and Fata proceeded in direct contravention of the knowledge built into every attorney's educational training, so that they could not have advanced the Dismissed Counterclaims consistently with Rule 11(b)(2). Only a determined indifference to the legal merits of the case serves to explain their conduct.

In that respect it is clear that Needle and Fata concocted the fanciful approach presented in the Dismissed Counterclaims -- under which Needle, P.C. and Royce, as the ultimate lawyers in the underlying litigation, would receive up to 60% of the $4.2 million settlement figure, with the Amari Group clients having to divide up only the remaining 40% or so -- because the Settlement Agreement had contained no provision as to an award of attorneys' fees and Judge Tharp had not acceded to the inclusion of such an award in any order thereafter. Because the Settlement Agreement and Judge Tharp's dismissal orders were silent on the subject of attorneys' fees, the required presentation of the proposed settlement for approval by at least 2/3 of the Amari Group (expressly called for in the Needle-drafted Fee Agreement § VI.2) -- a presentation communicated by Needle -- would necessarily have included full disclosure of all aspects of the

settlement, importantly including proposed attorneys' fees, so that the Amari Group clients could make a fully informed judgment.[12]

That full disclosure would by definition have had to include an explanation of the 2/3-to-the-clients and 1/3-to-the-lawyers alternative that Needle himself had drafted in the first instance and embodied in Fee Agreement Part B. And there can of course be little if any doubt that if such proper disclosure had been made, the obvious economics of the situation would have resulted in the approval of the Settlement Agreement as tendered to the Amari Group -- a Settlement Agreement that did not contain a lawyers' fee award, thus causing Fee Agreement Part B to kick in as defining the lawyers' participation in the $4.2 million proceeds of settlement.[13]

Thus hoist by his own petard, Needle (along with Fata as counsel for Needle, P.C.) invented the claimed theories that now attempt to substitute a judicially determined award in place of the Contingent Fee Agreement's requirement, as drafted by Needle himself, calling for approval by 2/3 of the Amari Group. That is surely the epitome of an improper purpose.[14]

---

[12] It goes without saying that the subject of fees, with its necessarily built-in conflict of interest between a lawyer and his or her client who is not separately represented by counsel on that subject, is the paradigmatic topic calling for such full disclosure.

[13] Needle, P.C. has sought to deflect attention from its own misconduct by pointing to Royce's having participated in communicating the details of the Settlement Agreement to the Amari litigation plaintiffs to seek their ratification (N. Resp. Mot. Dismiss 11-12, 18, 20-21; see also N. Am. Cc. against R. and A ¶¶ 228$^c$-31). But unlike Needle, Royce has not betrayed the trust of his clients by interposing frivolous claims and arguments in an attempt to extract more in the way of fees than the Contingent Fee Agreement entitles him to receive -- and indeed the very filing of this lawsuit by Royce and the legally frivolous nature of Needle, P.C.'s responses provide particularly compelling proof of that contrast.

[14] What has been said here expresses no view as to the appropriate division of the $1.4 million attorneys' fees between Royce and Needle, P.C., another aspect of the dispute posed
(continued)

## Effect of Withdrawn Motion To Amend

Fata argues that he and Needle, P.C. cannot be sanctioned because he filed a motion to amend the Dismissed Counterclaims (F. Resp. 13). Under Rule 11(c)(2) a motion for sanctions

> must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.

What is <u>not</u> included in that list is a bare motion to amend. And while the Rule literally reads that the sanctions motion cannot be brought if the challenged paper or claim is <u>withdrawn</u>, it cannot seriously be suggested that a challenged claim is immune from sanctions if the paper in which it is advanced is replaced by a second paper that re-advances that same claim. If that were so, a law firm could press legally frivolous claims without sanction so long as it did so serially. Instead the Rule's only sensible reading is that if a claim or denial or motion or other paper is challenged, it must be withdrawn or corrected.

Certainly no precedent of which this Court is aware sanctions (in the other sense of that word's usage as a verb) the reading that Fata has tendered. On the contrary, where a bare motion to withdraw has shielded a party from sanctions that is because the proposed amendments have <u>dropped</u> the offending claims (see <u>Sneller v. City of Bainbridge Island</u>, 606 F.3d 636, 639 (9th Cir. 2010); <u>AeroTech, Inc. v. Estes</u>, 110 F.3d 1523, 1528 (10th Cir. 1997)). This Court was unable to find so much as a single case where a Court of Appeals had even been called on to address the wholly contraintuitive position that a motion to reassert frivolous claims should shield a party from sanctions, let alone finding any such court that has so held.

_____

(footnote continued)
by this litigation (see, e.g., the Royce Engagement Letter ¶ 7.4, N. Am. AD against R. I through III and N. Am. Cc. against R. III).

Here Needle, P.C. did not even seek to withdraw the Dismissed Counterclaims. Instead its proposed amendments actually repeated the legally frivolous Dismissed Counterclaims, supplemented only with more detailed factual allegations. And -- quite damningly -- those added allegations described the attorneys' fee that was purportedly negotiated separately as "[a]n attorneys' fee in an amount between $2.2-2.5 million" (Dkt. No. 106 Ex. A ¶ 183 and Ex. B ¶ 180) and thus simply made the violation of Rule 11(b)(2) more visible instead of curing it. So Fata's contention based on his motion to amend is just as empty -- just as frivolous! -- as the Dismissed Counterclaims themselves.

## Attorneys' Fees

While Rule 11 is not supposed to take the place of a fee-shifting statute, and while any monetary sanctions imposed under it are not necessarily meant to be compensatory in nature, the Rule's deterrent purposes are best served in this case by granting Royce's and the Amari Group's requests for attorneys' fees. Because the Dismissed Counterclaims were filed with the inevitable consequence of increasing the costs of this litigation, compelling the offenders to pay a fine only to the Clerk of the Court rather than reimbursing their adversaries would effectively punish the innocent victims of those tactics by increasing <u>their</u> litigation costs -- the fees payable because of <u>their</u> efforts in opposition to such tactics.

Nor should the imposition of such monetary sanctions be restricted unduly. Fata and his firm are clearly liable for the payment of a monetary sanction for their violation of Rule 11(b)(2), and while Rule 11(c)(5)(A) insulates Needle, P.C. under Rule 11(c)(2) because it has been a represented party, it is not shielded from monetary sanctions imposed for presenting a paper for an improper purpose. Because this opinion has found that Needle, P.C. did just that, the fees and expenses attributable to defeating the Dismissed Counterclaims are imposed on it as well.

To be clear, only those fees and expenses stemming from having to file the Rule 12(b)(6) motions aimed at the Dismissed Counterclaims and the instant motions for sanctions are chargeable against Needle, P.C., Fata and Cafferty Clobes. While nearly identical counterclaims were advanced in the initial pleadings and in the withdrawn second amendment to the pleadings that called for responses by Royce and the Amari Group, those papers are not before this Court on a motion for sanctions. Nor should any time separately spent on the now-withdrawn motions for sanctions under 28 U.S.C. § 1927 be included.

Where as here more than one person or entity are held to bear any financial responsibility in litigation, the questions of apportionment of such responsibility and of whether joint or several liability should be the order of the day may present complex problems. Although this Court has no desire to prolong unduly the final resolution of the issues dealt with here, it seems only fair to get input from the parties on those subjects before resolving them.[15]

### Remaining Affirmative Defenses and Counterclaims

In light of the Rule 11(c)(4) prescription that limits appropriate sanctions to those that suffice to deter repetition of the same conduct, the fact that Needle, P.C. still has eight affirmative defenses and seven counterclaims pending poses a problem. After all, if those contentions are pursued so far as to further increase the costs of litigation, and if the evaluation of those contentions were to lead to the same results arrived at in this opinion (a subject that this Court has taken pains to avoid in this opinion), no one's interests would be well served. With Fata and his firm now out of the picture and with Needle, P.C. not now represented by counsel, it

_____

[15] Meanwhile, to avoid even further prolongation, the parties are urged to meet and confer promptly about the quantification of the sanction award, and if possible to begin to do so even before the February 12 status hearing date set in the Conclusion.

would seem that the best course is to urge Needle (who is no doubt the principal, if not the sole, member of that professional corporation) to take a deep figurative breath and participate in the status hearing hereafter ordered in the <u>Conclusion</u> section of this opinion.

## <u>Conclusion</u>

This Court is of course more than well aware that Needle, P.C. has been without counsel since November 10, 2015 (see Dkt. No. 203) and has been on notice that it would need to get new counsel since at least October 26, 2015, when its attorney requested leave to withdraw (see Dkt. No. 192). But Needle does not seem to be equally aware that it may be perilous for him to play ostrich in a belief that the mere existence of his professional corporation can necessarily insulate him from personal responsibility for what has been dealt with in this opinion and what may come hereafter in this litigation.

That said, for the reasons set out in detail in this opinion Royce's and the Amari Group's motions for sanctions against Needle, P.C., Fata and Cafferty Clobes are granted under Rules 11(b)(1) and (2) and denied under Rule 11(b)(3). To discuss (1) the implementation of those rulings, (2) the continuing posture of Needle, P.C. in this litigation, (3) the subject referred to in the preceding paragraph of this Conclusion and (4) the further proceedings in this action generally, a status hearing is set for 9:30 a.m. February 12, 2016.[16]

_Milton I. Shadur_
Milton I. Shadur
Senior United States District Judge

Date: February 2, 2016

---

[16] Although Needle's personal presence would undoubtedly contribute to a more effective hearing both in terms of logistics and otherwise, if he finds that an in-person poses problems he should call this Court's courtroom deputy Carol Wing (312-435-5767) at least two working days before the hearing to designate a number at which he can be called to enable him to participate telephonically.