# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **MERLE L. ROYCE**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 15 C 259 |
| | ) |
| **MICHAEL R. NEEDLE, P.C.**, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This Court's February 2, 2016[1] memorandum opinion and order ("February 2 Opinion," Dkt. Nos. 211 and 212) sanctioned Michael R. Needle, P.C. ("Needle, P.C."), its then (but now former) attorney Anthony F. Fata ("Fata") and Fata's law firm, Cafferty Clobes Meriwether & Sprengel, LLP ("Cafferty Clobes"), for having violated Fed. R. Civ. P. ("Rule") 11(b)(1) and (2) by advancing frivolous counterclaims against (1) Needle, P.C.'s former co-counsel who is the plaintiff in this interpleader action, Merle Royce ("Royce"), and (2) 15 of their 16 former clients (the "Amari Group") in a now-settled underlying action.[2] Following the issuance of that opinion, all the parties involved other than Needle, P.C. -- which did not respond to the other parties' attempts at communication and from which this Court had heard nothing since its most recent counsel withdrew on November 10, 2015 -- tendered a Proposed Order that would allocate the prevailing parties' attorneys' fees equally between Needle, P.C. and Cafferty Clobes and would

---

[1] Because all but one of the other dates referred to in this opinion were in 2016, in the interest of simplicity all further date references will omit any "2016" year identification.

[2] Their sixteenth former client, John R. Cardulo & Sons, Inc., was not involved in the sanctions motions.

direct that Needle, P.C.'s 50% allocation be paid from its share of the disputed escrow account (there being no doubt that it would be entitled to at least that amount).

Then on February 26 this Court issued a brief order (Dkt. No. 222) that gave Needle, P.C. until March 11 to provide input as to the Proposed Order. After it requested and received a brief extension, Michael Needle ("Needle") -- whom this Court had ordered to respond personally (see Dkt. Nos. 211 and 222) because he had left his wholly-owned professional corporation without representation by counsel for a 4-1/2 month period after its last counsel's departure from the case in November 2015 -- delivered a March 21 Response (purportedly on behalf of Needle, P.C.[3]) that opposed the Proposed Order and that was supported by his own Declaration.

Regrettably, the arguments put forward in that submission by Needle are so lacking in merit that this opinion will address them largely in the order presented, rather than attempting to synthesize an orderly structure. Indeed, those arguments are largely akin to heaping Pelion upon Ossa: Needle's current response to the sanctions-enforcement Proposed Order could well be sanctionable in itself.

Thus Needle's contentions that the money from which the sanctions award is to be paid should not (at least yet) be distributed to Needle, P.C. because not all payments toward that

---

[3] When it has suited his purpose, Needle has been careful to maintain a separation between his individual persona and that of the professional corporation, Needle, P.C., of which he is the President and sole member. That has crested unwarranted complexities -- there is no excuse for his most recent stonewalling in not obtaining new counsel for Needle, P.C. (this Court had ample ground for denying his attempt to represent Needle, P.C. as to the merits of its dispute with Royce and the Amari Group (Dkt. No. 191)). That said, however, this Court will give Needle the benefit of the doubt in assuming that he acted in good faith in apparently viewing Dkt. No. 222 as a direction to respond on behalf of Needle, P.C. rather than as an individual. But that was not this Court's intention -- instead it expects to hold Needle personally responsible for the positions advanced in his Response, and to regard Needle, P.C. as responsible (a) for its delinquency in remaining unrepresented and (b) for whatever consequences may flow from that delinquency.

recovery have been made (Response at 2) are egregious examples of absolute garbage.  True enough, Section VII.2 of the October 6, 2008 Contingent Fee Agreement assures the former clients in the underlying case that no dispute among the attorneys "will interfere with or delay the distribution of any portion of any recovery due to any of you," but Needle shamelessly ignores the fact that it is this interpleader action -- which Royce was compelled to bring in order to deal with Needle, P.C.'s frivolous and now-dismissed interpretation of that Contingent Fee Agreement -- that is delaying any distribution to those former clients, not any proposed compensation for injuries that has deliberately been inflicted upon them.  And he totally ignores as well the fact that any disagreement between Needle, P.C. and Royce about their relative entitlements to fees is as to their respective shares of the $1.4 million in total fees prescribed by the Contingent Fee Agreement -- a dispute that does not at all pose any threat of the type that Section VII.2 sought to guard against.

Nor is it for Needle to advance what he contends are the Amari Group's interests against the attorney of its choosing or to venture that equity forbids either that attorney or Royce's attorney to be paid before the Amari Group and Royce themselves are -- that is, while Needle and Needle, P.C. prevent this interpleader action from being concluded (see Response at 3).  Such contentions are doubly disingenuous, given that both Royce and the Amari Group signed off on the Proposed Order against which Needle purports to act as their self-appointed champion.  Indeed, it must be remembered that the Amari Group in particular fired Needle, P.C. as counsel and has since then emphatically and repeatedly rebuffed his pretentions to speak for it.

Similarly, most of Needle's objections to the size of the proposed sanction betray a cynical or pathological willingness to assert arguments without regard to whether they have any persuasive force whatever.  In candor, this Court's instantaneous reaction to Needle's labeling of

the sanction award as "patently excessive" (Response at 4) was to classify it as bordering on the absurd. But this opinion's more extended analysis has shifted that characterization as having crossed the border into the realm of the truly absurd.

It is easy to see why that is so. It must not be forgotten that the difference between Needle's distortion of the Contingent Fee Agreement (a document that he himself had drafted), when applied to the settlement agreement that resolved the underlying litigation, would have taken (depending on Needle's shifting positions from time to time) an amount between some $600,000 or $800,000 at the low end and more than $1 million at the high end from the pockets of his own clients into the pockets of the lawyers (principally Needle himself).[4] Clearly any notion that the counsel for the Amari Group and the counsel for Royce should have met that vigorously advanced position with a less vigorous response than they did, thus taking the risk that their failure to go full bore might occasion a less fully analytical judicial response, makes no sense.

Moreover, as the following discussion shows, there are other highly cogent reasons to reject Needle's attempted second-guessing (a sort of "My own argument was so unsound that opposing counsel should have spent less time in challenging it"). For example, in the course of mangling the holding of this Court in a different case,[5] Needle proposes that Rule 11(b)'s

---

[4] That result would have followed from Needle's bogus contention that Section IV.1(A) rather than the plainly applicable Section IV.1(B) of the Contingent Fee Agreement was the properly applicable provision.

[5] Contrary to Needle's summary, the assertedly offending complaint in <u>Donohoe v. Consolidated Operating & Production Corp.</u>, 139 F.R.D. 626, 633 (N.D. Ill. 1991) was filed before our Court of Appeals had rendered it unviable -- indeed, it had expressly left the decisive issue unresolved -- and so there was a real question as to whether opposing counsel had failed to
(continued)

requirement for reasonable inquiry before a paper is presented means that his professional corporation should not have to pay any attorneys' fees incurred before a case later cited by this Court was brought to his attention by opposing counsel who is trying to have that Needle, P.C. paper tossed in the trash -- even if that later-cited case is relied on solely for an uncontroversial canon of construction on which the merits of Needle, P.C.'s position did not particularly turn (see Response at 4).

Even more groundlessly, under Needle's topsy-turvy brand of "reasoning" be contends that the more frivolous the argument, the less an injured party should be able to recover in attorneys' fees for opposing it (Response at 4). To the contrary, responsible counsel who are required on behalf of their clients to oppose a frivolous argument must fortify their opposition with the best available arguments, not rely on naked declarations that the frivolous argument would fail the laugh test -- all the more so when up to $1 million or more hangs in the balance and when Needle, P.C.'s voluminous, meandering and equivocal filings operate to frustrate simple treatment. On that score our Court of Appeals' affirmance of an earlier sanction award by this Court in Brandt v. Schal Assocs., Inc., 960 F.2d 640, 648 (7th Cir. 1992) (internal quotation marks and citation omitted) could well have been written for this case:

> Shallow claims may require costly replies. . . . We have little sympathy for the litigant who fires a big gun, and when the adversary returns fire, complains because he was only firing blanks.

And the most charitable reading of Needle's assertion that "[t]he Rule 12 proceedings to which the sanctions pertain involved issues other than the ones for which sanctions have been

---

(footnote continued)
mitigate its damages by neglecting to tell the plaintiff that recent changes in the law required it to withdraw a particular count. Nothing of the sort occurred here.

imposed," so that not all of the time spent at those hearings should be chargeable (Response at 4-5), is that it cavils over minutes in fee petitions that claim over 400 hours of wasted time -- in evident anticipation that even more hours might therefore be wasted in arguments over just how many minutes were spent in court on those issues.

Both Royce and the Amari Group submitted detailed fee petitions justifying their requests for $112,540.40 and $41,745.30, respectively (Dkt. Nos. 215 and 219), but Needle responds only with vague objections that identify no particular item that should not have been billed. Though he asserts that attorneys for Royce and the Amari Group performed some duplicative work (Response at 5), Needle, P.C. cannot insist that parties on opposite sides of the "v." sign must coordinate so closely that in effect they have a single counsel. In any event, it is plain from the record that they did coordinate, so that Needle's failure to identify any instances of waste or churning sinks his argument. And Needle has been around the block long enough to know that the possibility that Cafferty Clobes may have settled its liability for less than its share -- if Needle is correct that it has[6] -- does not impugn Royce's or the Amari Group's itemization of their damages (see Response at 5).

Thus only two arguments in Needle's Response may call for further discussion. First, he challenges the hourly rate of $350 charged by counsel for the Amari Group (Response at 5).

---

[6] Before receiving Needle's Response this Court had begun editing the Proposed Order to clarify (among other matters) that Cafferty Clobes would be discharged upon paying its 50% share of the aggregate amount of the sanction and that it had agreed to pay that amount, for the Proposed Order had spoken only of a sum certain specified in a confidential settlement agreement. This Court does not of course presume that Needle has provided the context necessary for understanding the statement that he attributes to a named partner at Cafferty Clobes to the effect that said sum is actually "far less" than its 50% share (see Response at 5; N. Decl. ¶ 20), but he might perhaps provide some input about that matter at the next status hearing.

Second, he says that ordering payment from the escrow account would disadvantage him in a way that simply ordering payment would not if the February 2 Opinion is overturned on appeal, for then he would have to recoup money already distributed, rather than simply being excused from making a payment never tendered (Response at 6).

Needle's silences are telling as to the hourly rate claimed by counsel for the Amari Group, for he does not contend that the counsel has not actually charged his client $350/hour in this case -- in fact, Needle's Declaration has attached a copy of that counsel's fee agreement that provides for precisely that rate . Instead Needle argues only that attorney Cochran's fee in a different case back in 2009 was just $250 an hour (see N. Decl. ¶¶ 10, 12, 14). Nor is there any affirmation that $350 is an unreasonable hourly rate for a partner in an established and respected Chicago law firm who has been at the bar for over 45 years. By contrast, counsel for the Amari Group has submitted sworn declarations affirming that $350 per hour is a reasonable rate in the Chicago market for someone of his experience handling this sort of case and is indeed his ordinary fee -- the 2009 case was billed at a discounted rate for an insurance company, and even then was only reduced to $300 an hour (Dkt. No. 239).

Most tellingly, Needle has blithely ignored the repeated adherence of our Court of Appeals, in actions involving fee shifting, to the principle that the best evidence of the reasonableness of lawyers' hourly rates is what those lawyers' clients have actually paid the lawyers for the services involved. Here, for example, is the voicing of that teaching in <u>TruServ Corp. v. Flegles, Inc</u>., 419 F.3d 584, 593 (7th Cir. 2005), with the internal quotation drawn from an earlier Seventh Circuit case (emphasis in original):

> We also note that "[c]ourts award fees at the market rate, and the best evidence of the market value of legal services is what people pay for it. Indeed, this is not 'evidence' about market value; it <u>is</u> market value."

- 7 -

Needle's attempt to counter that principle with a single years-old instance that bears no similarity to the current case on a number of grounds is not just a weak reed on which to lean -- it is no reed at all.

Hence Needle has once again put forth a bankrupt position. This Court flatly rejects his claim of excessiveness.

As for Needle's concern that his professional corporation would be disadvantaged by payment from the escrow account if the sanction is overturned, the negatives stemming from his proposed alternative far outstrip the claimed danger, especially given that the default state of affairs under his counterproposal should he continue to sit on his hands -- not even acting to obtain new counsel -- is that no one will see any money for years. For Needle suggests instead that any payment of the sanction imposed on his professional corporation should be delayed until this Court eventually disposes of this interpleader action and orders disbursements from the escrow account, at which point Needle, P.C.'s share of that account would be deposited with the Court until Needle, P.C. has exhausted all of its appeals of both the final judgment and the sanction (Response at 1, 7).

But the Proposed Order was devised precisely out of a reasonable apprehension that Needle would attempt to render collection impossible by his own stubborn inaction. Needle, P.C.'s failure -- or at this point, it is more properly labeled a refusal -- to secure counsel serves no purpose but to impede the progress of this action on the merits, and indeed Needle has sought to hide behind it by pretending falsely that he received no notice of proceedings related to the

February 2 Opinion.[7] Initially the counsel for Royce and the Amari Group quite understandably sought joint and several liability, leaving to Cafferty Clobes the hassle of dealing with its former client. Faced with the problem of how to prevent Needle, P.C.'s delaying tactics and unable to obtain Needle, P.C.'s involvement, the adversaries have sought the compromise position set out in the Proposed Order -- and everyone other than Needle (and hence Needle, P.C.) has found that approach acceptable.

Needle's counterproposal may provide ultimate payment, but at the unfair cost of delaying it until long after the entire interpleader action is at an end. And if the ultimate order (this Court has not yet approved either the Proposed Order or any revised version) were to generate an interlocutory appeal, there is no suggestion that the payees would not be able to make good on repayment (note, in fact, that the posting of a supersedeas bond or its equivalent by Needle or Needle, P.C. -- see Fed. R. Civ. P. 62(d) -- would effectively deal with their argument for a stay).

In sum, no even arguable case has been made that would call for a rejection of structuring the sanction contemplated in the February 2 Opinion along the broad outlines of the Proposed Order, with equal liability and with Needle, P.C.'s 50% share to be disbursed immediately from the disputed escrow account. But the Proposed Order was drafted when it seemed that nothing

---

[7] When Needle, P.C.'s most recent counsel of record withdrew from representing that professional corporation, it no longer had a designated provision for electronic notice. But to put the direct lie to Needle's no-notice contention, Royce and the Amari Group have shown that they sent their fee petitions, the Proposed Order and notices of upcoming status hearings to him directly via e-mail (Dkt. Nos. 226 at 2-3 and 228 at 2-3), and he has attempted to avoid the truth by suggesting that he had not received proper notice (Dkt. No. 225 ¶ 2). In like fashion, he now chides this Court as to the requirement that service must comply with Rule 77(d) (Response at 7). What irony, given the fact that it was Needle's own failure to provide Needle, P.C. with replacement counsel that has caused the claimed noncompliance on everyone's part.

would succeed in smoking out any responsive participation by Needle, P.C. or Needle personally, and what has been said in this opinion calls for some reworking of the Proposed Order -- certainly in some of its language, and perhaps in some substantive respect as well.

Accordingly this Court sets a status hearing at 9:15 a.m. April 8, 2016 to consider what should be done. And because Needle, P.C. has been dropped from the service list since its last attorney withdrew, the Clerk is ordered to serve notice of this order and subsequent filings on Needle individually at his e-mail address, with Needle being responsible for the transmittal of such notices to Needle, P.C.

                                              Milton I. Shadur
                                              Senior United States District Judge

Date: March 28, 2016