IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MERLE L. ROYCE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 15 C 259 |
| | ) |
| MICHAEL R. NEEDLE, P.C., et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

More than a year and a half after Merle L. Royce ("Royce") brought this interpleader action to allocate the settlement proceeds from <u>Amari Co. v. Burgess</u>, Case No. 07 C 1425 (the "Amari litigation") -- at the conclusion of which litigation Royce along with his former co-counsel Michael R. Needle ("Needle") represented 16 plaintiffs (the "Amari plaintiffs") who, along with Needle's professional corporation Michael R. Needle, P.C. ("Needle, P.C."), are now the 17 defendants in this action -- the parties are still stuck at the pleadings stage.[1] Most recently in that respect, counsel for 15 of the Amari plaintiffs (the "Amari Parties") have filed a motion (Dkt. No. 290) attacking various aspects of Needle, P.C.'s Second Amended Cross-Claims under Fed. R. Civ. P. ("Rule") 12(b)(1), 12(b)(6) and 12(f).

During the June 17, 2016 status hearing in the case this Court explained orally, in the course of denying Needle, P.C.'s motion to file a counter-reply to Amari Parties' motion, why Needle, P.C.'s cross-claims are legally deficient. To forestall any effort by Needle and Needle, P.C. to engage in any revisionist history on that score (something that has contributed

---

[1] Along the way this lawsuit has generated well in excess of 300 docket entries !!

substantially to the complexity of these proceedings in the past), this Court will now supplement that oral explanation with this written summary of some reasons for granting the Amari Parties' motion.

## Applicable Rule 12 Standards

Under Rule 12(b)(6) a party may move for dismissal for the "failure to state a claim upon which relief can be granted." Familiar Rule 12(b)(6) principles require the district court to accept as true all of Needle, P.C.'s well-pleaded factual allegations and view them in the light most favorable to it as the non-moving party (Lavalais v. Vill. of Melrose Park, 734 F.3d 629, 632 (7th Cir. 2013)). But "legal conclusions or conclusory allegations that merely recite a claim's elements" are not entitled to any presumption of truth (Munson v. Gaetz, 673 F.3d 630, 632 (7th Cir. 2012)).

In the past decade the Supreme Court made an important change in the evaluation of Rule 12(b)(6) motions via what this Court regularly refers to as the "Twombly-Iqbal canon," a usage drawn from Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), as more finely tuned in Erickson v. Pardus, 551 U.S. 89 (2007) (per curiam), and Ashcroft v. Iqbal, 556 U.S. 662 (2009)). And Silha v. ACT, Inc., 807 F.3d 169, 173-74 (7th Cir. 2015) has confirmed that the Twombly-Iqbal canon's new standard governs facial challenges to a court's subject-matter jurisdiction under Rule 12(b)(1), as well.

That canon has introduced the concept of "plausibility" into the analysis, and in that respect our Court of Appeals has "interpreted Twombly and Iqbal to require the plaintiff to provid[e] some specific facts to support the legal claims asserted in the complaint" (McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011) (internal quotation marks omitted)). As

McCauley went on to reconfirm, claimants "must give enough details about the subject-matter of the case to present a story that holds together" (id.).

Finally, something should be added to counter any possible attempt by Needle or Needle, P.C. to return to the drawing board after the current dismissal. Where as here "it is <u>certain</u> . . . that any amendment would be futile or otherwise unwarranted," the court can deny leave to amend (<u>Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.</u>, 786 F.3d 510, 519-20 (7th Cir. 2015), emphasis in original).

**Background**[2]

Needle, P.C. joined the Amari litigation as added counsel in October 2008, some 19 months after it began. When it did so, Needle took the lead in drafting a new Contingent Fee Agreement ("Agreement") to govern relations among the Amari plaintiffs and their various attorneys, present and future.

Under that Agreement the Amari plaintiffs delegated to a Management Committee the responsibility for monitoring the litigation and consulting with the attorneys (Section III.1). Part of those duties involved maintaining a Litigation Fund to cover expenses as they arose and to pay a retainer to the attorneys (Section V.1-4). Of particular relevance in that regard, Section V read in part:

> 4. The Litigation Fund will: (A) be held by the Management Committee, or a member designated by the Management Committee, (B) be held in a separate account used for no other purpose, and [(C)] be disbursed by the Management

---

[2] References to the parties' memoranda take the form "Mem. --," with identifying prefixes of "A." for the Amari Parties and "N." for Needle, P.C., while references (1) to the latter's 4th Declaration appended to its memorandum take the form "N. 4th Decl. ¶ --" and (2) to its Second Amended Cross-Claims Against the Amari Group Parties take the form "N. 2d Am. Cross-Cl. ¶ --." Citations to the Contingent Fee Agreement, attached as Ex. 1 to Royce's Amended Complaint (Dkt. No. 4), simply read "Section --."

> Committee to counsel and/or third parties in strict accordance with the terms of this Agreement. The Management Committee or its designee will maintain detailed records of all receipts and disbursements and provide this information to counsel or any of you upon request. Any interest in the Litigation Fund will be contributed to the Litigation Fund, with credit for such interest to be allocated pro rata according [to] each of your contributions.
>
> 5. In the event of a settlement, contributions to the Litigation Fund, including interest, will be refunded or credited back to you as set forth in Section VI.

Only the Amari plaintiffs were required to make contributions to the Litigation Fund (see Section V.3), and any delinquency in making required contributions could (at the Management Committee's recommendation) be treated as a loan from the contributing plaintiffs -- not from the attorneys (Section V.7(B)).

Section IV.1 provided that the fee due to the attorneys in the event of settlement or a favorable judgment was to be reduced by any retainer paid pursuant to Section V. And Section VI.3(A) mandated that the attorneys' fees be paid out of any recovery first. Only then were contributions to the Litigation Fund (including any amounts paid toward the retainer) to be refunded to clients still active in the Amari litigation (Section VI.3(B)). Finally, the net proceeds of any recovery were to be distributed among the remaining clients in proportion to their previously documented damages (Section VI.3(C)).

Before any recovery in the Amari litigation was to be so distributed, however, each active plaintiff was to be served with a detailed proposed distribution schedule (the "Schedule") at least 30 days in advance (Section VI.4). Each of the Amari plaintiffs then had a right to examine any source document upon which the Schedule was based (Section VI.5).

If any Amari plaintiff disputed any aspect of the Schedule, it could detail its objection at least three days before the anticipated distribution date (Section VI.6). Only "active clients" were afforded that right to object, and the result of an objection was that distribution would

proceed except with regard to the disputed amount (id.).  Section VI.7 stated in boldfaced capital letters -- the only provision in the Agreement to use either such format:

> **EACH CLIENT HEREBY ACKNOWLEDGES AND AGREES THAT ANY SUCH DISPUTE CANNOT BE RESOLVED BY ANY OF US OR BY ANY OTHER ATTORNEY WHO JOINS US IN REPRESENTING ALL OF YOU.**

Instead any such disputes were to be submitted to binding arbitration (Section VI.8).

Disputes did indeed arise about how to distribute the settlement proceeds when the Amari litigation finally settled in December 2013.  Those disputes included the total amount due to the attorneys in fees, the division of those fees between the attorneys and the amounts to be refunded to the Amari plaintiffs from the Litigation Fund.

As the owner of the escrow account into which the settlement proceeds were deposited, Royce brought this interpleader action in January 2015.  This Court asked the parties to turn first to Needle, P.C.'s twin counterclaims against both Royce and the Amari Parties, asserting that the settlement agreement specified some multimillion dollar amount as an award of attorneys' fees. With that matter having been resolved by this Court's rejection of Needle, P.C.'s contention -- including the imposition of sanctions on Needle, P.C. and its now-withdrawn counsel in this action for having asserted such frivolous nonsense in the first place, in direct contradiction of the provisions of Section IV (it will be recalled that Needle himself was the co-author -- perhaps the principal author -- of the Agreement that prescribed the attorneys' share of any settlement) -- it is now time to turn to the remainder of Needle, P.C.'s allegations against Needle's former clients and his co-counsel Royce.

As to the most recent pleading by Needle, P.C., it asserts two cross-claims against Amari Parties (Dkt. No. 181 Ex. 1).[3] Count I seeks an accounting of the Litigation Fund, while Count II asks that Royce be compelled to distribute the settlement proceeds to the Amari plaintiffs notwithstanding any objection by the Amari Parties -- in effect a request that this Court prepare and enforce a Schedule. In response the Amari Parties have moved to dismiss both cross-claim counts and to strike the 155-paragraph novella about Needle's heroism in the Amari litigation that precedes those counts (Dkt. No. 290).

**Cross-Claim Counts I and II**

As Silha, 807 F.3d at 172-73 (internal quotation marks and citations omitted) has summarized well-established principles of standing:

> Article III of the Constitution limits federal judicial power to certain "cases" and "controversies," and the irreducible constitutional minimum of standing contains three elements. To establish Article III standing, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Where a defendant allegedly breaches a contractual obligation owed to the claimant, the latter has standing even where no monetary loss or other concrete harm seems to have been sustained (J.P. Morgan Chase Bank, N.A. v. McDonald, 760 F.3d 646, 650-51 (7th Cir. 2014)).

---

[3] Because of Needle's stubborn refusal to comply with this Court's May 13, 2016 order to submit unredacted copies of the pleadings that he had previously sought to file under seal on October 13, 2015, which contained only promised typographical corrections (see Tr. May 13, 2016 [Dkt. No. 287] at 4:7-23), this Court has not accepted the proposed amendments to Needle, P.C.'s pleadings that it submitted under seal on June 10, 2016 (Dkt. Nos. 316 and 318). As a consequence this Court has in hand only the redacted copies attached as Exhibit 1 to Needle, P.C.'s October 13, 2015 motions to file unredacted versions under seal (Dkt. Nos. 179 and 181) and will treat those as the current pleadings. At the June 17 status hearing, however, Needle promised to cure that deficiency.

And thus Needle, P.C. stumbles at the threshold, for it struggles (unsuccessfully) to identify any material injury to itself, let alone any injury that would entitle it to the relief it seeks in Counts I and II. When, how and in what amount the Amari plaintiffs are paid their respective shares of the net proceeds of the recovery that belong to their group as a whole is of course of great interest to the Amari plaintiffs -- but only to them -- thus sinking Count II. And Needle, P.C. can allege all the shenanigans or bookkeeping errors it wants as to how contributions to and withdrawals from the Litigation Fund were recorded[4] -- it has no interest in that fund or in any amounts yet to be paid from that fund that would sustain it as a litigant asserting a Count I claim. Again it is the contributing Amari plaintiffs who have that interest. If the members of the Management Committee were to increase their own recovery by inflating the value of their contributions or were to siphon money off to Royce, as Needle, P.C. alleges, it is the amount to be recovered by the Amari plaintiffs under Section VI.3(C) that will be reduced -- Section VI.3(A) ensures that counsel (Needle, P.C. and Royce) are paid first.

Nor will it do for Needle or Needle, P.C. or both to claim standing to pursue the challenged cross-claims on the basis of some lawyer-client relationship with John Cardullo & Sons, Inc. ("Cardullo"), the only Amari plaintiff represented separately from the Amari Parties in this action. Any such relationship does not extend to this lawsuit, in which Cardullo has independent counsel -- in fact, Needle himself confirmed that during the June 17 status hearing.

In the most recent filings that have emanated from the Needle camp, Needle has been prone to lodge critical comments against his adversaries by lectures about their claimed

---

[4] As this Court said during its June 17 oral ruling, Needle can certainly provide any evidence that he may possess in that respect (indeed, he would be expected to do so), but that will be only as a fact witness, not as a party litigant.

noncompliance with lawyers' Rules of Professional Conduct, an ironic stance in light of his own highly unprofessional effort to appropriate Cardullo's entitlement to standing as somehow authorizing Needle and Needle, P.C. to inject themselves into this action as principals, asserting the cross-claims at issue here. And that irony is heightened by the fact that Cardullo's actual lawyer in this case has expressed the willingness, and is now working with counsel for the Amari Parties toward an agreement, to submit to arbitration any issues as to sharing by their clients in the proceeds of settlement, a course of action that Needle, P.C. vigorously opposes in Count II and actually argues is impermissible -- even while posing as authorized to press Cardullo's interests.[5]

Needle, P.C. further argues that, because it was named as a party to the Agreement, that somehow confers a right to enforce all of its provisions, even those that entitle other parties to the Agreement to receive benefits in which it has no stake under the express terms of the Agreement -- in this instance, its former clients' shares of the settlement proceeds. In attempted support of that argument, it says that the fact that the Amari Parties have cross-claimed against it by seeking a declaratory judgment as to the amount of fees owed to the attorneys ( an issue that, not incidentally, this Court has resolved against Needle, P.C.) somehow confers a right on Needle, P.C. to enforce the terms of distribution to the Amari plaintiffs (N. Mem. 3). It further contends that it must police the Litigation Fund because any Management Committee misconduct in that respect would give rise to a claim by one of its former clients against another of its former clients in litigation in which Needle represented both (id. at 11, citing Pennsylvania Rule of Professional Conduct 1.7(b)(3)).

---

[5] See Appendix.

But that is nonsense as well.  Being a party to a contract does not by itself give one an enforceable interest in rights granted exclusively to others under that contract.  Not only is there no contention that any obligation owed to Needle, P.C. regarding Section VI.3(C) has been breached, but Section VI.7 makes it clear that Needle, P.C. cannot resolve disputes that arise concerning Section VI.3 to begin with.  And the fact that Needle's former clients have cross-claimed against Needle, P.C. in this interpleader action to put an end to the latter's frustration of their attempt to exercise their rights under Section VI.3(C) is not an implicit admission that Needle, P.C. actually has any rights under that provision.  Amazingly, Needle, P.C. insists that because Needle's former clients have made accusations to the Pennsylvania Disciplinary Board that he has acted unethically concerning the distribution of the settlement proceeds, Needle, P.C. therefore has standing to meddle in that distribution (see N. Mem. 5) !

So Count II is beyond redemption on jurisdictional grounds.  To return to Count I, although it cannot stand as it has been framed, there are two respects in which Needle, P.C. has demonstrated an interest in the Litigation Fund's deposits and debits:  its contractual right to that information and the amount paid toward the retainer.  In that first respect, Section V.4 entitles both the Amari plaintiffs and their counsel to "detailed records of all receipts and disbursements."  As for the second issue, under Section IV.1(B) the attorneys' fee is to be reduced by any retainer paid pursuant to Section V.  Hence a ruling that would uphold Needle, P.C.'s allegation that some debits that the Management Committee has classified as retainer payments were in fact reimbursements for expenses or other outlays (2d Am. Cross-Cl. ¶ 164) would impact on its own recovery.

But those alleged injuries will not support a claim for an accounting as such. As Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys., 428 F.3d 706, 715 (7th Cir. 2005) (internal citations omitted) has summarized Illinois law:

> To state a claim for the equitable relief of an accounting, a plaintiff must allege the absence of an adequate remedy at law. In addition to the absence of an adequate remedy at law, the plaintiff must allege at least one of the following: (1) a breach of a fiduciary relationship, (2) a need for discovery, (3) fraud, or (4) the existence of mutual accounts which are of a complex nature.

Garden-variety contract disputes do not suffice, and a claimant's asserted need for discovery must outstrip what would be available at law in order for a claim seeking an accounting to be appropriate on that ground (id.).

All that Needle, P.C. alleges is that the Management Committee intends to breach the Agreement in calculating the retainer and that it has already failed to perform with respect to the disclosure of information. Even leaving aside the lack of ripeness of the first claim and the potential mootness of the second,[6] Needle, P.C. has an entirely adequate remedy at law for both claimed injuries.

In its response Needle, P.C. asks leave to file a one-page amendment to demonstrate that it lacks an adequate remedy at law should that question happen to be important (N. Mem. 12). But failure to address an argument raised by one's opponent constitutes a waiver (or more precisely a forfeiture) (Wojtas v. Capital Guardian Tr. Co., 477 F.3d 924, 926 (7th Cir. 2007)). Lack of any remedy at law is a sine qua non of equitable relief, and the Amari Parties argue persuasively that Needle, P.C. has an adequate legal remedy (A. Mem. 4-5). Because the

---

[6] Counsel for the Amari Parties has worked diligently to moot Count I by providing the requested information and correcting any inaccuracies in the records provided, but because proof of mootness would rely on facts not in Needle, P.C.'s pleading while Count I can be disposed of on the basis of that pleading alone, this Court will not address whether those efforts suffice.

adequacy of Needle, P.C.'s legal remedy is obvious, this Court will not further delay the long-overdue disposition of Needle, P.C.'s cross-claims against the Amari Parties by soliciting further briefing.

**Conclusion**

For the reasons given in this opinion and in open court, the Amari Parties' motion to dismiss (Dkt. No. 290) is granted and both cross-claims against them are dismissed without leave to amend. As for their motion (also part of Dkt. No. 290) to strike the extended narrative that precedes those cross-claim counts, it too is granted, not only because of its irrelevancy to the issue resolved here but also because it so blatantly flouts the Rule 8(a)(2) mandate requiring "a short and plain statement of the claim showing that the pleader is entitled to relief."

_____
Milton I. Shadur
Senior United States District Judge

Date: June 21, 2016

**Appendix**

This opinion's text has provided one or two illustrative examples of lawyer Needle's warped reading and his proposed application (really misapplication) of provisions of the Rules of Professional Conduct in his attempt to inject himself and his professional corporation Needle, P.C. into this litigation in areas in which neither has a justiciable claim.  This Court has given brief consideration to the possibility of identifying the many ironies implicit in those efforts when they are essayed in conjunction with Needle's own violation of professional standards in advancing the cross-claims at issue here.  But such a demonstration would have lengthened this opinion unduly and would really be unnecessary to expose the poverty of the arguments that Needle and Needle, P.C. have advanced here, because the opinion as written has amply done so.

Accordingly it should suffice just to express this Court's view that any reader with an informed understanding of legal ethics and the standards set by the Code of Professional Responsibility would reach the same conclusions that have been expressed in the text of this opinion and this Appendix.  In sum, the Needle-Needle, P.C. presentation has called two often-quoted epigrams to mind:

1. From Shakespeare's Merchant of Venice act I, sc. 3:  "The devil can cite Scripture for his purpose."

2. From Matthew 7:2-3:  "And why beholdest thou the mote that is in thy brother's eye, but considerest not the beam that is in thine own eye?"