# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| **MERLE L. ROYCE**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15 C 259 |
| | ) | |
| **MICHAEL R. NEEDLE, P.C.**, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

When this multiparty declaratory judgment action brought by Chicago lawyer Merle Royce ("Royce") came to this Court's calendar via this District Court's computer-driven random assignment system, the case did not appear to pose an unduly daunting task. To be sure, it called for three determinations as to various individuals' and entities' rights to share in the $4.2 million proceeds of a mediation-produced settlement of a RICO case before this Court's colleague Honorable John J. Tharp, Jr.:

1. determination of the portions of that sum respectively payable to

    (a) Royce and one of the defendants, Philadelphia lawyer Michael Needle ("Needle"), as lawyers' fees for their services in the underlying litigation and (b) the 16 former clients of those lawyers who had been plaintiffs in that RICO action;

2. determination of the respective entitlements of Needle and Royce to their shares of those lawyers' fees; and

3. determination of the share of each of those former clients in the total amount of the clients' entitlement.[1]

But those determinations appeared quite straightforward, for all were governed by a carefully drafted and crafted "Fee Agreement"[2] that had been authored by Needle.[3]

This Court's anticipations were soon shattered when Needle sought to assert a claim to half or more of the total pot of $4.2 million for his services alone, laying claim at various points to sums of $2 million, $2.2 million and even $2.5 million, while each of those claims was in direct conflict with the unambiguous provisions of the Fee Agreement that Needle himself had drafted. Indeed, that conflict coincided with the inherent conflict of interest that exists whenever a lawyer engages in a dispute with a client over the fees that should be paid to the lawyer where the litigation has been the subject of legal representation that has proved successful in monetary

---

[1] That last determination requires a calculation of the various credits and debits running and to and from the individual clients.

[2] That single spaced October 8, 2008 "Dear Clients" document, which was signed by all of the plaintiffs in the underlying 2007 RICO action that ultimately ended up before Judge Tharp, has been referred to by the label "Fee Agreement" on the one hand and "Contingent Fee Agreement" on the other. But what is most important for purposes of this litigation is that the scope of the document went well beyond its comprehensive treatment of the attorney's fees questions to embrace all of the substantive aspects of the litigation, including the matters just described in the text.

[3] Needle originally had other Chicago cohorts (not Royce) working with him at the outset of the representation that ultimately ended with the recovery in the RICO litigation. Whatever circumstances led to the departure of those other lawyers from that representation is not relevant to this case, and the same is true as to whatever circumstances led to Needle's hookup with Royce as a colleague. What is relevant instead is the fact that the Agreement, created by Needle before Royce entered the picture was really comprehensive, seeking to cover every aspect of the then-imminent RICO lawsuit (the document's entitlement "Fee Agreement" is a truly inadequate designation -- its subject matter covered far more than the typical documents covering the terms of lawyer representation).

terms. In this instance Needle exacerbated that conflict by seeking to justify his claim in part through assertions that what was left over after his claimed share would leave the clients with more than was needed to make them whole.[4] Although no more need be said on that score because Needle's contentions flouted the straightforward provisions of his own contract governing fees, he has certainly confirmed the truth of the familiar aphorism that "No one should be judge in his own case" (Publilius Syrus, Maxim 545).[5]

Regrettably the pace of Needle's continuing -- and continuous -- intransigence and of his obstructionist tactics was not slowed after he found himself hoist by his own petard (defeated by the express terms of the Fee Agreement that he himself had authored) in his unsuccessful effort to obtain a huge financial benefit at the expense of his former clients. In conjunction with its preparation of this opinion, this Court has run a printout of the docket entries in this case that has just recently passed its second anniversary, and in sheer numbers those entries are closely approaching the 500 mark, with a large number of those entries bearing on Needle's multivaried efforts at obfuscation.

Lest the pejorative characterizations of Needle contained in this opinion be viewed mistakenly as suggesting any judicial mindset directed toward Needle himself rather than toward the sanctionable conduct that he has exhibited in this litigation, a small sample from the proceedings before Judge Tharp that followed the mediation-produced settlement in the

---

[4] Never mind that the underlying litigation, like all civil RICO cases, presented the potential for an award of treble damages.

[5] That truth, going back two millennia, was later echoed some 350 years ago in Pascal's Pensees:

It is not permitted to the most equitable of men to be a judge in his own cause.

underlying RICO action provides some added insight into Needle. With the Settlement Agreement in that case having resulted in the delivery of the settlement proceeds to Royce as escrow agent, Needle launched a full-bore attack on Royce, his co-counsel for the plaintiffs in that case. Some notion of that attack, which produced three submissions totalling just short of 40 pages, may be gleaned from Needle's heading of his initial submission (Dkt. No. 1215) in that case:

> Motion To Disqualify Attorney Meryl L. Royce as Plaintiffs' Counsel and Escrow Agent, To Require Him To Return Settlement Funds and To Establish a Schedule For Resolution of Allocation Disputes Among Plaintiffs and Their Counsel. [6]

Judge Tharp gave that effort short shrift in his memorandum order denying, for lack of subject matter jurisdiction, Needle's motion to disqualify Royce and for other relief. That order labeled Needle's charges as "salacious" and stated that Needle had inappropriately sought to embroil Judge Tharp in the lawyers' and parties' disagreements about division of the settlement proceeds that has become the gravamen of this action.

So this Court is not alone in finding that Needle's approach to litigation can be highly problematic, though the problems that he has posed here dwarf those that he presented to this Court's able colleague. But to return to the issues at hand, it is really unnecessary to detail the distortions on Needle's part that gave rise to the pending motion in this case for sanctions against him -- that subject has been well-covered in Royce's extensive submissions in Dkt. Nos. 288, 387 and 422. They amply demonstrate the propriety of sanctioning Needle, under both 28 U.S.C.

---

[6] That initial submission was supplemented by a supporting memorandum of law (Dkt. No. 1219) and later by a brief (Dkt. No. 1246) addressing Judge Tharp's claimed jurisdiction over the disqualification motion.

§ 1927 and this Court's inherent power, in the full amount sought by Royce -- the sum of $24,480 sought in Royce's Fee Petition.

For his part Needle's attempted response to Royce's sanction motion is entirely unpersuasive. Needle's Memorandum in Opposition (Dkt. No. 407) is in principal part (four pages out of its six plus pages of text that follow the page 1 introduction identifying Royce's sanctions motion are non-responsive to the issues posed by those, being devoted instead to a misleading rehashing of an earlier-disposed-of issue in the case. Then the remaining two pages that purport to respond to the sanctions motion itself distort the state of the record as to this Court's designation of 28 U.S.C. § 1927 as a basis for sanctions, as well as providing no input to challenge the quantification of relief tendered by Royce's counsel.

What <u>is</u> noteworthy about the Needle memorandum, however, is in its very opening, which reads "Michael R. Needle P.C. ('MRNPC'), by Michael R. Needle ('Needle')." That opening reflects a pervasive aspect of Needle's obstructionist efforts to make a shambles of the case by an improper attempt to personify his wholly owned professional corporation as somehow distinct from Needle himself.

It is of course a universal truth that it is individual members of the bar and not their law firms that are admitted in any case to ply their wares in the litigation. Here is this District Court's LR 83.16(c), which in this Court's understanding is exemplary of the principle governing the law practice and its practitioners everywhere in this country:

> **Appearance by Firms Prohibited.** Appearance forms are to list only the name of an individual attorney. The Clerk is directed to bring to the attention of the assigned judge any appearance form listing a firm of attorneys rather than an individual attorney. For the purposes of this rule, an individual attorney who practices as a professional corporation may file the appearance as the professional corporation.

In the underlying litigation before Judge Tharp, Needle quite properly practiced (and filed his written submissions) as an individual, having been granted leave to proceed pro hac vice, just as was true in this case. But in this action Needle has since sought to sow confusion by injecting a meaningless differentiation between his individual persona and that of "Michael R. Needle P.C." the entity of which (as stated earlier) he is the sole member and owner.

From that warped approach Needle appears to believe that, and he styles his presentations as though, a termination of his own pro hac vice status somehow enables his professional corporation to have -- still -- some amorphous standing in the case. Not so -- with Needle's pro hac vice status having been rescinded on separate occasions for more than one reason, that rescission contemporaneously deprived his wholly owned corporation of any standing independently of Needle himself.

In that regard this Court has been confronted by extended delays by Needle in obtaining outside counsel for Michael R. Needle P.C. (meaning, in real world terms, for Needle individually), and those months of delay on Needle's part have stymied this Court's and the other litigants' efforts to move the case forward. But that subject, though it bears mention as otherwise relevant to the case overall, is not covered by the limited sanctions dealt with here.

To return to the latter subject, this Court finds that the egregiousness of Needle's conduct is addressed inadequately by simply requiring, as this Court does, his payment of the requested amount of $24,480 to Royce in partial recompense for the services rendered by his counsel. This Court finds instead that a further sanction is in order to deal with the burdens thrust on the judicial system by Needle's conduct, and it therefore orders that a like sum -- again $24,480 -- be paid by Needle to the Clerk of Court for that reason.

Finally, although this opinion has resolved the sanctions issue posed by Royce's submissions identified here, it may well remain for another day whether other aspects of this case -- either past or future or both -- may bring that subject into play again. If that were to come about, the subject would deserve -- and get -- separate treatment.

Milton I. Shadur
Senior United States District Judge

Date: February 10, 2017