# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MERLE L. ROYCE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 15 C 259** |
| | ) | |
| **MICHAEL R. NEEDLE, P.C.** *et al.*, | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Attorneys Michael R. Needle and Merle Royce represented a group of plaintiffs in a RICO action filed in this court and settled in 2013. *See Amari et al. v. Burgess et al.*, No. 07 CV 1425 (N.D. Ill.). Both Needle and Royce are entitled to a share of attorneys' fees earned in that case. Before those funds were paid out, Royce brought this interpleader action against Needle's law firm, Michael R. Needle, P.C. ("MRNPC"), and the sixteen *Amari* plaintiffs, seeking an adjudication concerning the distribution of the settlement funds, now on deposit in the court's registry. While the interpleader action was pending, Needle gave a security interest in his firm's share of settlement funds to Mayer Brown LLP ("Mayer Brown.") Thereafter, Needle retained Cozen O'Connor ("Cozen") to represent MRNPC in the interpleader action. Cozen has since withdrawn, but now claims its own interest in MRNPC's share of the *Amari* fees.

Significantly, MRNPC's share of the fees is insufficient to satisfy both Mayer Brown's and Cozen's interests. The question before this court, therefore, is which of their claims takes priority. In an order dated February 4, 2019, the court determined that it has jurisdiction to adjudicate the dispute between Mayer Brown and Cozen, but that neither side had adequately briefed it. (February 2019 Order [1075], 1, 5-6.) The court therefore directed the parties to file supplemental briefs addressing the following questions: (1) What state law applies to this dispute? (2) Does the applicable law require that value be given to the debtor in return for a security interest? (3)

At what point does each lien attach? (4) Which is superior, an Article 9 security interest or a valid attorney's lien? (*Id.* at 14.) Having reviewed the parties' supplemental briefs, the court concludes that Mayer Brown's security interest is superior to Cozen's lien. Mayer Brown's motion to enforce its prior perfected lien [963] is therefore granted, and Cozen's motion for immediate payment of funds from the court's registry [961] is denied.

## BACKGROUND

The court assumes familiarity with the procedural and factual background in this case, which is summarized in the February 2019 Order. To further clarify the issues, the court adds the following details.

On August 20, 2015, Judge Milton Shadur (to whom this case was originally assigned) ruled on the share of the *Amari* settlement proceeds recoverable as attorneys' fees. (August 2015 Order [130].) Needle's position was that the attorneys—Needle and Royce—should collectively recover sixty percent of the settlement proceeds; but Judge Shadur sided with Royce on this issue, concluding that the attorneys were collectively entitled to one third of the settlement payout. (*See id.* at 1-2, 11; February 2019 Order 2.) After reassignment, on March 12, 2018, this court allocated the one-third attorneys' share between Royce and MRNPC. (March 2018 Order [874].) Specifically, the court awarded sixty percent of the one-third share to MRNPC and forty percent to Royce, over Needle's objection that he is entitled to more than sixty percent. (*See id.* at 3.) Needle has appealed both rulings. (February 2019 Order 2.)

John Cardullo and Sons ("Cardullo") was one of sixteen plaintiffs in the *Amari* litigation. (July 30, 2018 Affidavit of Michael Needle [971] ("Needle Aff.") ¶ 3.)[1] Cardullo and fifteen other

---

[1] According to Cardullo's Counterclaims and Crossclaims in the present action, Needle represented Cardullo in a Pennsylvania state court action before Cardullo joined the *Amari* litigation as a plaintiff. (*See* Cardullo Counterclaims and Crossclaims [709] ¶¶ 19-23.) In the state court action, Cardullo sued International Profit Association ("IPA"), the same entity that the *Amari* plaintiffs sued. (*Id.* ¶¶ 1, 21.) The court dismissed Cardullo's case without prejudice in 2006 due to an Illinois forum selection clause. (*Id.* ¶ 22.) Cardullo contends that "[i]n 2007, after learning of Cardullo's suit against IPA, including its large damages claim," the *Amari* plaintiffs "solicited

*Amari* plaintiffs were represented by Needle in that litigation. (Needle Aff. ¶ 3.) Needle no longer represents the other fifteen plaintiffs; his work for them ended after *Amari* concluded. (*Id.*) Needle does still represent Cardullo for certain purposes (*see* MRNPC Second Amended Answer, Affirmative Defenses, and Counterclaims (Revised and Undredacted) ("MRNPC Second Am. Ans.") [382] ¶ 10), but does not and cannot represent Cardullo in the present interpleader action,[2] presumably because Needle and Cardullo's interests are now in conflict: Cardullo would benefit from maximizing the plaintiffs' share of the *Amari* settlement, while Needle would benefit from reducing it. (*See* Needle Aff. ¶ 5 (recognizing that Needle and Cardullo have different interests in "division of the settlement between plaintiffs and lawyers").)[3]

In the summer of 2015, Needle sought representation for Cardullo and contacted Mayer Brown. (Needle Aff. ¶ 6.) Needle has not explained why he attempted to find counsel for Cardullo, nor why Cardullo was unable to do so on its own. Needle does assert, however, that after *Amari* settled, he "came to suspect that the plaintiffs' Management Committee and [Royce] were attempting to divert large amounts of the settlement fund to themselves to the detriment of MRNPC, Cardullo, and other *Amari* plaintiffs." (*Id.* ¶ 4.) Needle hoped that this interpleader action "would uncover what had occurred." (*Id.* ¶ 5.) Needle asserts his belief that "Cardullo's and MRNPC's interests were aligned because both were victims of the same scheme." (*Id.*)

---

Cardullo to join" the *Amari* litigation. (*Id.* ¶ 24.) Cardullo joined the *Amari* litigation on or around October 6, 2008. (*See id.* ¶ 26.) Needle became co-plaintiffs' counsel in the *Amari* litigation at that time. (*See id.*; Complaint [1] ¶ 17.) Royce joined the litigation as co-plaintiffs' counsel in November 2009. (*See* Cardullo Counterclaims and Crossclaims ¶ 27; Complaint ¶ 8.)

[2] Royce, on the other hand, resigned as counsel for Cardullo effective August 4, 2014. According to Needle, Royce continued to owe Cardullo a fiduciary duty stemming from Royce's service as escrow agent under the settlement agreement. (Complaint ¶ 10; MRNPC Second Am. Ans. ¶ 155.)

[3] Cardullo was, for a time, represented by other counsel in this case, but those attorneys withdrew in August 2015, citing "irreconcilable differences and a conflict of interest." (Motion to Withdraw [133] ¶ 3; Order Granting Motion to Withdraw [148].)

Needle suggests that these factors motivated him to retain Mayer Brown for Cardullo.  (*See id.* ¶¶ 4-6.)

"After discussions with Mr. Needle and Cardullo's principal, Pat Cardullo," Mayer Brown agreed to appear as local counsel for Cardullo.  (Affidavit of Howard J. Roin in Support of Mayer Brown Motion to Enforce its Prior Perfected Lien [963-4] ("Roin Aff.") ¶ 4.)  Cardullo made Mayer Brown its principal counsel in September 2016, after Cardullo "was served with a purported distribution schedule under which it would have received only a miniscule amount of the settlement."  (*Id.* ¶ 5.)[4]  "Cardullo also authorized Mayer Brown to consult with Mr. Needle concerning the facts and background of the case." (*Id.*)  Cardullo, however, "quickly fell far behind in paying Mayer Brown's bills."  (*Id.* ¶ 6.)  At that time, Needle "still believe[d] that Cardullo's and MRNPC's interests largely were aligned," and thought that "it would benefit both Cardullo and MRNPC for Mayer Brown to continue to represent Cardullo."  (Needle Aff. ¶ 9.)

In light of the interests that Mayer Brown purportedly shared with MRNPC,[5] "MRNPC agreed to give Mayer Brown a lien on MRNPC's share of the underlying settlement fund with respect to Mayer Brown's bills."  (*Id.*)  In agreeing to this proposal, Mayer Brown "stressed" to both Cardullo and MRNPC that Mayer Brown represents Cardullo, not MRNPC.  (Roin Aff. ¶ 8.)  Mayer Brown and Needle memorialized their agreement concerning the security interest in a letter dated July 27, 2017.  (*See* Mayer Brown Motion to Enforce its Prior Perfected Lien [963] ("Mayer

---

[4]     Mayer Brown first entered an appearance on Cardullo's behalf on February 25, 2016 [221].  At that time, Cardullo was already represented by Robert Gamburg, an attorney from a different, Pennsylvania-based law firm.  (*See* October 6, 2015 Motion for Leave to Appear *Pro Hac Vice* [172]; October 21, 2015 Order Granting Motion for Leave to Appear *Pro Hac Vice* [189].)  Neither Mayer Brown nor Cozen discusses (or even mentions) how Gamburg came to represent Cardullo and no party has explained what Gamburg's role has been in the case.  The fact that Cardullo had other counsel in October 2015 adds to the court's uncertainty about the reasons for Needle's efforts in soliciting Mayer Brown to represent him.  On July 5, 2017, yet another attorney, from yet another law firm, entered an appearance on behalf of Cardullo:  George N. Vurdelja.  (*See* Appearance [676].)  Mayer Brown refers to Vurdelja as its co-counsel.  (*See* Roin Aff. ¶ 9.)

[5]     Needle has not explained why he believed neither he nor MRNPC's other attorneys could achieve the "benefit" that he says Mayer Brown provided to MRNPC by representing Cardullo.

Brown Mot."), 2 ¶ 6.)  By August 15, 2017, Mayer Brown's unpaid bills for representing Cardullo exceeded $700,000.  (*Id*. at 3 ¶ 7.)

In contrast with its zeal in obtaining counsel for Cardullo, MRNPC has for lengthy periods proceeded in this case without independent counsel.  Between August 2015 and October 2015, attorneys filed appearances for MRNPC but then quit in quick succession:  MRNPC's original attorney withdrew from the case in August 2015; MRNPC obtained a new attorney in September 2015; and the new attorney moved to withdraw less than a month later.  (*See* Appearance [14]; Motion to Withdraw [124]; Order Granting Motion to Withdraw [148]; Appearance [167]; Motion to Withdraw [192]; Order Granting Motion to Withdraw [203].)  Additionally, in October 2015, Judge Shadur denied Needle's motion to appear *pro hac vice* to represent MRNPC.  (*See* Order [191]; October 23, 2015 Hearing Tr. [200], 20.)  Judge Shadur reasoned that because Needle operates MRNPC as its sole member and president, there is no real distinction between Needle and MRNPC; Needle was going to be a key witness in the case; and allowing Needle to serve as both an attorney and a witness would be inappropriate.  (*See* October 23, 2015 Hearing Tr. 4-5, 12-20 (discussing lawyer-witness rule); *see also* September 19, 2016 Order [403] ("September 2016 Order"), 2 (discussing same).)

Dismayed by this ruling, Needle delayed for months in obtaining counsel for MRNPC, delaying the resolution of this case as well.  (*See* September 2016 Order 2, stating that Needle's failure to obtain counsel "effectively shut[] down the ability of the lawsuit to proceed in a realistic manner".)  On May 6, 2016, presumably to keep the litigation from coming to a standstill, Judge Shadur granted Needle leave to appear *pro hac vice*.  (Order [279].)  But because Needle engaged in "obstructionist," "inappropriate[]" conduct, Judge Shadur revoked his *pro hac vice* status on September 15, 2016.  (September 2016 Order 2-3, 6.)  Judge Shadur ordered Needle and MRNPC "to obtain responsible new counsel to represent" MRNPC by October 17, 2016.  (*Id*. at 6.) He also struck, without prejudice, MRNPC's second amended answer, affirmative defenses, and counterclaims, and all earlier versions thereof.  (*See id*.)  Needle did not meet the deadline.

(*See* Order [424].)  Judge Shadur relented in part, reinstating Needle's *pro hac vice* status for the limited purpose of "addressing the questions of law posed" by MRNPC's answer, affirmative defenses, and counterclaims.  (*Id.*)  But he prohibited Needle from taking discovery "before the pleadings issues ha[d] been resolved."  (*Id.*)  On January 13, 2017, Judge Shadur revoked Needle's *pro hac vice* status yet again.  (Order [481].)

As of February 2017, Needle had not yet obtained counsel for MRNPC.  (*See, e.g.*, Royce Motion for Dismissal of Counterclaim and for Order of Default and for Default Judgment [517] ("Royce Default Mot.") ¶¶ 1, 48.)  On February 14, 2017, Royce filed a motion seeking an order of default and default judgment against MRNPC.  (*See generally id.*)  Royce contended, among other things, that he was entitled to an order of default because MRNPC had failed to obtain counsel for nearly eleven months.  (*See, e.g.*, *id.* ¶ 65.)  Royce also sought a default judgment awarding him fifty percent of the one-third attorneys' share of the *Amari* settlement fund.  (*See, e.g.*, *id.* ¶¶ 73-74, 101.)  Royce asserted that he had maintained contemporaneous time records in *Amari* that support his claim to fifty percent of the share.  (*See, e.g.*, *id.* ¶ 75.)  Royce contended that Needle did not maintain contemporaneous time records, and that for this and other reasons, MRNPC is not entitled to the larger share it seeks.  (*See, e.g.*, *id.* ¶¶ 75, 94.)

In August 2017, MRNPC, still facing the threatened default, finally obtained Cozen as its counsel.[6]  Cozen, Needle, and MRNPC "entered into a written retention agreement" on August 29, 2017.  (*See* Cozen Response in Opposition to Mayer Brown's Motion to Enforce its Prior Perfected Lien and Reply in Further Support of its Motion for Payment of Funds from the Court's Registry [1046] ("Cozen Opp."), 5.)  Cozen's compensation, as set forth in the agreement, was contingent on MRNPC's recovery and was to be paid from the fee award to MRNPC.   According to Cozen, at the time it entered into the retention agreement, neither Needle nor Mayer Brown

---

[6]  Again, the court does not understand Needle's delay in doing so, in the face of the threatened default of MRNPC and Needle's contrasting diligence in retaining counsel for Cardullo.

had notified Cozen of Mayer Brown's security interest in those same funds. (*See id.*) Three Cozen attorneys entered their appearances on August 30 and 31, 2017. (Appearances [756, 757, 758].)

Mayer Brown reports that it first learned of Cozen's intention to represent MRNPC on September 1, 2017. (Mayer Brown Mot. 4 ¶ 14.) That same day, attorney Howard Roin of Mayer Brown wrote in an e-mail to Cozen, "we should talk about [Needle's] prior letter to my firm committing that Needle PC would pay my firm's fees and granting my firm a lien for that purpose." (September 1, 2017 Mayer Brown E-mail, 10:03 a.m. [963-3].) Mayer Brown also attached a copy of the July 27, 2017 letter to the e-mail message. (*See id.*)[7] Cozen responded, in relevant part, "I will leave it to [Needle] to speak with you regarding your prior discussions pertaining to your firm's fee since they are unrelated to our firm's representation of [Needle] in connection with his fee dispute with Royce." (September 1, 2017 Cozen E-mail [963-3].) Mayer Brown countered, "The fees are directly related because we both seek to be paid from the same source, so I would like to be sure we and Mike Needle have an understanding at the outset." (September 1, 2017 Mayer Brown E-mail, 11:18 a.m. [963-3].) Needle was copied on all three e-mails. (*See* September 1, 2017 E-mails.)

Despite this warning ("we both seek to be paid from the same source"), Cozen asserts that "[n]othing in [this] correspondence expressed that Mayer Brown sought to be paid before Cozen received its fee." (Cozen Opp. 5-6.) Cozen also contends that in other correspondence on September 1, 2017, "Needle advised [it] that Mayer Brown did not have a valid lien, and was not seeking to be paid before Cozen received payment." (*Id.* at 6 (citing Elliott R. Feldman Declaration in Support of Cozen Petition to Adjudicate and Enforce Attorney's Lien [910-1] ¶ 8).)

---

[7]  The copy of the e-mail message produced to the court does not contain the attachment. (*See id.*) But Mayer Brown wrote in the e-mail, "Although I understand Mike [Needle] has already provided you with the July 2017 letter, I attach it here as well." (*See id.*)

If that correspondence is in the record, the court has not been able to locate it.

On September 14, 2017, Mayer Brown filed a UCC financing statement with Pennsylvania's Secretary of the Commonwealth.[8] (Mayer Brown Mot. 8 ¶ 34.) Cozen states that on October 10, 2017, Needle "advised [attorneys at Cozen] that Mayer Brown was unwilling to compromise its position concerning its purported priority lien on MRNPC's share of the funds." (Cozen Opp. 8.)[9] "As a result, Cozen notified MRNPC" that it intended to withdraw from representation after thirty days. (*Id.*) Before Cozen moved to withdraw, however, it filed a sur-reply in opposition to Royce's default motion [770]. As a result, the court declined to enter a default order against MRNPC. On October 27, 2017 and November 8, 2017, "Cozen served Needle, MRNPC, Royce and his attorney with a Notice of Attorney's Lien" under the Illinois Attorneys Lien Act. (Cozen Opp. 7; *see* Cozen Statutory Lien Notices [881-3].) Cozen moved to withdraw on November 13, 2017 [795], and the court granted the motion on November 21, 2017 [806].

After Cozen withdrew, Needle retained another attorney, Frank Fusco, to represent MRNPC. At this court's direction, on December 14, 2017, Fusco, on behalf of MRNPC, and counsel for Royce filed simultaneous five-page briefs on the appropriate division of the one-third share of the *Amari* settlement fund between Royce and MRNPC [833, 834]. As explained above, this court determined that MRNPC should receive sixty percent of the share and Royce should receive forty. (*See* March 2018 Order 3.)

As of September 2017, the *Amari* settlement fund was being held in Royce's escrow account at a Northern Trust bank in Chicago, Illinois. (*See* Cozen Supplemental Brief in Opposition to Mayer Brown's Motion to Enforce its Prior Perfected Lien and in Further Support of

---

[8]  As discussed *infra*, Mayer Brown argues that it thereby "perfected" its interest in MRNPC's share of attorneys' fees.

[9]  Cozen actually states that this event occurred on October 10, 2011 (*see id.*), but the court assumes that was an inadvertent error.

its Motion for Payment of Funds from the Court's Registry [1083] ("Cozen Supp. Br."), 5; *see also* Royce December 2017 Motion for Leave to Transfer Escrow to Court's Registry [849].)  On or around January 3, 2018, Royce transferred the funds into the court's registry.  (*See* January 3, 2018 Order [858].)

## DISCUSSION

Mayer Brown now asks this court to find that its interest in MRNPC's share of attorneys' fees has priority over Cozen's interest.  Specifically, Mayer Brown argues that its security interest "attached" to MRNPC's share of fees, and that Mayer Brown "perfected" that interest by filing a financing statement on September 14, 2017, trumping any interest held by Cozen.  Cozen disputes that Mayer Brown holds a security interest of any kind.  Moreover, Cozen contends that even if Mayer Brown holds a perfected security interest, Cozen's own interest (which Cozen believes to be either a statutory attorney's lien, a charging lien, or an interest based in the common fund doctrine) is superior.  These disputes create three distinct questions for the court to decide: (1) whether Mayer Brown has a valid and enforceable security interest, (2) whether Mayer Brown perfected that interest, and (3) whether, in any event, Mayer Brown's interest is trumped by one held by Cozen.  The court addresses these questions in turn.

Because the court is sitting in diversity, it applies Illinois choice-of-law rules to determine which state's law must be applied to each of these issues.  *See Heiman v. Bimbo Foods Bakeries Distrib. Co.*, 902 F.3d 715, 718 (7th Cir. 2018).  In Illinois, "a choice-of-law determination is required only when a difference in law will make a difference in the outcome." *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 155, 879 N.E.2d 893, 898, 316 Ill. Dec. 505, 510 (2007); *see also West Side Salvage, Inc. v. RSUI Indem. Co.*, 878 F.3d 219, 223 (7th Cir. 2017) (citing same).  With these principles in mind, the court turns to the issues at hand.

## I. Attachment

"Attach" is the term used in Article 9 of the Uniform Commercial Code (the "UCC") to "describe the point at which property becomes subject to a security interest."  33 Ill. Law and Prac.

Secured Transactions § 74.  It "relates to the creation and enforceability of a security interest between the parties to a transaction," and is a prerequisite to "perfection."  *Id*.  Cozen disputes that Mayer Brown's security interest attached to MRNPC's share of the *Amari* settlement.

### A. Choice of Law

Although the parties disagree on which state's law applies to this issue—Cozen argues that Illinois law applies, whereas Mayer Brown believes Pennsylvania law governs—both agree that the rules set out in Article 9 of the UCC, adopted in both Illinois and Pennsylvania, control the substantive law on this point.  (*See* Cozen Supplemental Brief [1083] at 3; Mayer Brown Supplemental Brief [1084] at 4.)  *See also* 810 ILL. COMP. STAT. 5/9-101 *et seq.*; 13 PA. CONS. STAT. § 9101 *et seq*.  Each state's courts have interpreted Article 9 in differing ways that may be material to the outcome of the attachment issue.  Indeed, the parties' dispute suggests they themselves acknowledge that varying interpretations of the UCC may be material to the outcome.

There is, unfortunately, no provision of the UCC that governs choice of law in these circumstances.  Article 9 itself includes a choice-of-law provision, but it expressly governs only disputes based on perfection or priority.  Specifically, Part 3 of Article 9, titled "Perfection and Priority," sets out rules for determining which law ought to govern "perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral."  810 ILL. COMP. STAT. 5/9-301.  This statute therefore does not govern the immediate issue: whether an enforceable security interest exists at all.  *See Peb Report: Article 9 Perfection Choice of Law Analysis Where Revised Article 9 Is Not in Effect in All States by July 1, 2001* [hereinafter "Peb Report"], 56 BUS. LAW. 1725, 1731 (2001) (drawing a distinction between Section 9-301, which provides choice of law rules for perfection and priority, and a now-defunct Section 1-105, which provided the choice of law rule for attachment).  Rules relating to attachment appear in a different section of the UCC; that section, Part 2, "Effectiveness of Security Agreement; Attachment of Security Interest; Rights of Parties to Security Agreement," does not contain its own choice-of-law provision.  *See generally* 810 ILL. COMP. STAT. 5/9-203.

A prior version of the UCC, adopted in Illinois in 2001, stated that UCC issues not covered by another choice-of-law provision or prior agreement of the parties were to be governed by Illinois law "where appropriate." *See* 810 ILL. COMP. STAT. 5/1-105 (repealed December 31, 2008). This section, while in force, functioned as the choice-of-law rule for attachment issues. *See Peb Report*, *supra*, at 1731 n.20. For reasons that the court has not been able to ascertain, however, this section was removed from the UCC in 2008, and was not replaced in form or in substance.

As neither party has identified a valid choice-of-law rule that applies to these circumstances,[10] and the court is not itself aware of any, the court will instead rely on general choice-of-law principles observed in Illinois. *See Clark v. TAP Pharm. Prod., Inc.*, 343 Ill. App. 3d 538, 547, 798 N.E.2d 123, 278 Ill. Dec. 276 (5th Dist. 2003). Illinois courts endeavor to apply the law of the forum that "has the most significant relationship with the occurrence and with the parties." *Id*. (citing *Ingersoll v. Klein*, 46 Ill.2d 42, 47, 262 N.E.2d 593 (1970)). To determine which forum this is, Illinois courts consider "(1) the place where the injury occurred, (2) the place where the conduct occurred, (3) the parties' domicile, nationality, place of incorporation, and place of business, and (4) the place where the parties' relationship is centered." *Id*. (citing *Ingersoll*, 46 Ill.2d at 47-48, 262 N.E.2d at 595-96.)

Here, there is no "injury" that the court believes can be assigned to a particular jurisdiction. Nor do the parties' places of business answer the question: Mayer Brown is headquartered in Illinois, whereas MRNPC is headquartered in Pennsylvania. The relevant conduct, however, seems to have taken place substantially in the Northern District of Illinois. This is, after all, where *Amari* was litigated and settled, creating the fund that Mayer Brown seeks to draw on. It is also where Mayer Brown litigated the case for which it now seeks fees. The court concludes that Mayer Brown and MRNPC's relationship, to the extent it was "centered" anywhere, was in the

---

[10]        Cozen erroneously asserts that simply because the court is sitting in diversity, Illinois substantive law governs Mayer Brown's security interest. Mayer Brown recognizes that an Illinois choice-of-law rule must be applied, but cites only the choice-of-law rule for perfection and priority which, as discussed above, is not applicable here.

Northern District of Illinois and will therefore apply Illinois substantive law and precedent to the attachment issue.

### B.    Analysis

Under Article 9, a security interest "attaches" to collateral "when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment."  ILL. COMP. STAT. 5/9-203(a).  With certain exceptions that are inapplicable here, "a security interest is enforceable against the debtor and third parties with respect to the collateral only if (1) value has been given; (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and (3) one of [four additional conditions] is met . . . ."  810 ILL. COMP. STAT. 5/9-203(b).

The parties' dispute regarding the enforceability of Mayer Brown's security interest concerns only the "value has been given" requirement.  Cozen recognizes that Illinois law governs the issue of enforceability because "Section 5/9-203 does not make the type of collateral . . . determinative of the applicable state law" and the court is sitting in diversity in Illinois. (Cozen Supp. Br. 3-4.)  According to Cozen, Illinois appellate courts interpret the "value has been given" language "to require that the creditor must give value *to the debtor*."  (*Id.* at 6 (emphasis added) (citing, among other cases, *Metro. Life Ins. Co. v. Am. Nat'l Bank & Trust Co.*, 288 Ill. App. 3d 760, 766, 682 N.E.2d 72, 76, 224 Ill. Dec. 511, 515 (1st Dist. 1997)).)[11]  Cozen emphasizes that Mayer Brown represents only Cardullo in this lawsuit and argues that Mayer Brown did not provide value to MRNPC—the debtor.  (*See* Cozen Supp. Br. 7.)  Cozen concludes that as a result, Mayer Brown's security interest is unenforceable.

Mayer Brown responds that Cozen has the law wrong, and that "neither Illinois nor Pennsylvania law requires that value must be given *to the debtor*."  (Mayer Supp. Br. 5.)  The words "to the debtor" are not present in the relevant UCC provision, Mayer Brown emphasizes,

---

[11]    Cozen does not address how Pennsylvania courts have construed the language.

and the case law does not support the proposition that a security interest is unenforceable unless the secured party has given value to the debtor.  To the extent the court in *Metropolitan Life* suggests there is such a requirement, it "incorrectly paraphrase[s]" the UCC provision and relies on a case that does the same.  (Mayer Brown Reply 5 n.5.)  And, Mayer Brown observes, the language is *dictum*; the *Metropolitan Life* case does not discuss whether a security interest is enforceable where the creditor gives value to someone other than the debtor.[12]  Finally, Cozen has not cited any case directly holding that a security interest is unenforceable in that circumstance.  (*See* Mayer Brown Reply 5.)

By contrast, the Seventh Circuit has rejected the argument that "the value given in fulfillment of Section 9-203 must be extended to the debtor, rather than to a third party."  *In re Reliable Mfg. Corp.*, 703 F.2d 996, 1000 (7th Cir. 1983); *see* Mayer Brown Reply 5-6; Mayer Brown Supp. Br. 5.  In *In re Reliable*, the court explained, among other things, that under the relevant sections of the UCC, "'value' may consist in 'any consideration sufficient to support a simple contract.'"  *Id.* (quoting ILL. REV. STAT. ch. 26, § 1-201(44)(d)).[13]  In Illinois, the court continued, a "benefit to a third party is clearly sufficient to support a simple contract."  *Id.* (citing, inter alia, *Lauer v. Blustein*, 1 Ill. App. 3d 519, 521, 274 N.E.2d 868, 870-71 (1st Dist. 1971)).  The court also stated that for purposes of Section 9-203, "[i]t is enough . . . that there be detriment to the secured party even if there is no benefit to the owner of the assets subject to the security interest."  *Id.* (citing *In re Terminal Moving & Storage Co.*, 631 F.2d 547, 550-51 (8th Cir. 1980) (en banc)) ("There is no requirement under the U.C.C. that the entity whose assets are pledged

---

[12]    The court notes that the same is true of the other cases Cozen cites in its supplemental brief.  *See Voutiritsas v. Intercounty Title Co. of Illinois*, 279 Ill. App. 3d 170, 180, 664 N.E.2d 170, 177, 215 Ill. Dec. 773, 780 (1st Dist. 1996); *Andrews v. Mid-Am. Bank & Trust Co. of Fairview Heights*, 152 Ill. App. 3d 139, 143, 503 N.E.2d 1120, 1123, 105 Ill. Dec. 114, 117 (5th Dist. 1987).

[13]    ILL. REV. STAT. ch. 26, § 1-201(44)(d) is now 810 ILL. COMP. STAT. 5/1-204(4).

must receive consideration.").

Cozen argues that this court should not follow *In re Reliable*; the Illinois Supreme Court has not interpreted Section 9-203's value requirement and therefore, Cozen contends, decisions of Illinois appellate courts control. (*See* Cozen Supp. Br. 7 n.2.) But as just explained, Cozen has not cited any Illinois appellate decisions that support its position, and the court has found none. *In re Reliable*, on the other hand, is directly on point. The court, therefore, concludes that value extended to someone other than the debtor can fulfill the "value has been given" requirement set forth in 810 ILL. COMP. STAT. 5/9-203(b). *See In re Reliable*, 703 F.2d at 1000. So, too, can a "detriment to the secured party." *Id.*

Mayer Brown argues that it provided "substantial value" in exchange for the security interest by providing legal services to Cardullo. (Mayer Brown Supp. Br. 5.) For example, Mayer Brown contends that it "increased Cardullo's share of the settlement fund from approximately $62,000 to $850,000." (*Id.* at 6; *see also* Proposed Distribution Schedule as of November 2017 [805-1] (allocating approximately $62,000 to Cardullo); Amended Judgment Order [960] (awarding $850,000 to Cardullo).) Cozen does not appear to dispute this, nor, more generally, the proposition that Mayer Brown provided value to Cardullo. (*See generally* Cozen Opp. 10-12; Cozen Supp. Br. 6-7.) The court concludes that by providing legal services to Cardullo, Mayer Brown supplied "consideration sufficient to support a simple contract," and therefore gave "value" under the meaning of the UCC.[14] *In re Reliable*, 703 F.2d at 1000; 810 ILL. COMP. STAT. 5/1-

---

[14] Mayer Brown's alternative argument that it has provided value to MRNPC as well is unconvincing. Mayer Brown admits it represented only Cardullo's interests in this lawsuit. (*See* Cozen Opp. 10; Cozen Supp. Br. 7; Mayer Brown Reply 9; Needle Aff. ¶ 11 ("I understood, and Mr. Roin made clear to Cardullo and me, that even though MRNPC was helping to pay Mayer Brown's bills, Mayer Brown would represent Cardullo's interests, not MRNPC's.").) MRNPC was not a plaintiff in *Amari*, so it does not have any claim to the plaintiffs' portion of the settlement fund. Indeed, what is more obvious than any alignment of interests is the *conflict* of interest between MRNPC and Cardullo: MRNPC seeks to maximize the attorneys' share of the settlement fund, while Cardullo benefits from a division that maximizes the plaintiffs' share. Mayer Brown does not explain in its briefing how it could, without violating its ethical obligation to Cardullo, provide assistance to MNRPC's challenge to Judge Shadur's thirty-percent ruling. Separately,

204(4).[15]  Accordingly, Mayer Brown has satisfied Article 9's "value has been given" requirement, and its security interest is enforceable.  810 ILL. COMP. STAT. 5/9-203(b).

Mayer Brown asserts that its security interest attached on July 27, 2017, when Mayer Brown and MRNPC finalized their letter agreement.  (*See* Mayer Supp. Br. 7-8.)  Notwithstanding its dispute that attachment occurred at all, Cozen concedes the point as to timing.  (*See* Cozen Supp. Br. 7.)

## II.    Perfection and Priority of Mayer Brown's Security Interest

"Perfection of a security interest entitles a creditor to take priority in the collection and liquidation of collateral pledged by a debtor to such creditor as against other creditors who are either unsecured or who perfect their security interests in such collateral at a later point in time."  *In re B&M Hospitality LLC*, 584 B.R. 88, 95 (Bankr. E.D. Pa. 2018); *see also Sign Builders, Inc. v. SVI Themed Constr. Solutions, Inc.*, 2015 IL App. (1st) 142212, ¶ 16, 30 N.E.3d 475, 479, 391 Ill. Dec. 205, 209 ("In general . . . a competing claim to . . . assets by a secured creditor will take priority over a lien creditor, *provided* the secured creditor has perfected its lien." (citing 810 ILL. COMP. STAT. 5/9-317(a))); 810 ILL. COMP. STAT. 5/9-317(a)(1), (a)(2)(A) (providing that a security interest is subordinate to the rights of "[a] person entitled to priority under Section 9-322" and "a person that becomes a lien creditor before . . . the security interest . . . is perfected"); 13 PA. CONS. STAT. § 9317(a)(1), (a)(2)(i) (same); 810 ILL. COMP. STAT. 5/9-322(a)(1) ("Conflicting perfected security interests . . . rank according to priority in time of filing or perfection."); 13 PA. CONS. STAT. § 9322(a)(1) (same).

---

Mayer Brown has not satisfied the court that any of the work it performed for Cardullo could support MRNPC's appeal of this court's decision to award MRNPC only sixty percent of the attorneys' thirty-percent share.  Thus, if Illinois courts interpret Section 9-203 to require that value be given to the debtor, the court is unprepared to conclude that Mayer Brown can satisfy that requirement.

[15]    Put another way, Mayer Brown suffered a detriment by providing, in exchange for the security interest, legal services that it was not otherwise obligated to provide.  *See In re Reliable*, 703 F.2d at 1000.

## A. Choice of Law

Article 9 of the UCC contains several rules that dictate which state law governs the perfection and priority of a security interest, depending on the circumstances. *See, e.g.*, 810 ILL. COMP. STAT. 5/9-301; 13 PA. CONS. STAT. § 9301. Under the "[g]eneral rule," the debtor's location determines the choice of law. (*See* Mayer Brown Supp. Br. 4.) Specifically, Article 9 provides that "Except as otherwise provided in this Section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral." 810 ILL. COMP. STAT. 5/9-301(1); 13 PA. CONS. STAT. § 9301(a) (same). Moreover, Article 9 defines "collateral" as "property subject to a security interest" including "(A) proceeds to which a security interest attaches; (B) accounts, chattel paper, payment intangibles, and promissory notes that have been sold; and (C) goods that are the subject of a consignment." 810 ILL COMP. STAT. 5/9-102(a)(12); 13 PA. CONS. STAT. § 9102(a) (same).[16] Mayer Brown argues that its security interest in MRNPC's share of the settlement fund is an interest in "proceeds," and therefore constitutes collateral. (Mayer Brown Supp. Br. 4 & n.3 (citing 810 ILL COMP. STAT. 5/9-102(a)(12)(A); 13 PA. CONS. STAT. § 9102(a.).) Because the debtor, MRNPC, is located in Pennsylvania, Mayer Brown continues, Pennsylvania law governs the perfection and priority of the security interest. (*See* Mayer Brown Mot. 7 ¶ 28; Mayer Brown

---

[16] One exception to the general choice of law rule provides, "While collateral is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a *possessory* security interest in that collateral." 810 ILL. COMP. STAT. 5/9-301(2) (emphasis added); 13 PA. CONS. STAT. § 9301(b) (same); *see also* 810 ILL. COMP. STAT. 5/9-301, cmt. 5(a) (noting distinction between nonpossessory and possessory security interests); 13 PA. CONS. STAT. § 9301, cmt. 5(a) (same). This exception does not apply here. A secured party's interest is "possessory" when that party is "in possession of the collateral." *See* 810 ILL. COMP. STAT. 5/9-101, cmt. (4)(d) (describing a "possessory security interest" as the security interest of a party "who is in possession of the collateral"); 13 PA. CONS. STAT. § 9101, cmt. 4(d) (same); *see also* 810 ILL. COMP. STAT. 5/9-313(a) (stating that "a secured party may perfect a security interest in tangible negotiable documents, goods, instruments, money, or tangible chattel paper by taking possession of the collateral"); 13 PA. CONS. STAT. § 9313(a) (same). Because the collateral is being held in the court's registry, neither Mayer Brown nor Cozen is "in possession of" it. Cozen does not dispute this issue. (*See* Mayer Brown Reply 4 n.3 (arguing that the choice of law exception for a possessory security interest does not apply); *see generally* Cozen Supp. Br. (failing to address the argument).)

Supp. Br. 4 & n.3.)

Cozen argues that Mayer Brown's security interest is in a "deposit account," which is distinct from other "collateral" for purposes of Article 9.  (*See* Cozen Supp. Br. 5.)  The distinction is critical because under Article 9, the location of the deposit account—rather than the location of the debtor—determines the state law applicable to perfection and priority issues.  *See* 810 ILL. COMP. STAT. 5/9-304(a) ("The local law of a bank's jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in a deposit account maintained with that bank."); 13 PA. CONS. STAT. § 9304(a) (same).  According to Cozen, the settlement fund was in Royce's escrow account at an Illinois bank in September 2017, when Mayer Brown "attempted to perfect its alleged security interest."  (Cozen Supp. Br. 5.)  Cozen maintains, therefore, that Illinois law governs issues of perfection and priority.

In its February 2019 Order, the court noted that UCC provisions regarding "deposit accounts" *might* be applicable to the parties' dispute.  (*See* February 2019 Order 6.)  The court requested supplemental briefing on this and other issues.  Cozen and Mayer Brown have provided very little analysis regarding deposit accounts in their supplemental briefing.  Cozen's argument that Mayer Brown has a security interest in a deposit account is limited to the facts recounted in the preceding paragraph.  Mayer Brown, for its part, contends only that the UCC defines collateral to include "proceeds to which a security interest attaches," and argues that its "collateral is in MRNPC's share of the settlement fund, not the court registry itself."  (Mayer Brown Supp. Br. 4 n.3.)

The court concludes that Mayer Brown's security interest is in collateral, not a "deposit account."  Under Article 9, a "deposit account" means "a demand, time, savings, passbook, nonnegotiable certificates of deposit, uncertificated certificates of deposit, nontransferrable certificates of deposit, or similar account maintained with a bank.  The term does not include investment property or accounts evidenced by an instrument."  810 ILL. COMP. STAT. 5/9-102(a)(29); *see also* 13 PA. CONS. STAT. § 9102(a) (similar).  In the case law the court has located,

courts have determined that escrow accounts are not "deposit accounts" under the meaning of Article 9. *See In re O.P.M. Leasing Servs., Inc.*, 46 B.R. 661, 670 n.5 (Bankr. S.D.N.Y. 1985) (rejecting argument that an escrow account is a "deposit account"); *In re Miller*, No. 16-12687-B-7, 2018 WL 878841, at *5 (Bankr. E.D. Cal. Feb. 12, 2018) ("The Placer Title escrow is not a demand, time, savings, passbook, or similar account. In particular, under California law, escrow holders are not demand depositories."); *Bochetto & Lentz, P.C. v. WFIC, LLC*, No. 2828 EDA 2014, 2015 WL 7199005, at *6 (Pa. Super. Ct. July 30, 2015) (nonprecedential) ("An escrow account . . . is not a deposit account . . . ."). The court also notes that although the fund is now in the court's registry, the court has, in effect, assumed Royce's role as escrow agent for the fund. (*See Escrow Definition*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/ escrow?src=search-dict-hed (last visited May 20, 2018) (defining "escrow" as "a deed, bond, money, or a piece of property held in trust by a third party to be turned over to the grantee only upon fulfillment of a condition).) Thus, the court's registry is not a "deposit account," either.

Because Mayer Brown's security interest is in "collateral" rather than a "deposit account," the court will apply Pennsylvania law to perfection and priority issues. (*See* Cozen Supp. Br. 12 n.4 ("The Court should apply Pennsylvania law in determining whether Mayer Brown has a perfected and priority lien on MRNPC's Share if it decides that the rules relevant to a deposit account are not applicable.")); *cf. Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) ("[I]t is the exceptional circumstance that a federal court, or any court for that matter, will not honor a choice of law stipulation." (internal quotation marks omitted)).

### B.     Analysis

The priority of a security interest depends in part on when the secured party perfected it. *See* 13 PA. CONS. STAT. § 9-317(a). Under Pennsylvania law, a secured party must perfect its security interest by "fil[ing] a financing statement with the Office of the Secretary of the Commonwealth." *In re B&M*, 584 B.R. at 95-96 (citing 13 PA. CONS. STAT. § 9310(a); 13 PA.

CONS. STAT. § 9501(a)(2)).[17]  A financing statement is considered sufficient if it "(1) provides the name of the debtor; (2) provides the name of the secured party or a representative of the secured party; and (3) indicates the collateral covered by the financing statement."  13 PA. CONS. STAT. § 9502(a)(1)-(3).  There is no dispute that Mayer Brown perfected its security interest on September 14, 2017 "by filing a UCC Financing Statement with the Secretary of the Commonwealth of Pennsylvania . . . ."  (Mayer Brown Mot. 3 ¶ 8; *see also* Mayer Brown Supp. Br. 8; Cozen Supp. Br. 11.)[18]  With that date in mind, the court turns to the parties' dispute regarding the priority of Mayer Brown's security interest.

Cozen purports to hold its own enforceable interest in MRNPC's settlement fund under three different theories:  Cozen claims a statutory attorney's lien, a common law charging lien, and an interest based in the "common fund" doctrine.  Cozen does not contend, however, that its statutory attorney's lien would have priority over a prior perfected security interest.  *See* Cozen Supp. Br. 11; *see also* 13 PA. CONS. STAT. § 9-317(a)(2)(i) (a security interest is subordinate to the rights of "a person that becomes a lien creditor before . . . the security interest . . . is perfected"); *Almi, Inc. v. Dick Corp.*, 31 Pa. Commw. 26, 42, 375 A.2d 1343, 1351 (Pa. Commw. Ct. 1977) ("The order of the priority of state and federal statutory liens is to be determined in accordance with the principle of law that the first choate lien in time is the first lien in right."); *In re B&M*, 584 B.R. at 95 (creditor with perfected security interest "take[s] priority" over unsecured

---

[17]     There are exceptions to these requirements that are inapplicable to this case.  *See* 13 PA. CONS. STAT. § 9310(b); 13 PA. CONS. STAT. § 9501(a)(1).

[18]     Cozen does, on the other hand, argue that if Mayer Brown's security interest is in a "deposit account," Mayer Brown did not perfect it.  (*See* Cozen Supp. Br. 10-11.)  Indeed, "a security interest in a deposit account may be perfected only by control under Section 9-314," 810 ILL. COMP. STAT. 5/9-312(b)(1), 13 PA. CONS. STAT. § 9312(b)(1), and the parties do not dispute that Mayer Brown failed to "perfect[] by control."  (*See, e.g.*, Cozen Supp. Br. 10-11; Mayer Brown Mot. 8 ¶¶ 33-34; Mayer Brown Supp. Br. 2, 8.)  If rules regarding deposit accounts were applicable, Cozen argues, its statutory attorney's lien would be superior to Mayer Brown's unperfected security interest.  (*See* Cozen Supp. Br. 11.)  Having concluded that Mayer Brown's security interest is not in a "deposit account," the court declines to address this argument.

creditors or those "who perfect their security interests . . . at a later point in time"). The court has concluded that Mayer Brown does have an enforceable, prior perfected security interest, and therefore turns to Cozen's remaining arguments: (1) that it holds an enforceable charging lien, and (2) that the common fund doctrine applies.

## 1. Charging Lien

"An attorney's lien, also known as a charging lien, is defined, in pertinent part, as '[t]he right of an attorney to have expenses and compensation due for services in a suit secured to the attorney in a judgment, decree or award for a client.'" *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 179 A.3d 1093, 1099 n.6 (Pa. 2018) (quoting BLACK'S LAW DICTIONARY 6th Ed. (1990) at 233). For a charging lien to "be recognized and applied, it must appear (1) that there is a fund in court or otherwise applicable for distribution on equitable principles, (2) that the services of the attorney operated substantially or primarily to secure the fund out of which he seeks to be paid, (3) that it was agreed that counsel look to the fund rather than the client for his compensation, (4) that the lien claimed is limited to costs, fees or other disbursements incurred in the litigation by which the fund was raised and (5) that there are equitable considerations which necessitate the recognition and application of the charging lien." *Recht v. Urban Redevelopment Auth. of City of Clairton*, 402 Pa. 599, 608, 168 A.2d 134, 138-39 (1961); *see also Meyer*, 179 A.3d at 1099 n.6 (setting forth the *Recht* factors); *Johnson v. Stein*, 254 Pa. Super. 41, 43-44, 385 A.2d 514, 515-16 (Pa. Super. Ct. 1978) (same).

The charging lien doctrine "operate[s] on equitable principles." *In re Howard*, 465 F. App'x. 152, 156 (3d Cir. 2012) (unpublished). It "does not depend upon possession, but upon the favor of the court in protecting attorneys, as its own officers, by taking care . . . that a party should not run away with the fruits of the cause without satisfying the legal demands of the attorney by whose industry those fruits were obtained." *Appeal of Harris*, 323 Pa. 124, 130-31, 186 A. 92, 95 (1936); *see also Kelly v. Vennare*, No. 2069 WDA 2014, 2016 WL 1062819, at *4 (Pa. Super. Ct. Mar. 16, 2016) (non-precedential) (quoting same); *Novinger v. E.I. DuPont de Nemours & Co.*, 809

F.2d 212, 218 (3d. Cir. 1987) ("The equitable charging lien gives an attorney the right to be paid out of a fund in court which resulted from his skill and labor, thereby extending only to services rendered in the particular case.").

Cozen argues that it "has an enforceable charging lien" even if "Mayer Brown's secured interest is first-in-time" because, by its August 29, 2017 retention agreement with Needle and MRNPC, "Cozen was expected to recover its fee from MRNPC's Share." (Cozen Supp. Br. 12, 13.) In other words, Cozen contends that an enforceable charging lien is superior to a prior perfected security interest. Cozen also maintains that its "services primarily aid[ed] in producing MRNPC's Share." (*Id.* at 13.) Mayer Brown, on the other hand, contends that Cozen cannot satisfy "at least" three of the *Recht* factors: the second, third, and fifth. (Mayer Brown Supp. Br. 10-11.)

As explained in *Recht*, to have an enforceable charging lien, Cozen's services must have operated "substantially or primarily[] to create the fund upon which [it] now claims the right to a charging lien." *Recht*, 402 Pa. at 609, 168 A.2d at 139; *see also, e.g.*, *Appeal of Harris*, 323 Pa. at 138, 186 A. at 99 (attorney was entitled to a charging lien where his efforts "produced, to a substantial extent, the fund for distribution"); *In re Indep. Pier Co.*, 210 B.R. at 264 (an attorney's services "must have substantially, primarily, largely, to a substantial extent, if not exclusively or entirely, procured or generated the fund itself"). An attorney's services do not operate "substantially or primarily" to create a fund merely because they "were valuable." *Recht*, 402 Pa. at 609, 168 A.2d at 139. In *Recht*, for example, the court determined that although an attorney had obtained a favorable result in one proceeding, his efforts did not "substantially or primarily" create the fund at issue—which a different attorney had later obtained in a "separate and distinct" (though related) appellate proceeding. *See id.* Similarly, in *In re Independent Pier*, the court concluded that where several attorneys had "set in motion a chain of events" and "performed work that was of value" before another attorney took over and settled the case, their "contribution to the creation of the [settlement] fund was indirect and entirely too attenuated to be the primary or

substantial procuring cause." 210 B.R. at 263-64 (internal quotation marks omitted). In short, cases concerning charging liens "do not talk in terms of attorneys' having assisted, or provided valuable services, or contributed in some measure, but rather, they concentrate on the extent to which the attorney's skill and services actually produced the fund." *Id.* at 264.

Mayer Brown argues that Cozen was not substantially or primarily responsible for producing the fund. It first points out that MRNPC and Royce created the settlement fund in the underlying *Amari* litigation "years before Cozen got involved." (Mayer Brown Supp. Br. 11.) According to Mayer Brown, "[t]his fact distinguishes Cozen's lien claim from all of the cases in which Pennsylvania courts have enforced a charging lien." (*Id.* at 11 & n.6 (citing *Almi*, 31 Pa. Commw. at 39-40, 375 A.2d at 1350, and *Appeal of Harris*, 323 Pa. at 135, 139, 186 A.2d at 97, 99).) This argument has some merit, but it ignores that additional work was required to create the fund that is at issue here: MRNPC's *share* of the settlement fund.

Mayer Brown next contends that Cozen did not substantially or primarily produce MRNPC's share, either. Mayer Brown's arguments in this regard have more traction. First, of course, Cozen contributed nothing to the decision that the *Amari* attorneys would receive one-third of the settlement fund; Judge Shadur made that determination "long before Cozen was involved" in this litigation. (Mayer Brown Supp. Br. 12.) In any case, Judge Shadur's ruling was adverse to MRNPC's position that the attorneys should recover a much larger share of the settlement proceeds. Cozen was retained to litigate the dispute concerning the fee division between MRNPC and Royce, but Mayer Brown argues that Cozen "had little if anything to do with" the resolution of that dispute, either. (*Id.*) Mayer Brown notes that on November 2, 2017, the court "ordered MRNPC and Royce to file 5-page briefs concerning the division of the attorney's fees," and ultimately "referred to" those briefs "as a basis for its decision" to split the fees 60/40 between MRNPC and Royce, respectively. (*Id.*) Cozen moved to withdraw from the case on November 13, 2017, and it was MRNPC's new counsel (Fusco) who filed the court-ordered brief on December 14, 2017. Mayer Brown argues that this timeline, together with Cozen's billing

records, show that Cozen "played no role in that brief." (*Id.* at 12 & n.7.)

Cozen emphasizes that it discussed the fee division issue in the sur-reply opposing Royce's default motion. (*See* Cozen Opp. 7.) In moving for default, Royce had argued that the court should split the fees 50/50. Cozen responded that because MRNPC "contributed substantially more hours than Royce" to the *Amari* case, MRNPC should receive a larger share of the fees. (*Id.*) Cozen contends that to prepare this argument, it spent "many hours" analyzing documents and conferring with Needle "to gain an understanding of" his time-recording system. (*Id.*)

The court recognizes that Cozen worked diligently for MRNPC, and that the representation was a challenging one. Needle's reconstructed time records appear to be the only materials that Cozen attorneys had at their disposal to determine exactly what Needle did to earn his fee in *Amari*. Cozen made a meaningful effort to analyze the records and present them to the court. In addition, as Cozen emphasizes, it staved off a default judgment against MRNPC by stepping into the case. (*See* Cozen Supp. Br. 13.) And the court stated earlier that Cozen's services were "substantially related to [its] determination of the share of [the] funds ultimately awarded to MRNPC." (February 2019 Order 8; Cozen Supp. Br. 13 (quoting same)). Having now reviewed Pennsylvania law and the parties' supplemental briefs, however, the court concludes that Cozen's work did not in fact "substantially or primarily" produce MRNPC's share of the fund. *Recht*, 402 Pa. at 608, 168 A.2d at 139.

First, although Cozen likely saved MRNPC from default, Cozen's efforts in this regard are fairly characterized, in the language of the *Recht* court, as "valuable" work in a separate stage of the proceedings or efforts that "set in motion a chain of events" that ultimately produced the 60/40 fee division. *Recht*, 402 Pa. at 609, 168 A.2d at 139; *In re Indep. Pier*, 210 B.R. at 264. Cozen's work to prevent the default was too "indirect" and "attenuated" to be the "substantial procuring cause" of the fund. *In re Indep. Pier*, 210 B.R. at 264. Second, in determining that the attorneys' portion of the fund should be split 60/40 between MRNPC and Royce, the court could not credit

Needle's reconstructed time records because it concluded they were largely unreliable. (*See* March 2018 Order 3.) The court recognizes that Cozen engaged in substantial effort on behalf of MRNPC,[19] but it is not clear that the work it performed contributed in any way to Fusco's fee-division brief. Third, as Mayer Brown points out, Royce proposed a 50/50 fee split in his default motion. Cozen, therefore, could have contributed, at most, the additional ten percent of the fees to which MRNPC is now entitled. That amounts to approximately $70,000—far less than MRNPC's total share: $674,928.75. (*See* Mayer Brown Supp. Br. 13.) It is also "far less than the $126,663.66 that Cozen claims it is entitled to be paid." (*Id.* at 13 n.10.) Pennsylvania law sets a high bar for proving that attorneys' legal services "substantially or primarily" contributed to a fund, and Cozen's legal services, though valuable, do not meet it. Because Cozen cannot satisfy the second *Recht* factor, it does not have a right to a charging lien. *See, e.g.*, *Recht*, 402 Pa. at 608, 168 A.2d at 138-39 (all factors must be present); *Shenango Sys. Solutions, Inc. v. Micros-Sys., Inc.*, 2005 PA Super 370 ¶¶ 10-11, 887 A.2d 772, 775 (Pa. Super. Ct. 2005) (where attorney could not establish first *Recht* factor, declining to adjudicate the others).

### 2. Common Fund Doctrine

Cozen next argues that it "is entitled to be paid from MRNPC's share before Mayer Brown" under Pennsylvania's common fund doctrine. (Cozen Supp. Br. 14.) That doctrine, "also known as the equitable fund doctrine, is an exception to the 'American' rule that, in the absence of statute or contract, each party to adversary litigation is required to pay his own counsel fees." *Jones v. Muir*, 511 Pa. 535, 541, 515 A.2d 855, 858 (1986). This doctrine recognizes that "[w]here the services protect a common fund for administration or distribution under the direction of the court, or where such fund has been raised for like purpose, it is liable for costs and expenses, including

---

[19]     In an earlier brief, Cozen asserted that it spent substantial time reviewing the case record and engaging in settlement discussions with Royce's counsel. (Cozen Petition to Adjudicate and Enforce Attorney's Lien and for an Award of Attorneys' Fees and Costs [881], 7.) Cozen also mentioned that MRNPC authorized it to draft other pleadings, but that after Cozen completed the drafts, MRNPC "did not authorize Cozen to file them." (*Id.* at 8 n.5.)

counsel fees incurred." *Id.* (quoting *Hempstead v. Meadville Theological Sch.*, 286 Pa. 493, 495-96, 134 A. 103, 103 (1926)); *see also Couy v. Nardei Enters.*, 402 Pa. Super. 468, 470, 587 A.2d 345, 346 (Pa. Super. Ct. 1991). The doctrine "rests on the perception that persons who obtained the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Couy*, 402 Pa. Super. at 471, 587 A.2d at 347; *see also In re Howard*, 465 F. App'x at 156 (the "common fund doctrine operate[s] on equitable principles").

"The 'common fund' exception has traditionally been narrowly applied, and most often invoked where the attorney's efforts have protected or preserved an estate or fund from waste, dissipation or fraudulent claims." *Jones*, 511 Pa. at 542, 515 A.2d at 859. "The doctrine has also been applied where the services created a fund or augmented it by new assets." *Id.* "Compensation for the services is then recovered from the fund itself, thereby spreading the costs amongst the beneficiaries." *Id.* The burden of proof is on "[t]he applicant for counsel fees." *Id.*

The Pennsylvania Supreme Court has recognized that in the U.S. Supreme Court's common-fund decisions, "the classes of beneficiaries [have been] small in number and easily identifiable"; the "benefits [have been] trace[able] with some accuracy"; and "there [has been] reason for confidence that the costs could indeed be shifted with some exactitude to those benefitting." *Jones*, 511 Pa. at 546, 515 A.2d at 861 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 264 n.39 (1975)); *see also In re Second Pennsylvania Bank Real Estate Corp.*, 192 B.R. 663, 666 (Bankr. W.D. Pa. 1995) (stating that the common fund doctrine is generally considered applicable when these factors are present).[20] Cozen contends these

---

[20] In Pennsylvania, the common fund concept is also codified at 42 PA. CONS. STAT. § 2503(8). *See In re Second Pennsylvania*, 192 B.R. at 666. That statute provides, "The following participants shall be entitled to a reasonable counsel fee as part of the taxable costs of the matter: (8) Any participant who is awarded counsel fees out of a fund within the jurisdiction of the court pursuant to any general rule relating to an award of counsel fees from a fund within the jurisdiction of the court." 42 PA. CONS. STAT. § 2503(8). Cozen does not explain how, if at all, the statutory application differs from the common law application. The court declines to venture into this territory.

factors are present here. (Cozen Supp. Br. 14.) Specifically, the class of beneficiaries (MRNPC, Cozen, and Mayer Brown) are "sufficiently identifiable"; "the benefits can be accurately traced to" Cozen's efforts; and "the fee can be 'shifted' with exactitude to those benefitting . . . ." (*Id.* at 14-15.) Cozen further argues that "Mayer Brown benefitted from Cozen's services, but now dubiously seeks to preclude Cozen from being paid." (*Id.* at 15.)

As already discussed, Cozen has not demonstrated that its legal services "created" the fund. *Jones*, 511 Pa. at 544-45, 515 A.2d at 859-60 (finding that an award of attorney's fees "was not justified under the common fund doctrine" because "the fund was *created* by" a legislative act, and appellee failed to "demonstrate that her counsel's efforts preserved the assets of the fund"); *compare In re Second Pennsylvania*, 192 B.R. at 667-68 (application of common fund doctrine was appropriate where trial testimony showed that attorney's extensive work was "directly responsible for the creation of" the fund). But the common fund doctrine—unlike the charging lien doctrine—permits recovery of fees by an attorney who merely "protected or preserved" a fund. *Jones*, 511 Pa. at 542, 515 A.2d at 859. Cozen can meet that test: Cozen's attorneys invested substantial time and effort in representing MRNPC and successfully defended it against Royce's default motion. Royce had proposed a 50/50 fee split, meaning that if the court had granted the motion, it likely would have divided the fund evenly between Royce and MRNPC. Cozen's work allowed MRNPC to continue pressing its claim that it was entitled to more than fifty percent of the fund.

The factors generally present in the Pennsylvania common fund decisions are also present here. Mayer Brown does not dispute that the class of beneficiaries is small. And although Mayer Brown contends that "it is impossible to accurately trace Cozen's contribution" (*see* Mayer Brown Supp. Br. 11 n.6), the court disagrees for the reasons just discussed. Finally, in light of the court's determination that Cozen protected or preserved at least the additional ten percent of the fund (which amounts to approximately $70,000 (*see* Mayer Brown Supp. Br. 13)), "the fee can be shifted with some exactitude to those benefitting." *In re Second Pennsylvania*, 192 B.R. at

666 (internal quotation marks omitted).

The court concludes that Cozen has a right to recover fees from MRNPC's share under the common fund doctrine. The analysis, however, does not end here. Rather, the court must determine whether Cozen's right is superior to Mayer Brown's secured interest. Cozen does not expressly argue that its right was first in time (*see* Cozen Supp. Br. 14-15), and such an argument does not appear to be viable in any event. Indeed, although MRNPC and Needle retained Cozen on August 29, 2017, the question whether Cozen's legal work created or preserved the fund could not be answered until Cozen completed the work. Mayer Brown perfected its security interest before that occurred. The question before the court, then, is whether Mayer Brown's prior perfected interest is superior to Cozen's right to recover fees under the common fund doctrine.

The court has found very little case law that addresses this question. (Cozen and Mayer Brown, moreover, have provided virtually no guidance.) In *In re Second Pennsylvania*, which Cozen cites, the court determined that a law firm could recover fees under the common fund doctrine ahead of a mortgagee whose secured interest was first in time. *See* 192 B.R. at 665-66, 670. For numerous reasons, the court concluded that the mortgagee would be unjustly enriched "at the expense of" the attorney seeking fees, rather than the mortgagor, if it were allowed to recover first. *See id.* at 670. Here, the notion that Mayer Brown would be unjustly enriched at Cozen's expense if allowed to recover first is less obvious; before Cozen became involved in the interpleader action, Mayer Brown sought the security interest to ensure it would be compensated for years of legal work in the same action, as well as for future legal work that Mayer Brown completed. In addition, as the court noted in its February 2019 order, the weight of authority holds that prior perfected security interests are superior to later attorneys' liens. (*See* February 2019 Order 11-12 (collecting cases applying, *inter alia*, Kentucky, Arkansas, Minnesota, Missouri, Virginia, Florida, and Washington law).) This rule should apply equally to a claim for fees under the common fund doctrine which, in Pennsylvania, is rooted in equitable principles similar to those on which charging liens are based. *See, e.g.*, *Appeal of Harris*, 323 Pa. at 130-31, 186 A. at 95;

*Couy*, 402 Pa. Super. at 471, 587 A.2d at 347; *In re Howard*, 465 F. App'x at 156.  The court applies the rule here and concludes that although Cozen is entitled to recover fees under the common fund doctrine, it can do so only after Mayer Brown has enforced its security interest.

This result is somewhat troubling in these circumstances:  Mayer Brown is representing Cardullo, but is being paid by MRNPC, which is Cardullo's adversary vis-à-vis the distribution of the overall settlement fund.  Not all of the equities militate in favor of Cozen, however.  Cozen's client, Needle, reportedly hid his relationship with Mayer Brown from his own lawyers, but there is documentary evidence that Mayer Brown notified Cozen of its security interest in MRNPC's share on September 1, 2017, just three days after Cozen filed its appearance on behalf of MRNPC.  Cozen contends that Mayer Brown did not make clear that it would seek "to be paid before Cozen received its fee" (Cozen Opp. 5-6), but it is not clear what else Mayer Brown could have meant:  in its September 1, 2017 e-mail, Mayer Brown warned that it and Cozen "both seek to be paid from the same source . . . ."  (Mayer Brown September 1, 2017 E-mail, 11:18 a.m.)  Even assuming Cozen was initially unaware that Mayer Brown would seek to be paid first, the court would expect that Cozen would promptly seek and obtain clarity.  Doing so, the court estimates, should have been accomplished in just a few days.  Instead, Cozen spent "many hours" working on MRNPC's case and "pursued resolution with Mayer Brown" until October 10, 2017.  (Cozen Opp. 7-8.)  On that date, Cozen argues, it first discovered that "Mayer Brown was unwilling to compromise," and therefore began the process of withdrawing from the case.  (*Id.* at 8.)

Cozen's commitment to its client may be admirable, but its failure to take appropriate, timely measures to protect itself from the foreseeable impact of Mayer Brown's security interest has consequences.  Additionally, Cozen's argument that the equities weigh in its favor because Mayer Brown has an alternative source of payment—Cardullo—is unpersuasive.  (*See, e.g.*, Cozen Supp. Br. 15-16.)  Namely, Cozen cites no authority for the proposition that Mayer Brown's ability to seek fees from another source is outcome-determinative on the priority of a perfected security interest, of which Mayer Brown promptly notified Cozen.

## III.   Illinois Rules of Professional Conduct

Cozen finally argues that MRNPC's agreement to give Mayer Brown a security interest in its share of the fund violates Illinois Rule of Professional Conduct 5.4(a). (Cozen Opp. 12.) Rule 5.4(a) provides that, with exceptions not applicable here, "[a] lawyer or law firm shall not share legal fees with a nonlawyer." ILL. S. CT. RULES OF PROF. CONDUCT Rule 5.4(a); *see also O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 343, 537 N.E.2d 730, 735, 130 Ill. Dec. 401, 406 (1989) (quoting then-effective version of Rule 5.4(a)); *In re Marriage of Steinberg*, 302 Ill. App. 3d 845, 857, 706 N.E.2d 895, 903, 236 Ill. Dec. 21, 29 (1st Dist. 1998) ("Under Illinois law, agreements to split fees between a lawyer and a nonlawyer are usually against public policy."). Courts "will not enforce a private agreement which is contrary to public policy." *O'Hara*, 127 Ill. 2d at 341, 537 N.E.2d at 734, 130 Ill. Dec. at 405. MRNPC's share of the fund represents its attorneys' fees from the *Amari* litigation. Cozen argues that granting Mayer Brown a security interest in the fees "is equivalent to MRNPC giving Cardullo," a non-lawyer, "money to pay Mayer Brown." (Cozen Opp. 12.) Cozen acknowledges that MRNPC plans to provide money directly to Mayer Brown (rather than to Cardullo) but argues that this technicality does not remove the agreement between MRNPC and Mayer Brown from Rule 5.4(a)'s purview. (*See id.*)

 The court disagrees. The comments to Rule 5.4(a) and relevant case law confirm that the rule—and the policy principles underlying it—do not apply to the agreement between Mayer Brown and MRNPC. Comment One to Rule 5.4(a), for example, explains that the rule is in place "to protect the lawyer's professional independence of judgment." ILL. S. CT. RULES OF PROF. CONDUCT Rule 5.4(a), cmt. 1. Comment Two to Rule 5.4(a) cross-references Rule 1.8(f), which provides that a lawyer can accept compensation from a third party "as long as there is no interference with the lawyer's independence of judgment or with the client-lawyer relationship"; "the client gives informed consent"; and the lawyer protects the client's information as otherwise required by the rules. ILL. S. CT. RULES OF PROF. CONDUCT Rule 1.8(f); ILL. S. CT. RULES OF

PROF. CONDUCT Rule 5.4(a), cmt. 2. Relatedly, in *O'Hara*, the Illinois Supreme Court provided examples of the "harms" that fee-sharing arrangements between attorneys and non-attorneys can cause. *See* 127 Ill. 2d at 342-43, 537 N.E.2d at 734-35, 130 Ill. Dec. at 405-06 (stating that potential harms include (1) the possibility that laypersons will solicit clients and control their cases; (2) increased potential for the "unauthorized practice of law"; and (3) the risk that attorneys will "be tempted to devote less time and attention to the cases of the clients whose fees they must share").

The motivation for MRNPC's agreement to grant a security interest to Mayer Brown remains a mystery; Mayer Brown is effectively being paid by a party whose interests are at least potentially adverse to those of Mayer Brown's own client. But that agreement does not implicate Rule 5.4 concerns. MRNPC earned the relevant fees in the *Amari* litigation, which "was over *before* MRNPC" granted the security interest to Mayer Brown. (Mayer Brown Reply 8.) The agreement, therefore, cannot possibly have impacted MRNPC's "professional independence of judgment" in *Amari*. ILL. S. CT. RULES OF PROF. CONDUCT Rule 5.4(a), cmt. 1. Mayer Brown, for its part, has not agreed to share fees with a non-attorney. So there is no risk, for example, that Mayer Brown will be "tempted" to spend less time on Cardullo's case. *O'Hara*, 127 Ill. 2d at 343, 537 N.E.2d at 735, 130 Ill. Dec. at 406. Indeed, MRNPC granted the security interest to Mayer Brown so that it could continue representing Cardullo, and Cardullo consented to the agreement. (*See* Needle Aff. ¶¶ 9-11; Roin Aff. ¶¶ 4-11.) Finally, although MRNPC is paying Mayer Brown to represent Cardullo, there is no evidence before the court suggesting that MRNPC is "direct[ing]" Mayer Brown's "professional judgment in rendering legal services to" Cardullo. ILL. S. CT. RULES OF PROF. CONDUCT Rule 5.4(a), cmt. 2.

Because the policy concerns underlying Rule 5.4(a) do not apply to the agreement between MRNPC and Mayer Brown, the court concludes that the agreement does not violate Rule 5.4(a). *See Chandra v. Chandra*, 2016 IL App. (1st) 143858 ¶ 27, 53 N.E.3d 186, 197, 403 Ill. Dec. 132, 143 (concerns outlined in *O'Hara* and *In re Marriage of Steinberg* "are completely

inapplicable to the instant cause" because "the division of monies contemplated and executed between the parties here in no way involved the 'sharing' of [the attorney's] fee"); *In re Marriage of Steinberg*, 302 Ill. App. 3d at 857, 706 N.E.2d at 903, 236 Ill. Dec. at 29 (assessing whether "the policy underlying Rule 5.4" was applicable to the agreement); *cf. O'Hara*, 127 Ill. 2d at 342, 537 N.E.2d at 734, 130 Ill. Dec. at 405 ("The type of harm any particular fee-sharing arrangement may produce is dependent to some extent on the purpose of the contract and the other terms in the agreement.").

## CONCLUSION

The court remains puzzled by Attorney Needle's decision to grant a security interest in his fees to the law firm representing Cardullo. But the court concludes that the security interest is enforceable and takes priority over a subsequent lien, as well as over an interest in the fees under Pennsylvania's common fund doctrine. The court therefore grants Mayer Brown's Motion to Enforce its Prior Perfected Lien [963] and denies Cozen's Motion for Payment of Funds from the Court's Registry [961]. Because there was no previous ruling on this motion, the court continues to believe Mayer Brown's pending appeal as to this issue was premature. This order is, however, now final and appealable.

ENTER:

Date: May 20, 2019

_____

REBECCA R. PALLMEYER
United States District Judge